**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

ONEAMERICA VOTES; LATINO COMMUNITY FUND OF WASHINGTON STATE; and UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as U.S. Attorney General; CHARLES NEIL FLOYD, in his official capacity as Acting U.S. Attorney for the Western District of Washington; SIMON PETER SERRANO, in his official capacity as First Assistant U.S. Attorney for the Eastern District of Washington; U.S. DEPARTMENT OF HOMELAND SECURITY; and MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,

Defendants.

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. With ballots already in the hands of Washington voters, the President, the U.S. Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), and their



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

agents have brought to our State a flagrantly unlawful, chilling, eleventh-hour operation purporting to target "noncitizen voters"—most, if not all of whom are likely lawful voters—and election officials who count their ballots pursuant to State law.

2. Defendants' operation is lawless.

3. On October 26, 2026—eight days before Election Day—two federal prosecutors sent Washington's Secretary of State Steve Hobbs a list of roughly 400 registered voters whom federal agencies believe "are or were noncitizens," conceding in the same breath that those voters "may have subsequently naturalized." Ex. A. They demanded that the Washington Secretary of State instruct county election officials not to proceed with signature verification or tabulation of those voters' ballots until their "citizenship can be determined," and gave the Secretary 48 hours to comply. *Id.* at 2. And they made clear that they will not stop at these 400 voters, warning that before Election Day they plan to send the State additional names.

4. The same day, federal prosecutors and a DHS official held a press conference warning that anyone who "assists" a noncitizen in voting—including the election officials who process ballots—could be prosecuted as an aider and abettor. Ex. B at 8. Three days later, the Acting Deputy Attorney General sent the Secretary a letter reminding him that mishandling the ballots and envelopes election officials process is a federal crime punishable by imprisonment. Ex. C.

5. Washington has not been Defendants' sole target. A similar pattern recently unfolded in California, where DOJ delivered a list of more than 20,000 registered voters the federal government "believes are likely noncitizens" on a thumb drive, and demanded





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

(among other things) that California officials review the list within 48 hours and set aside the ballots of voters on it—threatening criminal exposure for noncooperation.

6. After DOJ sued in the Central District of California to enforce that demand, a federal district court minced no words in rejecting it. Holding DOJ lacked any legal grounds for its actions, the court admonished: "these threats must stop." *United States v. California*, No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428, at *4 (C.D. Cal. Oct. 28, 2026) (Carter, J.) ("*California II*"); *see also United States v. California*, No. 26-7231, slip op. (9th Cir. Oct. 30, 2026) (per curiam) ("*California III*") (agreeing DOJ's demand is baseless, denying injunction pending appeal).

7. In Washington, Defendants now attempt the same attack on voters and election officials, but by a different route, hoping to bypass the scrutiny of the judiciary and instead coerce local election administrators to abide by their demands. To this end, Defendants have stated that election officials are now "on notice," that their goal is to "make sure these ballots aren't counted," and "if ultimately we have to send 39 letters to 39 auditors over the next couple of days, we can do that," even though doing so puts election officials "in a pickle" by forcing them to choose to either "comply with state law," or comply with Defendants' baseless "federal" demands under threat of "federal penalties." Ex. D at 2; Ex. E at 2–3.

8. Defendants' list is not evidence of anything, and their deeply chilling threats of federal penalty for election officials and others who fail to conform to their demands are baseless. By their own account, their list was assembled by trying to match federal immigration records against publicly available voter lists that lack the identifying information needed to know whether the person in one database is the same person as in the other. *See* Ex. A.

9. And, indeed, the sloppiness of Defendants' work is evident in many ways on its face. DOJ's October 26 letter misstated the date of election day (which is November 3, 2026) as "November 2, 2026." Ex. A at 2. More concerningly, Secretary Hobbs found after a preliminary analysis of Defendants' list that, contrary to DOJ's characterizations, the list contained many United States citizens as well as "a significant number of people" not registered to vote or on inactive status. Ex. F at 2.

10. The federal officials seeking to set aside ballots on the basis of their lists acknowledged that they "don't know everything the state knows"; that whether the people on the list actually filled out the ballots attributed to them, or whether "someone else register[ed] them," are "questions that we still have to answer"; and that "many of them are telling us, 'Yeah, I never filled out a ballot.'" Ex. B at 4. On information and belief, no one on the list has been charged with any crime. *See id.* The same process, when tested in California, produced a list on which more than a quarter of sampled records reflected a U.S. birthplace. In Nevada, DHS's claim of nearly 16,000 noncitizen registrants collapsed to 185, and then to none.

11. Federal law gives DOJ and DHS no authority whatsoever to do any of this. The Constitution commits the administration of elections—including the "registration," "protection of voters," and "counting of votes"—to the States, subject only to Congress's power to make or alter those rules. *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see* U.S. Const. art. I, § 4, cl. 1. The President and the agencies he directs have no role in that structure except as Congress has provided, and Congress has not authorized their conduct.

12. The statute Defendants have repeatedly invoked, 18 U.S.C. § 611, is a criminal prohibition on voting by noncitizens. It authorizes prosecution of individuals who violate it, through the criminal process and its protections. It does not authorize federal officials to tell



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

States whose ballots to verify and count, or to threaten the officials who count them. Nor, as a Ninth Circuit panel held earlier today, can it displace state election law that governs when and how voters can be challenged on eligibility grounds. *See California III*, No. 26-7231, slip op. at 10–14. Yet Defendants are broadcasting to the entire State that voters and election officials are "on notice" that federal officials are coming after them—threats the federal government has been making since July, when the DHS Secretary stated at a press conference that officials the government believes facilitate noncitizen voting could face "prison time." Ex. B; Doina Chiacu & A.J. Vicens, *DHS Threatens States with Fines, Charges Over Election Measures*, Reuters (July 17, 2026), https://www.reuters.com/legal/government/us-dhs-chief-asks-four-states-check-voter-rolls-non-citizens-2026-07-17/.

13. The Court cannot let Defendants' lawless "noncitizen voter" operation (the "Washington Ballot Operation") continue. It is already causing irreparable harm. It is plainly designed to coerce Washington's election officials into abandoning the procedures that state and federal law require, and it chills eligible voters—above all, naturalized citizens, the voters most likely to be misidentified by federal records—from exercising their right to vote.

14. As a result, it violates Section 11(b) of the Voting Rights Act, which forbids anyone, "whether acting under color of law or otherwise," from intimidating, threatening, or coercing voters or those who aid them. 52 U.S.C. § 10307(b). It exceeds Defendants' statutory and constitutional authority, commandeers state officials in violation of the Tenth Amendment, and is arbitrary and capricious and contrary to law under the Administrative Procedure Act ("APA").

15. Plaintiffs OneAmerica Votes, Latino Community Fund of Washington State ("LCF"), and the United Food and Commercial Workers International Union ("UCFW") are





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

Washington civic organizations and a labor union that, among other things, register, educate, and turn out voters in Washington, and whose members include immigrant, refugee, and Latino communities, including many naturalized citizens. In the final days of the election, Defendants' actions are undoing Plaintiffs' work, deterring the voters they serve, and forcing them to divert scarce resources to protect their members and other voters.

16. Plaintiffs seek declaratory and injunctive relief to stop Defendants from directing or coercing Washington election officials to withhold, segregate, decline to verify, or decline to count the ballots of registered voters.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4) because this action arises under the Constitution and laws of the United States and seeks relief under an Act of Congress providing for the protection of the right to vote. The Court may grant declaratory and further relief under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. §§ 705 and 706.

18. The United States has waived sovereign immunity for this action, which seeks relief other than money damages against federal agencies and officers acting in their official capacities. *See* 5 U.S.C. § 702.

19. Venue is proper under 28 U.S.C. § 1391(e)(1). Defendants are agencies of the United States and officers of the United States sued in their official capacities; at least some Plaintiffs and their members reside in this District; and a substantial part of the events giving rise to Plaintiffs' claims occurred here, including the transmission of Defendants' October 26, 2026 demand to Washington's Secretary of State, in Olympia, as well as Defendants' press conference announcing that demand, in Seattle.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

20. Assignment to the Seattle Division is appropriate under Local Civil Rule 3(e) because at least some Plaintiffs are either headquartered or have substantial membership in King County and a substantial part of the events giving rise to their claims occurred there, including but not limited to the press conferencing announcing the October 26, 2026 demand.

**PARTIES**

21. Plaintiff OneAmerica Votes is a nonprofit organizing, civic engagement, and advocacy organization headquartered in Seattle, Washington. Along with its sister organization OneAmerica, it is one of the largest immigrant-serving civic organizations in Washington. OneAmerica Votes advances justice and democracy by building power in immigrant and refugee communities, including by registering voters, educating them about their rights, and helping them cast ballots that count. OneAmerica has hundreds of members and a broader constituency of more than 25,000 individuals across Washington, including immigrants, refugees, individuals in the naturalization process, naturalized citizens, and the children of immigrants. A core part of its work is helping naturalized citizens register and vote. OneAmerica Votes is in the final days of its get-out-the-vote program for the November 2026 general election and plans to contact approximately 11,000 voters before Election Day. OneAmerica Votes' members include registered Washington voters who are naturalized citizens and who have voted or intend to vote in this election. As detailed below, they are being chilled by Defendants' Washington Ballot Operation. OneAmerica Votes sues on its own behalf and on behalf of its members.

22. Plaintiff Latino Community Fund of Washington State ("LCF") is a Washington-based nonprofit civic engagement organization headquartered in Seattle. Its mission is to build power within Latino, immigrant, and allied communities, including through

civic participation, voter registration, voter education, and get-out-the-vote campaigns. LCF serves individuals primarily in Yakima, Snohomish, Pierce, Franklin, and King Counties, including many naturalized citizens. LCF has a long history of protecting Latino voters in Washington, including by challenging the State's former signature-matching regime which it alleged disproportionately disenfranchised Latino voters. LCF has already contacted more than 15,000 voters to encourage and facilitate turning them out to vote in this election and intends to contact thousands more before Election Day. LCF sues on its own behalf and on behalf of its members and constituents.

23. Plaintiff United Food and Commercial Workers International Union ("UFCW") is a labor union made up of approximately 1.2 million men and women throughout the United States and Canada, including grocery workers, meatpacking, food processing and beverage production workers, retail workers, healthcare workers, chemical workers, distillery, wine and allied workers, pharmacy workers and booksellers. UFCW has more than 60,000 members across Washington State. UFCW membership also includes many naturalized U.S. citizens. UFCW works to encourage and help its members participate in the political process through voting, and so voter-registration, voter-education, voter-assistance, and get-out-the-vote ("GOTV") programs are critical to its mission. UFCW has organized and is now in the final weeks of its GOTV and voter-education efforts for the November 2026 general election, including person-to-person canvassing, messaging campaigns, and efforts to help its members and voters in its communities return their mail ballots and ensure their votes are counted. UFCW sues on its own behalf and on behalf of its members.

24. Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

25. Defendant U.S. Department of Justice is an executive department of the United States headquartered in Washington, D.C., and an “agency” within the meaning of 5 U.S.C. § 551(1).

26. Defendant Todd Blanche is the Attorney General of the United States. He heads DOJ, including its Civil Rights Division and the United States Attorneys’ Offices, and is sued in his official capacity.

27. Defendant Charles Neil Floyd is the Acting United States Attorney for the Western District of Washington. He signed and announced Defendants’ October 26, 2026 demand to Washington’s Secretary of State and is sued in his official capacity.

28. Defendant Simon Peter Serrano is the First Assistant United States for the Eastern District of Washington. He co-signed and announced Defendants’ October 26, 2026 demand and is sued in his official capacity.

29. Defendant U.S. Department of Homeland Security is an executive department of the United States headquartered in Washington, D.C., and an “agency” within the meaning of 5 U.S.C. § 551(1). DHS includes U.S. Citizenship and Immigration Services (“USCIS”) and Homeland Security Investigations (“HSI”), which generated lists of voters at the center of Defendants’ demand.

30. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

## LEGAL BACKGROUND

### I. Federal law invests States with authority and responsibility to conduct federal elections.

31. The Elections Clause "invests the States with responsibility for the mechanics of congressional elections," subject only to Congress's power to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); U.S. Const. art. I, § 4, cl. 1. Absent congressional action, the States are responsible for providing "a complete code for congressional elections," including "registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley*, 285 U.S. at 366.

32. Congress's power under the Elections Clause extends to "*how* federal elections are held, but not *who* may vote in them." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 (2013). And even when Congress acts, federal law supersedes state election procedures only "so far as it is exercised, and no farther." *Id.* at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).

33. The Executive Branch has no freestanding constitutional authority over the administration of elections. Its role is limited to what Congress has authorized. *See FEC v. Cruz*, 596 U.S. 289, 301 (2022) (an agency "literally has no power to act . . . unless and until Congress authorizes it to do so by statute" (citation omitted)).

34. Meanwhile, Congress has given federal agencies narrow and specific roles in election administration. The National Voter Registration Act ("NVRA") charges the States—not the federal government—with administering voter registration for federal elections and maintaining voter rolls. 52 U.S.C. § 20507(a). It requires that any program to ensure the





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

accuracy of the rolls be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act," *id.* § 20507(b)(1), and forbids any program "the purpose of which is to systematically remove the names of ineligible voters" within 90 days of a federal election, *id.* § 20507(c)(2)(A). The 90-day provision applies to programs targeting suspected noncitizens, and a program built on database matching to find non-citizens is inherently "systematic." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 715–17 (9th Cir. 2025); *see also California III*, No. 26-7231, slip op. at 15.[1]

35. The Help America Vote Act ("HAVA") likewise requires each State to maintain a computerized statewide voter registration list that is "defined, maintained, and administered at the State level," 52 U.S.C. § 21083(a)(1)(A), and leaves the "specific choices on the methods of complying" with HAVA to "the discretion of the State," *id.* § 21085.

36. Congress authorized the Attorney General to enforce the NVRA and HAVA through civil actions. 52 U.S.C. §§ 20510(a), 21111. Neither statute authorizes federal officials to identify voters they suspect are ineligible and direct States to set aside those voters' ballots.

37. Federal law also makes it a crime for a noncitizen to vote in a federal election, 18 U.S.C. § 611, and to falsely claim citizenship to register, *id.* § 1015(f). Those statutes are enforced through criminal prosecution of individuals, with the protections of criminal process. Section 611 includes an express exception for certain individuals who reasonably believed they

---

[1] The Supreme Court stayed an aspect of *Mi Familia Vota* not at issue here. *See RNC v. Mi Familia Vota*, 145 S. Ct. 108 (Aug. 22, 2024). It later granted *certiorari* on that unrelated aspect of the decision, and on the 90-day provision issue, with argument scheduled in December. *See RNC v. Mi Familia Vota*, 146 S. Ct. 2799 (June 29, 2026). *Mi Familia Vota* is controlling precedent in this Circuit.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

were citizens. *Id.* § 611(c)(3). Nothing in these criminal statutes authorizes DOJ or DHS to direct election officials to withhold, set aside, or refuse to count ballots.

38. Section 11(b) of the Voting Rights Act prohibits any person, "whether acting under color of law or otherwise," from intimidating, threatening, or coercing, or attempting to intimidate, threaten, or coerce, "any person for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b).

## II. Washington conducts its elections by mail, under careful procedures prescribed by state law.

39. Washington conducts all elections by mail. Every registered voter is mailed a ballot, and county auditors must mail ballots for a general election at least 18 days before Election Day. RCW 29A.40.010, .070. For the November 3, 2026 election, ballots were mailed to registered voters no later than October 16, 2026.

40. To register, every Washington voter must attest under penalty of perjury that he or she is a U.S. citizen. RCW 29A.08.230. Washington law independently limits voting to citizens, Wash. Const. art. VI, § 1, and makes it a crime for an unqualified person to vote, RCW 29A.84.660.

41. Washington law prescribes how returned ballots are processed. County officials verify the signature on each returned ballot envelope against the voter's registration record, notify voters of signature problems and give them an opportunity to cure, and tabulate ballots of voters whose signatures are verified. RCW 29A.40.110; RCW 29A.60.165. County canvassing boards must certify the results of the general election within 21 days. RCW 29A.60.190.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

42. Washington law also prescribes the exclusive procedures for challenging a registered voter's eligibility, including a sworn challenge based on the challenger's personal knowledge and notice and an opportunity for the voter to respond. *See* RCW 29A.08.810–.850. Nothing in Washington law authorizes election officials to refuse to verify or count a registered voter's ballot because a federal agency has placed the voter on a list.

## FACTUAL ALLEGATIONS

### I. Defendants have pursued a sustained campaign to seize control of election administration, but courts have rejected it at every turn.

43. Since returning to office, President Trump has repeatedly claimed, without evidence, that noncitizens vote in large numbers and has called for the federal government to "nationalize" voting. Miles Parks, *Trump Says He Wants Republicans to 'Nationalize' Elections*, NPR (Feb. 3, 2026), https://www.npr.org/2026/02/03/nx-s1-5698095/trump-says-he-wants-republicans-to-nationalize-elections. Congress has declined to enact his preferred legislation, including the SAVE America Act.

44. So the President has taken to executive action to try to insert the federal government in state election administration. In March 2025, he issued Executive Order 14,248, which, among other things, directed the Attorney General to "prioritize enforcement" of federal election laws against States that declined to share voter data with the federal government. Courts enjoined much of that Order as beyond the President's authority. *See, e.g.*, *Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026); *League of United Latin Am. Citizens v. Exec. Off. of the President ("LULAC III")*, 818 F. Supp. 3d 34 (D.D.C. 2026).

45. In March 2026, the President issued Executive Order 14,399, which directed the Attorney General to "prioritize the investigation and, as appropriate, the prosecution of State





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." Exec. Order No. 14,399, § 2(b), 91 Fed. Reg. 17,125, 17,126 (Mar. 31, 2026).

46. Throughout 2025 and 2026, in an effort that DOJ has itself tied to the President's Executive Orders, DOJ demanded unredacted statewide voter registration lists—including driver's license and partial Social Security numbers—from nearly every State, with the intention of running them through DHS's Systematic Alien Verification for Entitlements ("SAVE") system and pressing States to remove voters flagged as potentially ineligible. *Common Cause v. U.S. Dep't of Just.*, No. 1:26-cv-1352, 2026 WL 3033772, at *4–6 (D.D.C. Oct. 9, 2026).

47. Washington was among dozens of states that declined to hand over their voters' sensitive data to the federal government, and DOJ sued. Judge Evanson recently dismissed DOJ's suit in this District. *United States v. Hobbs*, No. 3:25-cv-6078-KKE, 2026 WL 2833713 (W.D. Wash. Sep. 22, 2026). Every other federal court to resolve DOJ's similar suits against other States has dismissed them, too. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026); *United States v. Henderson*, No. 2:26-cv-00166-DBB-DAO, 2026 WL 3181405, at *4 n.50 (D. Utah Oct. 23, 2026) (collecting remaining cases).

48. Recently, on October 9, 2026, a federal court vacated the policy under which DOJ had pursued that data, holding, among other things, that DOJ had failed to consider the risk that its use of citizenship records known to be unreliable would lead it to demand that States remove U.S. citizens from their voter rolls. *Common Cause*, 2026 WL 3033772, at *1, *8.

49. As that court and others have recognized, federal citizenship data, in SAVE and elsewhere, is notoriously unreliable for naturalized citizens. The Social Security Administration and other federal agencies frequently fail to update their records when a person naturalizes, so naturalized citizens often appear in federal databases as noncitizens. *See League of Women Voters v. DHS*, 835 F. Supp. 3d 79, 102 (D.D.C. 2026), *stay granted on other grounds*, No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026); *Mi Familia Vota*, 129 F.4th at 714. When state and local election officials have scrutinized federal lists of supposed noncitizens, they have found that the lists have been riddled with errors.

50. That these lists are patently unreliable appears to be the result of the deeply suspect and unreliable process by which they were made. A federal whistleblower has described how DHS generated lists of supposed noncitizen voters. According to the whistleblower, officers assigned to DHS's "Unlawful Voter Initiative" received less than two hours of training, were assigned quotas of reviewing 40 records a day, worked from data that likely included naturalized citizens, and were told that the lists were compiled with what officials described as "supplemental magic," and were directed to search state voter lookup systems using individuals' personal information. *See* Letter from Anonymous Whistleblower to Alex Padilla, U.S. Senator at 30, 39–40 (Sep. 8, 2026), available at https://perma.cc/J3D3-GLDF.

51. DHS has also surged armed agents into communities to question residents about their voter registration and eligibility. On information and belief, DHS guidance issued on or about September 1, 2026, directed HSI to conduct field operations, including face-to-face interrogations, in at least nine States, including Washington. A federal court has since enjoined those operations. *See Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *10–11 (N.D. Cal. Oct. 21, 2026).

**II. Defendants threaten election officials with prosecution based on unreliable lists of supposed noncitizen voters.**

52. On July 7, 2026, DOJ's Civil Rights Division sent letters to election officials in every State, including Washington, warning that any election official, "including the chief election officer of the state," who "knowingly retains noncitizens" on the voter rolls or "facilitates noncitizens in receiving and casting ballots" could be criminally prosecuted. Ex. G at 2.

53. On July 16, 2026, DHS sent letters to the chief election officials of California, Nevada, New Jersey, and Pennsylvania claiming that "preliminary reviews" of publicly available voter data had identified thousands to hundreds of thousands of possible noncitizens on their rolls. Press Release, DHS, *DHS Secretary Markwayne Mullin Sends Letters to Secretaries of State Warning About Non-Citizens on Voter Rolls* (July 16, 2026), https://www.dhs.gov/news/2026/07/17/dhs-secretary-markwayne-mullin-sends-letters-secretaries-state-warning-about-non.

54. The letters did not disclose DHS's methodology or data sources. The next day, Secretary Mullin publicly warned that election officials who failed to act on DHS's findings could face fines, penalties, and "even . . . prison time." Doina Chiacu & A.J. Vicens, *DHS Threatens States with Fines, Charges Over Election Measures*, Reuters (July 17, 2026), https://www.reuters.com/legal/government/us-dhs-chief-asks-four-states-check-voter-rolls-non-citizens-2026-07-17/.

55. Those claims collapsed when tested by election officials. In Nevada, DHS claimed it had found nearly 16,000 possible noncitizen registrants, then narrowed its claim to 185 individuals it said it had confirmed were noncitizens. Nevada's review indicated that all





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

185 were citizens, and DHS offered nothing to the contrary. In Pennsylvania, DHS officials acknowledged that they lacked high confidence in their claim that more than 14,500 registrants were noncitizens. Ex. H at 1.

56. On July 16, 2026, Secretary Hobbs responded to the federal government's July 7 letter. He noted that the letter did not identify any specific concerns about Washington's practices and asked for the factual basis and legal authority for any federal recommendations. Ex. I at 2. On information and belief, Defendants did not provide that information.

57. On October 13, 2026—after California had mailed ballots to every registered voter—DOJ sent California's Secretary of State and the Los Angeles County Registrar a list of more than 20,000 registered voters whom it asserted the federal government "believes are likely noncitizens," delivered on a thumb drive. DOJ demanded that California review the list within 48 hours; segregate the ballots of listed voters whose citizenship it could not independently confirm; and, for ballots already returned, "not verify the signature and/or tabulate the ballot until citizenship can be determined." DOJ threatened to seek emergency relief if California did not comply. Ex. J at 2.

58. California refused, explaining that DOJ had provided no information about its data or methodology and that its demands were contrary to federal and state law. DOJ sued California, its Secretary of State, and the Los Angeles County Registrar on October 15, 2026, asserting a novel claim that Section 611 preempted California's counting of the listed voters' ballots. *See United States v. California*, No. 2:26-cv-12025 (C.D. Cal. filed Oct. 15, 2026).

59. Immediately, serious and significant problems with and errors in DOJ's list began to come to light. Los Angeles County reviewed a sample of the listed voters with Los Angeles addresses and found that more than a quarter of the sampled entries listed a place of

birth in the United States, and that more than 40% concerned registrations that had already been cancelled. Opp'n to Ex Parte Appl. for TRO at 17, *California*, No. 2:26-cv-12025 (C.D. Cal. Oct. 20, 2026), ECF No. 32-1. In a separate sample, nearly 39% of records with meaningful birthplace information reflected birth in the United States. *See United States v. California*, No. 26-7070, 2026 WL 3212945, at *13 n.4 (9th Cir. Oct. 26, 2026) (Bennett, J., concurring) ("*California I*").

60. Defendants escalated their threats while that litigation was pending. On October 16, 2026, Bill Essayli, who purports to lead the U.S. Attorney's Office for the Central District of California, warned that election officials who refused DOJ's demands faced significant legal consequences for "knowingly" facilitating noncitizen voting. @USAttyEssayli, X (Oct. 16, 2026), https://perma.cc/8NBN-3SJQ. The President reposted the warning, declaring of California's officials: "They will all go to jail for a long period of time!!!" Jasper Ward, *Trump Threatens California Officials with Imprisonment over Stance on Mail Ballots*, Reuters (Oct. 16, 2026), https://perma.cc/44RT-JDV4. During the same period, DOJ opened a criminal investigation into dozens of county election officials and issued federal grand jury subpoenas.

61. Before the district court issued any ruling in their case, DOJ sought an injunction from the Ninth Circuit, premised on a purported "constructive denial" of their request to immediately sequester and prevent the counting of ballots for any person on its list. *See California I*, 2026 WL 3212945. On October 26, 2026, the Ninth Circuit dismissed DOJ's appeal, finding that it lacked jurisdiction and that the emergency DOJ asserted was "at least in part . . . a self-constructed one." *Id.* at *6. Both judges in the majority wrote separately to explain that DOJ's claim would fail on the merits in any event: Section 611 regulates individual voters,

not state election administration; Congress limited the Executive's role in voter-list matters to civil enforcement of the NVRA and HAVA; DOJ's demand likely conflicted with the NVRA's 90-day bar; and the relief DOJ sought would alter the rules of an election already underway. *Id.* at *7–16 (Bennett, J., concurring), *id.* at *16–20 (Sanchez, J., concurring).

62. On October 27, 2026, the district court held a two-hour hearing on DOJ's request for preliminary relief and the following day, October 28, it denied DOJ's motion. *California II*, 2026 WL 3252428. Noting that the government had reiterated in open court its threat that state and county officials who did not comply with its letters risked federal aiding-and-abetting charges under 18 U.S.C. § 2, the court admonished: "these threats must stop." *California II*, 2026 WL 3252428, at *4. DOJ immediately sought an injunction pending appeal, and today the Ninth Circuit denied that request, finding that DOJ had failed to make a showing that it was appropriate, rejecting DOJ's claim on the merits, and noting that the request also came far too late in the election cycle. *California III*, No. 26-7231, slip. op. at 8–21. Both the district court and the Ninth Circuit further recognized that DOJ's eleventh-hour demands threaten to disenfranchise lawfully registered citizens—and especially recently naturalized citizens. *See California II*, 2026 WL 3252428, at *14; *California III*, No. 26-7231, slip. op. at 17.

63. The threats did not stop, and they have not stopped. The next day, October 29, 2026, it was reported that DOJ had directed federal prosecutors to pursue criminal subpoenas of state and local election officials in California for allegedly facilitating unlawful votes. Ben Penn, *DOJ Orders Criminal Probes of California Officials on Voting*, Bloomberg L. (Oct. 29, 2026), https://news.bloomberglaw.com/us-law-week/doj-orders-criminal-probes-of-california-officials-over-ballots.

### III. Defendants bring their operation to Washington.

#### A. Defendants announce their demand, threatening alleged noncitizen voters and election officials.

64. On October 26, 2026—the same day the Ninth Circuit dismissed DOJ's California appeal, and eight days before Election Day—Defendants sent Secretary Hobbs a letter (the "October 26 Demand") identifying approximately 405 registered Washington voters whom federal agencies believe "are or were noncitizens (i.e., they may have subsequently naturalized)," and who had been sent a vote-by-mail ballot for the general election. Ex. A.

65. The October 26 Demand directed Secretary Hobbs to instruct Washington's election officials "to not verify the signature and/or tabulate the ballot" of any listed voter "until citizenship can be determined." *Id.* at 2. It gave the Secretary 48 hours to comply and warned that, if he did not, DOJ "will have no choice but to seek emergency relief." *Id.* The October 26 Demand also warned that Defendants would refer matters to state prosecutors and stated that Defendants expect to send Washington additional names before Election Day. *See id.*

66. The same afternoon, Defendants and the acting special agent in charge of HSI for the Pacific Northwest, held a press conference to announce the October 26 Demand. A transcript is attached as Exhibit B.

67. At the press conference, Defendant Floyd told the public that "[k]nowingly assisting those who are voting illegally is a crime," and that federal prosecutors "will criminally prosecute those who vote illegally and those who assist others in voting illegally." Ex. B at 2. He declared that "[n]ow that the state is on notice, it is incumbent upon state officials to make sure they are counting only legal votes." *Id.* at 1.

68. Asked whether county election officials could face charges if they processed the ballots of voters on the list, Defendant Floyd answered that anyone who "assists someone in voting illegally would be also guilty of that crime under the aiding abetting theory," and that "if you conspire, if you aid and abet someone else in committing a crime, then you could be guilty of a crime as well." *Id.* at 8.

69. Defendant Floyd also addressed voters directly: "If you are not a citizen of the United States and you register to vote or you vote illegally, we will find you." *Id.* at 2.

70. Defendant Floyd described the list as a "test to see if [the State is] checking." *Id.* at 8. Asked what would happen if Washington did not comply, he said that "we sit back and watch," that Defendants would "continue to provide them notice of those individuals that are non-citizens." *Id.* at 5. He acknowledged that the timing was late: "It would have been nice if we'd have done it before many of the ballots had already been sent out." *Id.* at 3.

71. Secretary Hobbs responded to the October 26 Demand on October 28. *See* Ex. F. He noted "several glaring deficiencies" in DOJ's list of supposed citizen voters, including that DOJ provided "no information about how the information was collected or what sources were used" and lacked necessary information to identify individuals on the list, making it "difficult—if not impossible—to confirm whether an entry on the list matche[s] a voter registration." *Id.* at 1–2. Secretary Hobbs then explained that even for those individuals his office was able to identify, DOJ's list of supposed noncitizen voters contained many United States citizens as well as "a significant number of people" not registered to vote or on inactive status. *Id.* at 2 He concluded that "it would likely be unlawful to decline to count ballots simply because a person's name appears on the unverified list." *Id.*



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

72. Defendants nonetheless doubled down on their intimidation. On October 29, 2026, the day after Judge Carter in California admonished Defendants that their threats against election officials "must stop," Acting Deputy Attorney General R. Trent McCotter sent Secretary Hobbs a letter titled "Obligations Under 52 U.S.C. § 20701." Ex. C. The same official signed DOJ's October 13 demand to California.

73. The letter recited a series of close elections. It then reminded the Secretary that federal law requires election officials to preserve, for 22 months, records "requisite to voting." *Id.* at 1. The letter asserted that those records include "envelopes containing a completed ballot" and "the ballot itself whether mailed, placed in a drop box, or submitted in person." *Id.* It also asserted that the obligation extends to "each county or local election official charged with administering a federal election" in Washington. *Id.*

74. The letter then warned that "[i]t is a crime to willfully fail to comply with Section 20701," punishable "by up to a year in prison and a $1,000 fine," and that it is "also unlawful to willfully steal, destroy, conceal, mutilate, or alter these records." *Id.* at 2.

75. The letter identified no reason to believe that Washington or any county had failed, or would fail, to preserve election records. It came days before Election Day and three days after Defendants demanded that Washington set aside the listed voters' ballots. It also came while Defendants were publicly warning that election officials who process those ballots could be prosecuted as aiders and abettors. In that context, the letter served to remind Washington's election officials that they face federal criminal exposure in connection with the ballots they handle if they do not do Defendants' bidding.

76. Defendants have also made clear that the purpose of their demands has been to create criminal exposure. The day the Demand was sent, Defendant Floyd told a Seattle radio





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

audience: "Now that we've put them [the State] on notice, it raises the bar a little bit because it is a violation of 18 USC 611 to vote illegally when you're not a citizen, and if someone were to cooperate or aid and abet, or to assist someone in voting illegally, then they could be guilty of a crime as well." Ex. D at 3.

77. Asked about his next steps, Defendant Serrano stated: "I think we're gonna continually demand that these are segregated. We want to make sure these ballots aren't counted, and if ultimately we have to send 39 letters to 39 auditors over the next couple of days, we can do that." Ex. E at 2– 3. He acknowledged that doing so would put the auditors "in a pickle," forcing them to choose: "Do we comply with the federal subpoena, or do we comply with state law?" He added a suggestion that because "DOJ [is] demanding information from them," a failure to respond to such demands could "subject [them] to federal penalties." *Id.* at 2.

**B. Defendants admit their data is unreliable.**

78. Federal officials' own description of how they built the list shows that it is not a reliable basis for determining that any registered voter is ineligible.

79. Federal agents did not start from Washington's voter rolls. By Defendant Floyd's account, they began with what he called "a very tiny population of people that we have made contact with recently"—people who applied to USCIS for immigration benefits, people interviewed while crossing the border, and people arrested and detained—and then tried to find those individuals on Washington's rolls, including by entering names and dates of birth into the State's public voter lookup website. Ex. B at 5, 7. Defendants explained that, because the list begins with people known to federal immigration authorities, it could easily sweep in naturalized citizens.

80. Asked what other voter lists federal agents had used, Defendant Floyd responded that "a lot of that stuff is publicly available and I don't know, and if I did, I wouldn't tell you the exact list that we're looking at." *Id.* at 5.

81. Defendant Floyd acknowledged that the public voter data lacks Social Security numbers and other identifying information, making it difficult to "marry those two lists" because "there might be a lot of John Does." *Id.* at 4.

82. Defendant Floyd conceded that federal investigators "don't know everything the state knows"; that whether the people on the list "are the ones that filled out the ballot," and whether "someone else register[ed] them," are "questions that we still have to answer"; and that "many of them are telling us, 'Yeah, I never filled out a ballot.'" *Id*. Defendants have charged no one on the list with any crime. *Id.*

83. The October 26 Demand itself concedes that listed voters "may have subsequently naturalized." Ex. A. The votes Defendants attribute to listed individuals span "[d]ecades" of prior elections, and Defendants describe many listed individuals as lawful permanent residents, *id.* at 6—precisely the population most likely to have naturalized in the interim. Washington's Secretary of State noted that at least one record on the list dated from 1994, *see* Ex. E.

84. Washington voters, including Plaintiffs' members and the voters they serve, have no way to learn whether they have been flagged, and no process through which to contest that designation.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

## IV. Defendants' actions are already inflicting irreparable harm on Plaintiffs and the public.

85. Defendants' actions directly impair Plaintiffs' members' ability to exercise their fundamental rights, and further impair Plaintiffs' core activities. Central to each Plaintiff's work is helping voters register, vote, and ensure those votes are counted; for OneAmerica Votes and LCF, those voters are primarily in immigrant, refugee, and Latino communities and include many naturalized citizens. All Plaintiffs' work includes educating voters about their rights, and helping them cast ballots that count. Defendants' actions strike at that work in the final days of the election.

86. Defendants' actions threaten to disenfranchise eligible voters whom Plaintiffs have registered and encouraged to vote, including Plaintiffs' members. Naturalized citizens are the voters most likely to be misidentified as noncitizens by federal records, and they are the population from which Defendants' list was drawn. If Washington officials capitulate to Defendants' demands, voters' ballots will be set aside, and many will never be counted: voters will not know their ballots were flagged, and few will be able to prove their citizenship to federal officials in time because there is no existing process for them to do so. Plaintiffs' work registering and turning out those voters would be undone.

87. Defendants' actions also deter eligible voters from participating. Naturalized citizens in the communities Plaintiffs serve already fear that registering and voting will expose them and their families to unwarranted government scrutiny or retaliation. Defendants' secret list, their public threats that federal agents "will find you," and their threats against the officials who count ballots confirm those fears. Some eligible voters will conclude that voting is not worth the risk of being misidentified and investigated; others will conclude that their ballots

may never be counted so is not worth the risk or effort. Each such voter is a voter Plaintiffs have worked to bring into the electorate and cannot now turn out.

88. Defendants' actions force Plaintiffs to divert resources from their planned get-out-the-vote work at the most critical moment of the election cycle. Plaintiffs will have to now divert time and resources to field questions from worried community members, create and distribute new materials, retrain staff and volunteers, and develop programs to help voters learn whether their ballots have been counted and gather documents to prove their citizenship if their ballots are set aside. Every hour spent responding to Defendants' actions impacts the Plaintiffs' abilities to help Washingtonians exercise their fundamental right to vote. That lost time and capacity cannot be recovered, and if eligible voters' ballots are set aside or go uncounted, that harm cannot be undone after the election.

89. Defendants' threats against election officials also threaten the orderly administration of the election in which Plaintiffs' members vote. Election officials must now process and canvass ballots under the threat of federal prosecution for following state law.

90. Plaintiffs' injuries are caused by Defendants' actions and would be redressed by the relief Plaintiffs seek.

## CLAIMS FOR RELIEF

### COUNT I: *ULTRA VIRES* EXECUTIVE ACTION
### U.S. Const. art. I, § 4, cl. 1 (Elections Clause)

91. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

92. "The Framers created a Federal Government of limited powers, and assigned to [federal courts] the duty of enforcing those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 588 (2012). A federal agency "literally has no power to act . . . unless

and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301. And where Congress authorizes a "lawful means" for an agency to pursue its "policy aims," the tools it provides are exhaustive: Agencies may not "'improvise on the powers granted by Congress' by devising an extralegal path" to their chosen ends. *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 368 n.* (2018) (quoting *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 330 (1961)).

93. It has been axiomatic since the Founding that the Constitution "submit[s] the regulation of elections for the federal government, in the first instance, to the local administrations." The Federalist No. 59 (Alexander Hamilton). To that end, the Constitution "invests the States with responsibility for the mechanics of congressional elections," *Foster*, 522 U.S. at 69 (citing U.S. Const. art. I, § 4, cl. 1); *see also* U.S. Const. art. II, § 1, cl. 2. States thus have expansive authority to regulate "registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (quoting *Smiley*, 285 U.S. at 366).

94. The Constitution gives Congress preemptive power over the "Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. It is only "the action of Congress," not the executive, that may "supersede[]" contrary state law. *Ex parte Siebold*, 100 U.S. at 384 (emphasis added). Even then, "Congress's power to regulate elections 'supersede[s]' state law 'so far as it is exercised, and no farther.'" *Watson v. RNC*, 609 U.S. 672, 697 (2026) (alteration in original) (quoting *Ex parte Siebold*, 100 U.S. at 392).

95. The Executive Branch's constitutional and statutory authority over elections is purposefully limited. "Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

administration of federal elections." *Washington*, 814 F. Supp. 3d at 1214 n.57. The "Constitution does not spell out a role for the President in the operation of state voting procedures in federal elections." *State. v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023). The Executive Branch lacks any "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections," and it thus has "no authority" to "interfere[] with state election procedures based solely on the federal executive's own initiative." *Id.* at 1347. Instead, executive officers may only act "in relation to another branch's constitutionally authorized act." *Id.*

96. "Constitutional ultra vires claims" are available where "the executive exceed[s] its powers under the Constitution." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 836 F. Supp. 3d 137, 173 (D.D.C. 2026). As distinguished from statutory ultra vires claims arguing that agency action "exceeded specific statutory authority," constitutional ultra vires claims arise where the Executive Branch "disclaims reliance on any statute, ostensibly in favor of inherent constitutional authority." *Id.* (citing *Dalton v. Specter*, 511 U.S. 462, 472 (1994)). And in such circumstances, "courts are normally available to reestablish the limits on [its] authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting authority); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 798 (D.C. Cir. 2023) (concluding claims of ultra vires action are reviewable), *cert. denied*, 144 S. Ct. 1110 (2024).

97. Defendants' effort to federalize certain aspects of state election administration falls outside any colorable boundary of Defendants' lawfully delegated authority when it comes to conducting federal elections.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

98. Defendants have targeted States that refused to purge their voter rolls using the SAVE database. *Supra* ¶¶ 43–51. In such States, Defendants have generated lists comprising thousands of voters whom they believe, based on shoddy data-matching techniques, may not be citizens. Defendants have, in turn, launched a campaign to coerce States—through the threat or initiation of civil or criminal action—to remove these registered voters from the rolls, and to withhold, segregate, and refuse to tally potentially thousands of lawful ballots cast by these individuals.

99. No source of legal authority exists for the Executive Branch to compel or coerce States into segregating or refusing to tally ballots cast by registered voters. While Defendants have grounded their efforts in their inherent authority under the "Supremacy Clause" to prevent the casting of any ballot in violation of 18 U.S.C. § 611, *supra* ¶ 58, no such authority exists: 18 U.S.C. § 611 simply makes it "unlawful for any alien to vote in any [federal] election."

100. Nothing in Section 611 authorizes Defendants to seek injunctive relief against, or otherwise compel or coerce, States to withhold, segregate, or refuse to tally ballots cast by registered voters. Defendants appear to recognize as much in their litigation against California election authorities, which is why they have thus far disclaimed reliance on any clear statutory authority and instead have relied upon vague invocation of the Supremacy Clause to support their ultra vires conduct. Today, the Ninth Circuit rejected even that argument. *California III*, No. 26-7231, slip op. at 10–11 (holding that "nothing in § 611" preempts "how a state deals with citizenship challenges to vote-by-mail ballots").

101. Accordingly, Defendants' issuance and enforcement of the October 26 Demand, and their threats to prosecute Washington election officials who decline to follow it

are straightforwardly ultra vires and this Court must "reestablish the limits on [the executive's] authority," *Reich*, 74 F.3d at 1328 (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)), by issuing injunctive and declaratory relief against Defendants' attempts to prevent Washington from canvassing ballots of lawfully registered voters, *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

**COUNT II: VIOLATION OF THE CONSTITUTIONAL SEPARATION OF POWERS**
**U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend. X**

102. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

103. The Tenth Amendment reserves to the States all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. This separation of powers is further reflected in the Constitution's express reservation of certain rights to the States, at least where Congress has not acted in a contrary manner. *See id.* art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2.

104. This is especially true in the election context. "The Constitution addresses two types of power over federal elections: first, the power to determine who is qualified to vote, and second, the power to regulate federal election procedures. In both spheres, the Constitution vests authority first in the States." *LULAC III*, 818 F. Supp. 3d at 59. Thus, "considerations of federalism and the vertical separation of powers" are especially salient where an executive order intrudes on a traditional domain of state authority. *Id.* at 100.

105. Defendants' conduct violates the vertical separation of powers between the federal government and the States by intruding upon matters that both the Constitution and Congress have left to the States, namely the maintenance of voter rolls, and the issuance and canvassing of ballots to voters who have lawfully registered under state law.

106. Such conduct is inconsistent with the Constitution and Congress's longstanding assignment of most election administration responsibilities to the States, and is at odds with the States' reserved authority to "determine who is qualified to vote" and "regulate federal election procedures." *Id.* at 59; *accord Smiley*, 285 U.S. at 366.

107. While Defendants have nominally identified supposed sources of authority for their actions, such as the Supremacy Clause and 18 U.S.C. § 611, those sources do not grant Defendants the freewheeling election administration powers they claim. Indeed, they merely emphasize that Defendants enjoy only specific powers when it comes to elections that are derived from express congressional enactments. Defendants may not transgress such grants of authority, *Foster*, 522 U.S. at 69, yet they have done just that, trampling upon matters reserved to the States in the process.

108. Plaintiffs have a cause of action to remedy this separation-of-powers violation. The Supreme Court's precedents have long recognized that "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 594 U.S. 220, 245 (2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles" (citation omitted)).

**COUNT III: VIOLATION OF THE ANTICOMMANDEERING DOCTRINE**
**U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2; U.S. Const. amend. X**

109. Plaintiffs incorporate each Paragraph above as if set forth fully herein.

110. As noted, the Tenth Amendment reserves any "powers not delegated to the United States by the Constitution, nor prohibited by it to the States . . . to the States respectively,

or to the people." U.S. Const. amend. X. Based on the Founders' "fundamental structural decision" in that regard, *Murphy v. NCAA*, 584 U.S. 453, 470 (2018), the anticommandeering doctrine prohibits the federal government from "commandeer[ing] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program," *New York v. United States*, 505 U.S. 144, 176 (1992) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981)). The rule applies "whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *NFIB*, 567 U.S. at 578.

111. The anticommandeering doctrine is not limited exclusively to instances where the federal government hijacks state legislative processes. It also applies when the federal government seeks to conscript state officials into enforcing federal priorities, *see New York*, 505 U.S. at 161–62, 188; *Printz v. United States*, 521 U.S. 898, 935 (1997), or to punish States and state officials for refusing to acquiesce to federal demands, *see, e.g.*, *In re Grand Jury Subpoenas*, 835 F. Supp. 3d 947, 955 (D. Minn. 2026) ("Nor may the federal government coerce or retaliate against states or political subdivisions who decline to help the federal government enforce federal laws."); *City & County of San Francisco v. Trump*, 816 F. Supp. 3d 1017, 1040–41 (N.D. Cal. 2026).

112. Defendants' efforts to federalize voter list maintenance, and to control how Washington counts ballots, therefore reflect a textbook violation of the anticommandeering doctrine, in keeping with the President's insistence that his political party should "nationalize" voting. *Supra* ¶ 43. Specifically, Defendants have repeatedly pressured and attempted to coerce Washington into purging its voter rolls of individuals who appear on USCIS-generated lists of supposed noncitizens because the State declined to run its voter rolls through SAVE, and have





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

now demanded that Washington refuse to count ballots from individuals on these USCIS-generated lists.

113. In essence, Defendants seek to conscript Washington's election officials into a federal investigation of suspected noncitizens: they demand that state officials set aside ballots pending a federal citizenship determination, and they threaten prosecution if the officials decline. Defendants' actions violate the Tenth Amendment and the constitutional allocation of authority over elections.

114. Nothing in federal statutory or constitutional law affords Defendants such authority, which seeks to override legitimate state choices about how to engage in "supervision of voting, . . . prevention of fraud and corrupt practices, counting of votes, [and the] duties of inspectors and canvassers." *Moore*, 600 U.S. at 29 (internal quotation marks omitted). By "weaponiz[ing]" enforcement authority against States that "purportedly fail to comply with" Defendants' preferred election administration policies, Defendants have violated the anticommandeering principle contained within the Tenth Amendment. *City & Cnty. of San Francisco*, 816 F. Supp. 3d at 1041.

115. Plaintiffs may challenge this direct structural constitutional violation, which injures them, through a cause of action in equity. *See Bond v. United States*, 564 U.S. 211, 222–24 (2011); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

**COUNT IV: VIOLATION OF THE VOTING RIGHTS ACT**
**52 U.S.C. § 10307(b)**

116. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

117. Section 11(b) of the Voting Rights Act provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to

intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b).

118. Section 11(b) applies to federal officials. The provision reaches threats of legal action and criminal prosecution, and does not require proof of specific intent or racial animus. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477, 484 (S.D.N.Y. 2020); *Cal. Nurses Ass'n*, 2026 WL 3166149, at *8.

119. Washington election officials who verify signatures on and tabulate the ballots of registered voters are "aiding" those voters to vote within the meaning of Section 11(b). Voters who return mail ballots are "voting or attempting to vote." 52 U.S.C. § 10307(b).

120. Defendants have threatened Washington election officials with criminal prosecution as aiders and abettors for verifying and counting the ballots of registered voters whom Defendants have placed on an unverified list, and have done so in order to coerce those officials into refusing to verify and count those ballots.

121. Defendants have also intimidated and threatened, and attempted to intimidate and threaten, voters—including Plaintiffs' members and the voters Plaintiffs serve—for voting or attempting to vote, including by publicly warning that federal agents "will find you," by compiling and transmitting a secret list of registered voters that the voters cannot see or contest, and by demanding that ballots, including those of naturalized citizens who appear on that list, be set aside.

122. Considered against the background of contemporaneous events—including Defendants' grand jury subpoenas to California election officials, the President's declaration that California officials "will all go to jail," DHS's field operations questioning residents about

their voter registration, and Defendants' refusal to stop after a federal court admonished them that "these threats must stop"—Defendants' conduct would intimidate a reasonable election official and a reasonable voter.

123. Defendants' conduct in carrying out the Washington Ballot Operation violates Section 11(b) and, unless enjoined, will continue to cause Plaintiffs and their members irreparable harm.

**COUNT V: ADMINISTRATIVE PROCEDURE ACT (AGENCY ACTION CONTRARY TO CONSTITUTIONAL RIGHT, POWER, AND PRIVILEGE AND IN EXCESS OF STATUTORY AUTHORITY)**
**5 U.S.C. § 706(2)(A)–(C)**

124. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

125. DOJ and DHS are agencies subject to the APA. 5 U.S.C. § 701(b)(1).

126. The Washington Ballot Operation, including Defendants' October 26 Demand, their program of generating lists of registered voters suspected of being noncitizens, transmitting them to state election officials, and directing those officials to segregate and decline to count the listed voters' ballots on pain of litigation and prosecution, is final agency action. They mark the consummation of Defendants' decision making: Defendants designated specific registered voters as suspected noncitizens, issued a directive to state officials with a 48-hour deadline, and provided no further process. And legal consequences flow from them: Defendants assert that the October 26 Demand places election officials on notice for purposes of criminal liability, and Defendants have treated noncompliance as grounds for litigation and criminal investigation. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597–600 (2016); *Sackett v. EPA*, 566 U.S. 120, 126–27 (2012).



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

127. Section 706(2) of the APA directs courts to "hold unlawful and set aside agency action" that is found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C). "An analysis of whether agency action violates the APA because it is contrary to constitutional right mirrors the analysis of whether the agency action violates the relevant constitutional provision." *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 197 (D.N.H. 2025); *see also, e.g.*, *Bronco Wine Co. v. U.S. Dep't of Treasury*, 997 F. Supp. 1309, 1316 (E.D. Cal. 1996) (similar).

128. The Washington Ballot Operation violates the Elections Clause (Count I), the Tenth Amendment (Count II), the separation of powers (Count III), as well as the First and Fifth Amendments (Count VII); it is therefore contrary to constitutional right, power, or privilege under the APA. *See* 5 U.S.C. § 706(2)(B).

129. Defendants' Washington Ballot Operation, including the October 26 Demand, also exceeds Defendants' statutory authority and is contrary to law. 5 U.S.C. § 706(2)(A)–(B). It violates Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), *see supra* Count IV, as well as the NVRA, 52 U.S.C. § 20507(c)(2)(A). Defendants seek to accomplish, within 90 days of a federal election, a systematic program to exclude registered voters whom Defendants deem ineligible, in violation of § 20507(c)(2)(A), and are doing so through a non-uniform and discriminatory process that targets naturalized citizens, in violation of § 20507(b)(1). In addition, they subject registered voters identified through federal immigration records to a citizenship-verification procedure applied to no other voter, contrary to 52 U.S.C. § 10101(a)(2)(A).



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

130. Because the Washington Ballot Operation, including the October 26 Demand, is contrary to constitutional right, power, or privilege, and in excess of statutory law, it should be held unlawful and set aside, and Defendants should be enjoined from implementing it.

**COUNT VI: ADMINISTRATIVE PROCEDURE ACT (ARBITRARY AND CAPRICIOUS AGENCY ACTION)**
**5 U.S.C. § 706(2)(A)–(C)**

131. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

132. Agency action is arbitrary and capricious if the agency fails to provide "a satisfactory explanation for its action including a rational connection between the facts found and the choice made," fails to consider "an important aspect of the problem," or offers an explanation "that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified).

133. The October 26 Demand and the Washington Ballot Operation are arbitrary and capricious. Defendants, among other things, offered no explanation of their data sources, methodology, or the reliability of their matches; failed to consider the well-documented unreliability of federal citizenship data for naturalized citizens, which a federal court found DOJ had already failed to consider weeks earlier, acknowledged that listed voters "may have subsequently naturalized" yet demanded that their ballots be set aside anyway; drew their list from a population that excludes U.S.-born citizens by design; failed to consider that their own investigators could not determine whether listed individuals had cast the ballots attributed to them; failed to provide any process, standard, or timeline for determining citizenship, or any means for voters to learn of or contest their designation; and failed to consider the reliance interests of registered voters who cast ballots under procedures established by state law, the

harms of mid-election disruption, and the collapse of materially identical lists in Nevada and California.

134. Worse still, Defendants' Washington Ballot Operation comes as the November 2026 election is already underway, which alone makes it arbitrary and capricious. *See, e.g.*, *U.S. Postal Serv. v. California*, No. 26A305, 2026 WL 2687160, at *1 (U.S. Sep. 14, 2026) (Kavanaugh, J., concurring) (explaining that "applying [a new] rule" issued by the federal government in September 2026 "would be arbitrary and capricious in violation of the Administrative Procedure Act because state and local election officials do not have sufficient time to reasonably implement the rule before the election").

135. Section 706(2)(A) of the APA directs courts to "hold unlawful and set aside agency action" that is found to be "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Because it is arbitrary and capricious, the Washington Ballot Operation, including Defendants' October 26 Demand, should be held unlawful and set aside.

**COUNT VII: VIOLATION OF THE RIGHT TO VOTE AND FUNDAMENTALLY FAIR ELECTIONS**
**U.S. Const. AMENDS. I, V**

136. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

137. The Constitution protects the right of qualified citizens to vote and to have their votes counted. *United States v. Classic*, 313 U.S. 299, 315 (1941); *Reynolds v. Sims*, 377 U.S. 533, 554–55 (1964). The Due Process Clause of the Fifth Amendment protects that right against federal action and protects voters against government conduct that renders an election fundamentally unfair. *See Bennett v. Yoshina*, 140 F.3d 1218, 1226–27 (9th Cir. 1998).

138. Defendants' actions severely burden the right to vote of eligible Washington voters, including Plaintiffs' members, by seeking to have their lawfully cast ballots set aside



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

and left uncounted based on an unreliable list, without notice or any opportunity to be heard, and by deterring eligible citizens from voting. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). No legitimate federal interest justifies that burden: Defendants may investigate and prosecute any individual who votes unlawfully through the criminal process, without interfering with the counting of registered voters' ballots.

139. Defendants' actions also induce state officials to depart, in the middle of an election, from the procedures on which Washington voters relied in casting their ballots, threatening to render the election fundamentally unfair. *See Bennett*, 140 F.3d at 1226–27.

140. Defendants' actions violate the fundamental right to vote as secured by the First and Fourteenth Amendments and the Due Process Clause of the Fifth Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that Defendants' October 26 Demand, the Washington Ballot Operation, and Defendants' threats to prosecute Washington election officials for verifying and counting the ballots of registered voters are ultra vires, and violate the constitutional separation of powers and the anticommandeering doctrine, Section 11(b) of the Voting Rights Act, the Administrative Procedure Act, and the constitutional right to vote and right to fundamentally fair elections;

B. Declare that Washington election officials who verify, process, and tabulate the ballots of registered voters in accordance with state law do not violate federal law merely because a voter appears on a list transmitted by Defendants;

C. Preliminarily and permanently enjoin Defendants and their officers, agents, employees, and all persons acting in concert with them, from (i) requesting, directing,

or coercing any Washington state or local election official to remove registered voters from the voter rolls; withhold ballots from registered voters; or segregate, decline to verify the signature on, or decline to tabulate any ballot cast by a registered voter in the November 3, 2026 general election based on the voter's inclusion on any list compiled or transmitted by Defendants; (ii) threatening Washington election officials with criminal prosecution, investigation, or other legal action for verifying, processing, or tabulating ballots in accordance with state law on the basis that a voter appears on any list compiled or transmitted by Defendants; or (iii) otherwise interfering with the administration, process, or certification of Washington's November 3, 2026 general election.

D. Hold unlawful, vacate, and set aside the October 26 Demand and the Washington Ballot Operation as applied to Washington, and stay them pending final judgment under 5 U.S.C. § 705;

E. Order Defendants to notify the Washington Secretary of State and each county auditor in writing that the October 26 Demand, and any other list or demand Defendants have transmitted concerning the November 3, 2026 general election, has been withdrawn or enjoined;

F. Order Defendants to notify the Court and Plaintiffs within 24 hours of transmitting any further list of registered Washington voters, or any further demand concerning the processing or counting of ballots, to any Washington election official before certification of the November 3, 2026 general election;

G. Award Plaintiffs their costs and reasonable attorneys' fees, including under 28 U.S.C. § 2412; and





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

H. Grant such other and further relief as the Court deems just and proper.

Dated: October 30, 2026

Respectfully submitted,

/s/ Abha Khanna
**ABHA KHANNA**
WA Bar No. 42612
**TYLER L. BISHOP**
WA Bar No. 63821
**WALKER McKUSICK**
WA Bar No. 63205
ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177
akhanna@elias.law
tbishop@elias.law
wmckusick@elias.aw

**LUCAS W. LALLINGER***
DC Bar No. 1046778
**HARLEEN K. GAMBHIR***
DC Bar No. 1781869
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
(202) 935-1148
llallinger@elias.law
hgambhir@elias.law

*Attorneys for OneAmerica Votes, the Latino Community Fund of Washington State, and the United Food and Commercial Workers International Union*

**Pro hac vice application forthcoming*