The Hon. Jamal N. Whitehead

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

OneAmerica Votes, et al.,

Plaintiffs,

v.

Donald J. Trump, in his official capacity as President of the United States, et al.,

Defendants.

Case No. 2:26-cv-04223-JNW

**PLAINTIFFS' MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

NOTE ON MOTION CALENDAR: NOVEMBER 2, 2026

ORAL ARGUMENT ON PRELIMINARY INJUNCTION REQUESTED



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ............................................3

I. The Constitution assigns election administration responsibilities to States, except where Congress purposefully chooses to preempt state procedures. ................3

II. Congress afforded federal agencies narrow, carefully circumscribed roles concerning state voter registration and ballot counting processes. ...............................4

III. The Trump administration launches a comprehensive effort to unlawfully federalize elections. ........................................................................................6

IV. Defendants pursue President Trump's initiative by directly interfering in States' voter registration and ballot counting procedures. ......................................................8

A. DOJ and DHS threaten Washington and other States based on unsupported claims of noncitizens voting. ....................................................................8

B. Defendants initiate legal action against California election officials. ....................9

C. Defendants now threaten disenfranchisement of lawful Washington voters and inject chaos into the election in its final days. ..............................................11

V. Plaintiffs sue to protect their interests and defend voting rights. ................................14

LEGAL STANDARD ....................................................................................15

ARGUMENT ..............................................................................................16

I. Plaintiffs are likely to succeed on the merits. ...........................................................16

A. Defendants' interference with the casting and counting of ballots is unsanctioned by any federal law and therefore *ultra vires*. .................................16

B. Defendants' effort to federalize Washington's election violates the Tenth Amendment. ..........................................................................................19

1. Defendants' efforts to dictate how Washington reviews and tabulates ballots violate vertical separation of powers. ...........20

2. Threatening Washington election officials with civil and criminal liability to coerce compliance with federal policy violates the anticommandeering doctrine. ....................................21




ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

C. Defendants' actions violate Plaintiffs' right to vote and right to fundamentally fair elections. ....22

II. Plaintiffs have standing and face imminent irreparable harm. ....24

A. Plaintiffs satisfy Article III standing on multiple grounds. ....24

B. The harm Plaintiffs are suffering is irreparable. ....27

III. The equities and public interest favor relief. ....28

CONCLUSION ....30

CERTIFICATE OF COMPLIANCE ....32

CERTIFICATE OF SERVICE ....33

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*AFL-CIO v. Dep't of Lab.*,
836 F.Supp.3d 137 (D.D.C. 2026) .....16

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .....18

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .....15

*Am. C.R. Union v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017) .....5

*AMG Cap. Mgmt., LLC v. FTC*,
593 U.S. 67 (2021) .....18

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) .....18

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) .....26

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .....3, 17, 20

*Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*,
733 F.3d 939 (9th Cir. 2013) .....24

*Bennett v. Yoshina*,
140 F.3d 1218 (9th Cir. 1998) .....22, 23

*Bond v. United States*,
564 U.S. 211 (2011) .....20

*Burdick v. Takushi*,
504 U.S. 428 (1992) .....23

*California v. HHS*,
390 F.Supp.3d 1061 (N.D. Cal. 2019) .....14

*Cedar Park Assembly of God v. Kreidler*,
402 F.Supp.3d 978 (W.D. Wash. 2019) .....24



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

*Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*,
511 U.S. 164 (1994)....6

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996)....16

*City & County of San Francisco v. Trump*,
783 F.Supp.3d 1148 (N.D. Cal. 2025)....21

*City & County of San Francisco v. Trump*,
816 F.Supp.3d 1017 (N.D. Cal. 2026)....21, 22

*Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*,
367 U.S. 316 (1961)....18

*Collins v. Yellen*,
594 U.S. 220 (2021)....20

*Common Cause v. Dep't of Just.*,
No. 26-cv-1352-SLS, 2026 WL 3033772 (D.D.C. Oct. 9, 2026)....7, 9, 10

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009)....25

*Cort v. Ash*,
422 U.S. 66 (1975)....19

*Ctr. for Biological Diversity v. EPA*,
168 F.4th 1164 (9th Cir. 2026)....27

*Ctr. for Taxpayer Rts. v. IRS*,
No. 26-5006, 2026 WL 2635380 (D.C. Cir. Sep. 8, 2026)....28

*DHS v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026)....25

*DSCC v. Trump*,
No. 26-cv-1114, 2026 WL 2681471 (D.D.C. Sep. 13, 2026)....25, 27

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)....26

*FEC v. Cruz*,
596 U.S. 289 (2022)....6, 16

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016)....5

*Fish v. Schwab*,
957 F.3d 1105 (10th Cir. 2020) ....................25

*Foster v. Love*,
522 U.S. 67 (1997) ....................3, 17

*Galarza v. Szalczyk*,
745 F.3d 634 (3d Cir. 2014) ....................21

*Georgia v. Meadows*,
88 F.4th 1331 (11th Cir. 2023) ....................4

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) ....................19

*Griffin v. Burns*,
570 F.2d 1065 (1st Cir. 1978) ....................23

*Griffin v. N.C. State Bd. of Elections*,
781 F.Supp.3d 411 (E.D.N.C. 2025) ....................23

*Hubbard v. U.S. EPA Adm'r*,
809 F.2d 1 (D.C. Cir. 1986) ....................19

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018) ....................4

*Isho v. Marin*,
830 F.Supp.3d 1002 (C.D. Cal. 2026) ....................29

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ....................28

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................... *passim*

*Lee v. U.S. Agency for Int'l Dev.*,
859 F.3d 74 (D.C. Cir. 2017) ....................19

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................27

*LULAC v. EOP*,
780 F.Supp.3d 135 (D.D.C. 2025) .................... *passim*

*LULAC v. EOP*,
818 F.Supp.3d 34 (D.D.C. 2026) ....................16, 19, 20



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

*Merrill v. Milligan*,
142 S.Ct. 879 (2022) ....27

*Mi Familia Vota v. Fontes*,
719 F.Supp.3d 929 (D. Ariz. 2024) ....24, 26

*Moore v. Harper*,
600 U.S. 1 (2023) ....17

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ....21

*Nader v. Brewer*,
531 F.3d 1028 (9th Cir. 2008) ....23

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ....21

*Nken v. Holder*,
556 U.S. 418 (2009) ....15, 28

*Nw. Immigrant Rts. Project v. USCIS*,
496 F.Supp.3d 31 (D.D.C. 2020) ....14

*Or. Council for Humanities v. DOGE*,
794 F.Supp.3d 840 (D. Or. 2025) ....15

*Printz v. United States*,
521 U.S. 898 (1997) ....21

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ....29

*Reynolds v. Sims*,
377 U.S. 533 (1964) ....22

*SAS Inst. Inc. v. Iancu*,
584 U.S. 357 (2018) ....18

*SEIU v. U.S. Dep't of Just.*,
No. 3:26-cv-12800-TLT (N.D. Cal. Oct. 30, 2026), ECF No. 26 ....14

*Smiley v. Holm*,
285 U.S. 355 (1932) ....3, 17

*Thomas More L. Ctr. v. Obama*,
651 F.3d 529 (6th Cir. 2011) ....20



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

*United States v. Bellows*,
834 F.Supp.3d 113 (D. Me. 2026) ....................17

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ....................21

*United States v. California* ("*California I*"),
No. 26-7070, 2026 WL 3212945 (9th Cir. Oct. 26, 2026) ....................10

*United States v. California* ("*California II*"),
No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428 (C.D. Cal. Oct. 28, 2026) ........2, 11, 12

*United States v. California* ("*California III*"),
No. 26-7231, 2026 WL 3268272 (9th Cir. Oct. 30, 2026) ....................2, 11

*United States v. Classic*,
313 U.S. 299 (1941)....................22

*United States v. Hobbs*,
No. 2:25-cv-6078-KKE, 2026 WL 2833713 (W.D. Wash. Sep. 22, 2026) ....................7

*Washington v. Trump*,
814 F.Supp.3d 1173 (W.D. Wash. 2026)....................3, 16, 17

*Watson v. Republican Nat'l Comm.*,
609 U.S. 672 (2026)....................17

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008)....................29

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................16

*Zepeda v. INS*,
753 F.2d 719 (9th Cir. 1983) ....................29

**CONSTITUTION**

U.S. Const. amend. X ....................20

U.S. Const. art. I, § 4, cl. 1 ....................3, 17

**STATUTES**

5 U.S.C. § 705 ....................15

18 U.S.C. § 2 ....................11



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

18 U.S.C. § 611 ........ *passim*

18 U.S.C. § 1015 ........ 5

18 U.S.C. §§ 241, 242 ........ 4

42 U.S.C. § 1983 ........ 4

42 U.S.C. § 1985 ........ 4

42 U.S.C. § 1986 ........ 4

52 U.S.C. § 10101 ........ 4

52 U.S.C. § 10301 ........ 4

52 U.S.C. § 10307 ........ 4

52 U.S.C. § 10308 ........ 4

52 U.S.C. § 20501 ........ 4

52 U.S.C. § 20505 ........ 5

52 U.S.C. § 20507 ........ 1, 5, 18

52 U.S.C. § 20508 ........ 5

52 U.S.C. § 20510 ........ 5

52 U.S.C. § 20511 ........ 5

52 U.S.C. § 20701 ........ 12

52 U.S.C. § 21082 ........ 18

52 U.S.C. § 21083 ........ 5

RCW 29A.40.070 ........ 15

**OTHER AUTHORITIES**

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) ........ 7

S. 3752, 119th Cong. (2026) ........ 6

*The Federalist No. 59* (Alexander Hamilton) ........ 17

## INTRODUCTION

Pursuant to President Trump's campaign to "take over the voting," the U.S. Department of Justice ("DOJ") has issued multiple demands that Washington election officials set aside hundreds of voters' ballots based on unsubstantiated suspicions, under threat of criminal sanctions if they do not bend to the administration's demands. Ex. E.[1] The constitutional rights of Washington voters hang in the balance. This Court must act immediately to protect Washington voters from this unlawful intrusion.

DOJ's extraordinary demands have no basis in law. The Executive Branch enjoys *zero* authority to superintend state voter-list maintenance, to supplant state determinations of who is qualified to vote, or to dictate whose ballot gets tossed aside. While Congress may preempt state laws as to the time, place, or manner of elections, here federal law *prohibits* what DOJ asks: the National Voter Registration Act ("NVRA") bars systematic programs to remove ineligible voters from the rolls in the 90 days before an election, when mistakes based on flawed data are most likely to disenfranchise eligible voters. 52 U.S.C. § 20507(c)(2)(A). DOJ's demands seek an end-run around this statutory protection and constitutional structure based on little more than faulty data, speculation, and conspiracy theories.

Plaintiffs therefore seek a temporary restraining order and preliminary injunction barring DOJ from further commanding Washington's election officials—including on the basis of the Department of Homeland Security's ("DHS") shoddily compiled target lists—to set aside voters' ballots rather than count them in the ordinary course.

---

[1] Except where otherwise indicated, exhibits are exhibits to the Declaration of Abha Khanna (Nov. 2, 2026) ("Khanna").

The relevant factors for relief are satisfied. On the merits, Defendants' conduct is straightforwardly *ultra vires*: Nothing in the Constitution or federal law affords the President or federal agencies authority to superintend state election administration via unlawful demands, threats, and coercion. And by intruding upon traditional state matters—and deploying coercive tactics to bully state and local officials into compliance—Defendants have violated the Tenth Amendment and its anticommandeering doctrine. Defendants have also violated Washingtonians' right to vote and right to fundamentally fair elections guaranteed by the First and Fifth Amendments.

Absent prompt relief, Plaintiffs—nonprofit civic organizations that represent and serve the Washington voters most affected by Defendants' attacks—will suffer irreparable harm. Their members include naturalized citizens who, by DOJ's own admission, are most likely to be wrongly targeted by Defendants' efforts. Defendants' actions threaten not only to disenfranchise Plaintiffs' members and constituents, but to undermine Plaintiffs' get-out-the-vote efforts by deterring eligible voters who fear being misidentified as noncitizens or having their ballots discarded.

These injuries are quintessentially irreparable because elections have no do-overs, *see League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016), while Defendants have no legitimate interest in either exercising ungranted authority or injecting chaos into the ongoing election, *United States v. California*, No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428, at *4 (C.D. Cal. Oct. 28, 2026) ("*California II*") (commanding that DOJ's "threats must stop"); *United States v. California*, No. 26-7231, 2026 WL 3268272 (9th Cir. Oct. 30, 2026) ("*California III*") (per curiam) (holding DOJ lacked authority to issue demand that State officials segregate ballots). The public interest likewise favors orderly elections in which





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

registered voters' ballots are cast and counted. A temporary restraining order, and then a preliminary injunction, should issue.

## BACKGROUND AND PROCEDURAL HISTORY

### I. The Constitution assigns election administration responsibilities to States, except where Congress purposefully chooses to preempt state procedures.

The Constitution's Elections Clause "invests the States with responsibility for the mechanics of congressional elections," subject only to Congress's power to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see* U.S. Const. art. I, § 4, cl. 1. Absent intervention by Congress, the States are charged with establishing "a complete code for congressional elections," including as to "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

Congress may displace these requirements under the Elections Clause, but that authority is limited to "regulat[ing] how federal elections are held, [] not who may vote in them," *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 (2013) *("ITCA")* (emphases omitted), consistent with "the Framers' aversion to concentrated power," *id.* at 17. Even when Congress exercises its Elections Clause authority, that power extends "so far as it is exercised, and no farther." *Id.* at 9 (citation omitted).

Nothing in the Constitution "assigns any authority over federal election administration to the President or the Executive Branch." *Washington v. Trump*, 814 F.Supp.3d 1173, 1214 (W.D. Wash. 2026). The President has no "direct control" over "the individuals—members of Congress and state officials—who conduct federal elections" and "no authority" to

"interfere[] with state election procedures based solely on the federal executive's own initiative." *Georgia v. Meadows*, 88 F.4th 1331, 1347 (11th Cir. 2023), *cert. denied*, 145 S.Ct. 545 (2024).

**II. Congress afforded federal agencies narrow, carefully circumscribed roles concerning state voter registration and ballot counting processes.**

Pursuant to its Elections Clause authority, Congress has enacted laws governing specific aspects of the electoral process; these laws establish the outer bounds of the federal government's role in election administration. After the Civil War, Congress enacted the Enforcement Act of 1870, which authorizes prosecution of conspiracies against voting rights, *see* 18 U.S.C. §§ 241, 242, and the Ku Klux Klan Act of 1871, which creates civil causes of action to enforce federal rights, including voting rights, *see* 42 U.S.C. §§ 1983, 1985, 1986. Both operate through criminal or civil actions; neither authorizes the Executive to intrude upon state election procedures.

Congress later enacted the Civil Rights Acts of 1957, 1960, and 1964 and the Voting Rights Act of 1965, which likewise protect individual voting rights, constrain what election officials can demand of voters, and prohibit all persons—including federal officials—from intimidating, threatening, or coercing voters. *See* 52 U.S.C. §§ 10101, 10301, 10307(b), 10308. No provision authorizes the federal government to set voter qualifications or control ballot casting or counting.

In the modern era, Congress enacted the NVRA in 1993 to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501. The NVRA expressly charges States—not the federal government—with the

"administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists, *id.* § 20507(c)-(g). The Attorney General may sue to enforce the terms of the NVRA, *see id.* § 20510(a), but must plausibly allege a substantive violation of federal law, such as a failure to make "a reasonable effort to remove the names of ineligible voters" who have died or moved. *Id.* § 20507(a)(4). Nothing in the NVRA grants the Executive Branch freestanding authority to superintend state voter rolls, never mind elections more generally.

The NVRA also requires that voter registration forms for federal elections include "an attestation that the applicant meets each … requirement" for registration, "including citizenship." *Id.* §§ 20508(b)(2), 20505(a)(2). This attestation reflects the "presumptive minimum amount of information necessary for state election officials to carry out their eligibility-assessment and registration duties." *Fish v. Kobach*, 840 F.3d 710, 717 (10th Cir. 2016) (emphasis omitted). States may therefore rely on a prospective voter's attestation that they meet all eligibility requirements, including citizenship, and the Executive Branch has no authority to quarrel with that choice absent a violation of the NVRA itself.

After the 2000 elections, Congress enacted the Help America Vote Act ("HAVA") to "help improve the equipment used to cast votes, the way registration lists are maintained, and how polling operations are conducted." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 180 (3d Cir. 2017). HAVA requires States to create and maintain a "computerized statewide voter registration list" but again leaves the administration and oversight of that list to the States. 52 U.S.C. § 21083(a)(1)(A), (a)(2)(A).

Finally, DOJ possesses criminal enforcement tools to address noncitizen voting, *see* 18 U.S.C. § 611, and false claims of citizenship, *id.* § 1015(f); *see also* 52 U.S.C. § 20511.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

Such statutes are enforced through the criminal process, with its constitutional protections and legal standards—including proof beyond a reasonable doubt. Nothing in these statutes grants the government any broader regulatory or enforcement power beyond charging and prosecuting offenders. *Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A.*, 511 U.S. 164, 190-91 (1994).

The upshot of all this is that the Executive Branch possesses limited, congressionally granted powers when it comes to voting. Beyond those, Defendants have "literally ... no power to act ... unless and until Congress authorizes [them] to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

## III. The Trump administration launches a comprehensive effort to unlawfully federalize elections.

Since returning to office in 2025, President Trump has continued his decade-long campaign of lies about voter fraud, falsely contending that noncitizens are "brought to our country to vote, and they vote illegally," and urging the Republican Party to "take over" and "nationalize the voting." Ex. E. Yet Congress has refused to authorize greater federal involvement in establishing procedures for determining a voter's qualifications under state law. *E.g.*, S. 3752, 119th Cong. (2026).

Unable to persuade Congress, President Trump has pursued this goal through Executive Orders, litigation against States, and intimidation by DOJ and DHS. In March 2025, President Trump signed E.O. 14,248, which purported to require certain voters to present documentary proof of citizenship when registering, change state mail-in voting deadlines, provide federal agencies with access to state voter-list data, and coerce States into complying with DOJ demands by threatening to withhold federal funding. Courts swiftly enjoined broad



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

swathes of the order as unlawful. *See* Compl. ¶44 (collecting authority). A year later, President Trump's Executive Order 14,399, among other things, includes the instruction that the Attorney General "prioritize the investigation and, as appropriate, the prosecution of State and local officials or any others involved in the administration of Federal elections who issue Federal ballots to individuals not eligible to vote in a Federal election." Exec. Order No. 14,399 § 2(b), 91 Fed. Reg. at 17,126 (Mar. 31, 2026).

Meanwhile, DOJ has attempted to usurp the States' voter list maintenance responsibilities. In the summer of 2025, DOJ launched a campaign to seize every State's unredacted voter registration list to facilitate the purging of "hundreds of thousands" of people from the rolls. Ex. F. Washington and dozens of other States resisted, prompting DOJ to file more than 30 lawsuits. Federal courts have rejected this unprecedented intrusion. *United States v. Hobbs*, No. 2:25-cv-6078-KKE, 2026 WL 2833713, at *1 n.3 (W.D. Wash. Sep. 22, 2026) (collecting cases). To date, 27 district courts have dismissed DOJ's suits, and not one court has found that DOJ stated a valid claim.

DOJ pursued these lists in order to run them through DHS and the U.S. Citizenship and Immigration Service's Systematic Alien Verification for Entitlements ("SAVE") tool, purportedly to double-check the citizenship of tens of millions of registered voters. But SAVE was never intended for use in election administration, and it has been beset by well-documented inaccuracies. *E.g.*, *Common Cause v. Dep't of Just.*, No. 26-cv-1352-SLS, 2026 WL 3033772, at *6 (D.D.C. Oct. 9, 2026). Many States like Washington have exercised their sovereign prerogative to refuse to surrender their voter rolls to DOJ or run them through faulty databases like SAVE. *See id.* Undeterred, the federal government has continued to resort to



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

desperate and unlawful tactics to hijack state election administration in the days before the election. These ongoing efforts form the crux of this lawsuit.

## IV. Defendants pursue President Trump's initiative by directly interfering in States' voter registration and ballot counting procedures.

In this latest chapter, Defendants are aggressively implementing a disturbing policy of threatening state and local election officials with prosecution for permitting registered voters to cast ballots, based on ham-handed efforts at identifying noncitizens on state rolls.

### A. DOJ and DHS threaten Washington and other States based on unsupported claims of noncitizens voting.

On July 7, 2026, Assistant Attorney General Harmeet Dhillon sent letters to every State, including Washington, purportedly to provide "notice of the federal laws applicable to state and local election officials to ensure free, fair, and transparent elections." Ex. D-3.[2] These letters threatened election officials with "criminal" prosecution if they "knowingly retain[]" noncitizens on their voter registration lists or otherwise "facilitate[] noncitizens in receiving and casting ballots." *Id.* AAG Dhillon demanded a response within five days as to how each State "intends to ensure it is complying with these federal laws." *Id.*

On July 17, 2026, DHS sent letters to the chief election officials of California, Nevada, New Jersey, and Pennsylvania, claiming that "preliminary reviews" of publicly available voter data had identified thousands of possible noncitizens on their rolls. Ex. G. The letters did not disclose DHS's methodology or data sources. The next day, Secretary Mullin publicly

[2] Correspondence between the federal government and the State is attached to the Declaration of Stuart Holmes, Director of Elections of Washington ("Holmes"), Ex. D.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

warned that election officials who failed to act on DHS's findings could face fines, penalties, and "even ... prison time." Ex. H. But these claims collapsed under scrutiny. In Nevada, DHS initially alleged nearly 16,000 possible noncitizen registrants, but when pressed, produced only 185 names. Ex. I. Nevada's review found that all 185 were citizens. *Id.* Similarly, in Pennsylvania, DHS officials acknowledged they lacked confidence in the claim that thousands of noncitizens were on the rolls. Ex. J at 1.

Since then, more information has emerged about Defendants' lists' unreliability. A federal whistleblower has described troubling processes whereby officers in DHS's "Unlawful Voter Initiative" were given less than two hours of training, required to meet quotas of reviewing records for 40 voters a day, and provided unreliable data that agency leaders acknowledged included naturalized citizens. Ex. K. Officials described the data as compiled with "supplemental magic." *Id.* at 30. Unsurprisingly, a federal court found that DOJ has "failed to consider the risk that its use of citizenship records known to be unreliable would lead [it] to demand that states remove U.S. citizens from their voter rolls." *Common Cause*, 2026 WL 3033772, at *8.

### B. Defendants initiate legal action against California election officials.

On October 13, 2026—just weeks before election day, and with voting well underway—DOJ demanded that California refuse to send ballots, or segregate and not count the ballots, of more than 20,000 individuals DOJ believed to be noncitizen registered voters. Ex. L. DOJ demanded that California election officials "review the list within 48 hours," and "immediately instruct the appropriate elections officials to segregate" mail ballots cast by these individuals until their citizenship status can be determined. *Id.* at 1. DOJ threatened that



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

if California did not comply by "October 15 at noon EST," it would seek emergency relief. *Id.* at 2.

California's Secretary of State refused, expressing concern about the methodology underlying the list, the last-minute and unprecedented nature of DOJ's ultimatum, and the likely violations of state and federal law that would result from complying with it. Ex. M. DOJ doubled down, insisting that officials who refused to withhold or segregate ballots cast by voters on the list would face "significant" "legal consequences" for "knowingly facilitating" noncitizen voting. Ex. N. President Trump himself reposted DOJ's letter to Truth Social with the announcement, "They will all go to jail for a long period of time!!!" Ex. O.

DOJ's threats were not idle. On October 15, it sued California, as well as Secretary Weber and the Los Angeles County Registrar-Recorder/County Clerk, bringing a novel, standalone claim under the Supremacy Clause. *See United States v. California*, No. 26-7070, 2026 WL 3212945, at *2-3 (9th Cir. Oct. 26, 2026) ("*California I*") (per curiam). Four days later, it moved for a TRO, but before the district court ruled, DOJ sought the same relief directly from the Ninth Circuit. *See id.* That court dismissed DOJ's appeal, concluding it lacked jurisdiction and that the emergency was "at least in part" a "self-constructed one." *Id.* at *6. Two judges on the panel noted DOJ's claim fails on the merits, for several reasons: Section 611 regulates individual aliens, not election administration; Congress limited the Executive's role in voter-list matters to civil enforcement of specific federal laws; DOJ's demand likely conflicted with the NVRA's 90-day bar; and the relief DOJ sought would alter the rules of an election already underway. *Id.* at *7-16 (Bennett, J., concurring); *id*. at *16-20 (Sanchez, J., concurring).

On October 27, the district court held a two-hour hearing on DOJ's TRO motion, and denied it the next day. *California II*, 2026 WL 3252428, at *1. The court noted DOJ "reiterated its threat in open court" that "election officials who do not comply with their letter[s] risk federal charges under 18 U.S.C. § 2," and the court admonished that the "threats must stop." *Id.* at *4. DOJ immediately sought an injunction pending appeal, which the Ninth Circuit again denied, rejecting DOJ's claim on the merits and noting that the request came far too late. *See California III*, 2026 WL 3268272. Both courts made plain that DOJ's threats to disenfranchise lawfully registered citizens—and especially recently naturalized citizens—could not stand. *See California II*, 2026 WL 3252428, at *14; *California III*, 2026 WL 3268272, at *1-3. DOJ has now applied to the U.S. Supreme Court for an injunction pending appeal and an "administrative injunction." Appl. for Inj. Pending Appeal 1, *United States v. California*, No. 26A___ (U.S. Nov. 2, 2026).

### C. Defendants now threaten disenfranchisement of lawful Washington voters and inject chaos into the election in its final days.

On October 26, days before election day, DOJ demanded that Washington segregate and not count the ballots of more than 400 individuals DOJ believes "are or were noncitizens (i.e., they may have subsequently naturalized)" on Washington's voter rolls. Ex. D-5 at 1. DOJ demanded that Secretary Hobbs instruct election officials "to not verify the signature and/or tabulate the ballot" for those individuals "until citizenship can be determined." *Id.* at 2. If the Secretary did not comply within 48 hours, DOJ threatened it "will have no choice but to seek emergency relief." *Id.* DOJ also added that a "second list" would follow before the "November 2 [sic]" general election. *Id.*





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

The October 26 demand was the first communication Washington had received from DOJ on the subject, even though state officials had been meeting regularly with federal officials—including from both of Washington's U.S. Attorneys' Offices—about election-related concerns. Holmes ¶¶7-18. The letter included no individualized evidence and did not explain the sources or methodology behind the list. *Id.* ¶19. And it reminded the Secretary that, although Defendants "do not enforce State law," they "do make criminal referral to [DOJ's] state counterparts." *Id.* ¶21.

Defendants held a press conference the same day to publicize the demand. Ex. P; *see also* Khanna ¶17. Defendant Floyd announced that "[k]nowingly assisting those who are voting illegally is a crime" and DOJ would seek to "criminally prosecute those who vote illegally and those who assist others in voting illegally." Ex. P at 2; Holmes ¶¶16-18. Asked whether election officials could be charged for processing ballots of voters on DOJ's lists, he replied, anyone who "assists someone in voting illegally would be also guilty of that crime under the aiding [and] abetting theory." Ex. P at 8.

On October 30, after Judge Carter in California commanded that DOJ "must stop" its threats against election officials, *California II*, 2026 WL 3252428, at *4, Acting Deputy Attorney General R. Trent McCotter doubled down. He sent Secretary Hobbs a letter titled "Obligations Under 52 U.S.C. § 20701," purporting to remind the Secretary that federal law requires election officials to preserve certain voting records and that "willfully fail[ing] to comply with Section 20701" is punishable "by up to a year in prison and a $1,000 fine." Holmes ¶30. The State is unaware of DOJ "ever previously sending a similar reminder on the eve of an election," and its officials understood its purpose "to be to intimidate state and local election officials." *Id.* ¶30; *see id.* ¶¶30-40.

But other Defendants continued their concerted attempt to intimidate Washington election officials for doing nothing more than adhering to state law and distributing ballots to registered voters. Defendant Serrano made clear DOJ would take its demands to local election officials: "if ultimately we have to send 39 letters to 39 auditors over the next couple of days, we can do that." Ex. Q at 8:22-9:2; *see also* Khanna ¶18. Doing so, he acknowledged, would force state officials into a "pickle": "[D]o we comply with the federal subpoena, or do we comply with state law?" Ex. Q at 8:7-11; *see also* Ex. R at 4:3 (Defendant Floyd stating election officials are "on notice"); Holmes ¶29 (stating that "[w]hile I know that neither I nor any of my staff have violated any criminal law, these threats are intimidating").

Defendants' own account of their list's provenance demonstrates its unreliability. They began with a "tiny population" of names derived from applications for benefits and immigration encounters at the border, which they subsequently attempted to match to names on Washington's public voter rolls. Ex. P at 5, 7. Defendants acknowledged, however, that the public lists they used lacked voters' specific identifying information, *id.* at 4, making definitive matches impossible. And the demand letter itself conceded that listed voters "may have subsequently naturalized." Ex. D-5 at 1.

Washington's preliminary review confirmed the list's unreliability. Contrary to DOJ's assertion that every listed individual had been sent a ballot, at least 62 of the 403 unique individuals on the list had not received one, because their registrations were cancelled or inactive or they could not be found at all. Holmes ¶24. The Department of Licensing's records showed that "multiple people on this list presented proof of citizenship, including United States birth certificates, United States passports, and certificates of naturalization." *Id.* ¶25. And DOJ has indicated that it relied on LexisNexis for part of its search. *Id.* ¶19. Secretary

Hobbs therefore responded that the State's review "confirms what your letter acknowledges: This list includes United States citizens and is not reliable." *Id.* ¶27.

On October 30, a federal district court entered a TRO against Defendants in a separate lawsuit challenging Defendants' threats against election officials. *SEIU v. U.S. Dep't of Just.*, No. 3:26-cv-12800-TLT (N.D. Cal. Oct. 30, 2026), ECF No. 26 at 2. That order bars Defendants from threatening, intimidating, or coercing state or local election officials to halt processing the ballots of registered voters solely because Defendants allege those voters are ineligible. Because that order applies nationwide, Plaintiffs did not file this motion concurrently with their Complaint. Defendants have since, however, sought emergency appeal of the order, and the district court scheduled a hearing on the government's motion for an emergency stay for today, November 2, 2026, *see SEIU*, No. 3:26-cv-12800-TLT, ECF Nos. 31, 35. Because the district court may stay or limit the *SEIU* TRO, Plaintiffs here seek an immediate TRO and preliminary injunction to preserve their own interests in Washington.[3]

## V. Plaintiffs sue to protect their interests and defend voting rights.

Plaintiffs' members are Washington voters, many of whom are naturalized citizens who are most likely to be wrongly flagged by federal citizenship data. *See* Ex. A, Decl. of Roxana Norouzi ("Norouzi") ¶¶4-6; Ex. B, Decl. of Lilliane Ballesteros ("Ballesteros") ¶¶7-8, 11; Ex. C, Decl. of Ademola Oyefeso ("Oyefeso") ¶¶3, 7. Each organization works to

---

[3] The existence of a related TRO does not bear on the harms established or the justiciability of the issues in this case. "Overlapping injunctions appear to be a common outcome of parallel litigation, rather than a reason for the Court to pass on exercising its duty to determine whether litigants are entitled to relief." *Nw. Immigrant Rts. Project v. USCIS*, 496 F.Supp.3d 31, 81 (D.D.C. 2020) (quoting *California v. HHS*, 390 F.Supp.3d 1061, 1065 (N.D. Cal. 2019)). That conclusion is especially warranted where, as here, the injunction may be "limited at any time." *California v. HHS*, 390 F.Supp.3d at 1065-66 (collecting authority).

register, educate, and turn out voters, particularly in historically excluded communities. Norouzi ¶¶3-5, 7; Ballesteros ¶¶3-9; Oyefeso ¶¶4-5. Each is in the middle of its get-out-the-vote program for the ongoing election. *See* RCW 29A.40.070. Because of Defendants' efforts, members who are eligible citizens could have their ballots set aside or left uncounted. Plaintiffs would also have to divert significant resources from planned get-out-the-vote work to identify affected constituents, help them prove their citizenship, and ensure their ballots are counted. Norouzi ¶¶11-13; Ballesteros ¶¶9, 13-15; Oyefeso ¶¶8-9.

## LEGAL STANDARD

To obtain a TRO or a preliminary injunction, Plaintiffs must show that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). When a temporary restraining order is sought against the government, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).[4]

---

[4] Plaintiffs alternatively bring their claims under the Administrative Procedure Act, Compl. ¶¶124-35, which similarly authorizes courts to grant preliminary relief, 5 U.S.C. § 705. The same factors govern. *Or. Council for Humanities v. DOGE*, 794 F.Supp.3d 840, 858 (D. Or. 2025).



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

#### A. Defendants' interference with the casting and counting of ballots is unsanctioned by any federal law and therefore *ultra vires*.

Defendants' bid to seize control of Washington's election administration far exceeds the outer bounds of executive power. The Executive Branch has no colorable authority—constitutional or statutory—to dictate how States manage their voter rolls, issue ballots, or count and tabulate those ballots. Defendants' escalating campaign to coerce Washington into altering its ballot rules on the cusp of the November 3 election therefore "exceeds [their] authority" and is straightforwardly *ultra vires*. *Washington*, 814 F.Supp.3d at 1218; *AFL-CIO v. Dep't of Lab.*, 836 F.Supp.3d 137, 173 (D.D.C. 2026) (similar). Injunctive relief is necessary to "reestablish the limits on [the executive's] authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (citation omitted); *see Washington*, 814 F.Supp.3d at 1227 (permanently enjoining executive action with respect to elections); *LULAC v. EOP* ("*LULAC I*"), 780 F.Supp.3d 135, 194-200 (D.D.C. 2025) (preliminarily enjoining the same); *see also LULAC v. EOP* ("*LULAC III*"), 818 F.Supp.3d 34, 80-81 (D.D.C. 2026) (discussing cause of action to enjoin *ultra vires* executive action).

Start from first principles. Any action that Defendants take "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). As executive agencies, DOJ and DHS have "literally ... no power to act ... unless and until Congress authorizes [them] to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted). Such authority is obviously lacking here. The Constitution "invests the States with responsibility for the mechanics of congressional





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

elections," while allowing Congress "to preempt state legislative choices." *Foster*, 522 U.S. at 69; *see also* U.S. Const. art. I, § 4, cl. 1. "The President does not feature at all" in this constitutional allocation of power, *LULAC I*, 780 F.Supp.3d at 159, consistent with "the Framers' aversion to concentrated power," *ITCA*, 570 U.S. at 17; *see also Washington*, 814 F.Supp.3d at 1214 n.57 ("Despite many constitutional provisions addressing elections, voting, or both, none authorize the President or the Executive Branch to exercise authority over the administration of federal elections."). Indeed, granting the Executive Branch "regulatory authority over federal elections does not appear to have [even] crossed the Framers' minds." *LULAC I*, 780 F.Supp.3d at 159 (citing *The Federalist No. 59* (Alexander Hamilton)).

Defendants thus have no constitutional power to draw on for their actions, which intrude upon matters the Constitution assigns to the States and Congress—"registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Moore v. Harper*, 600 U.S. 1, 29 (2023) (quoting *Smiley*, 285 U.S. at 366).

Defendants' authority, therefore, is limited to the specific enforcement tools Congress has provided. *Supra* Background § II. These tools are exhaustive—federal authority under the Elections Clause extends only so far as Congress has exercised it, and "no farther." *Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 697 (2026) (citation omitted). Yet Defendants have invoked none of them. The two federal statutes most relevant to the mechanics of voter registration—the NVRA and HAVA—"create a comprehensive scheme for the creation and upkeep of states' computerized [voter lists], and for the enforcement of the list maintenance requirements imposed by those statutes." *United States v. Bellows*, 834 F.Supp.3d 113, 125 (D. Me. 2026), *appeal docketed*, No. 26-1676 (1st Cir. May 21, 2026). "That scheme gives



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

the Attorney General the power to 'bring a civil action' against a state that has violated those provisions, ... but it does not contemplate" the intimidation tactics Defendants employ here. *Id.* DOJ also cannot point to any federal statute that permits it to superintend how States issue, collect, and count ballots. Nothing in federal law—including HAVA's provisional ballot provision, 52 U.S.C. § 21082(a)—empowers Defendants to order that regular ballots cast by registered voters be sequestered. Defendants have simply invented that authority out of whole cloth.

Indeed, the NVRA prohibits the very relief DOJ seeks—a last-minute purging of Washington's voter rolls. *See id.* § 20507(c)(2)(A) (precluding list-maintenance programs within 90 days of a general election); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014) (holding this provision prohibits last-minute voter purges based on citizenship status). Agencies cannot "'improvise on the powers granted by Congress' by devising an extralegal path" to their chosen ends. *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 368 n.* (2018) (quoting *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 330 (1961)); *see also AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77-78 (2021) (explaining Congress's provision of express enforcement tools prohibits implicitly finding broader tools under the same statute); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").

Rather than ground their actions in any of Congress's laws governing the mechanics of the voter registration process, Defendants have instead leaned on 18 U.S.C. § 611, which criminalizes voting by noncitizens. *See* Ex. D-5. But the proper channel for enforcing such a law is through the criminal process itself, which affords individuals procedural rights and

requires that the government establish guilt beyond a reasonable doubt before a jury. Nothing in Section 611 or any other criminal provision authorizes Defendants, on the eve of an election, to displace state voter registration or ballot counting procedures—whether by demand, threat, or even civil enforcement actions. It is axiomatic that "a bare criminal statute" does not confer any broader regulatory or civil enforcement power. *Cort v. Ash*, 422 U.S. 66, 80 (1975); *see also Lee v. U.S. Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017) (per curiam). A criminal statute does not authorize DOJ to reach beyond "the mechanism that Congress chose to provide for enforcing" the law, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 289 (2002)—namely, criminal prosecution of individuals—to impose ballot processing requirements upon States.

In short, Defendants lack any constitutional or statutory authority to demand that Washington undertake specific election administration procedures like segregating or not counting ballots cast by registered voters. Such lawless conduct is a quintessential constitutional *ultra vires* violation: Defendants are "wrongly exercis[ing] powers that the Constitution vests in Congress and the States alone." *LULAC III*, 818 F.Supp.3d at 82. This Court has both the authority and the obligation to "enjoin [such] unconstitutional acts." *Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986).

**B. Defendants' effort to federalize Washington's election violates the Tenth Amendment.**

Defendants' conduct also violates the Tenth Amendment's vertical separation of powers by intruding upon Washington's sovereignty. And because Defendants are pursuing their unlawful ends through threats and coercion intended to compel Washington officials to submit to federal policy preferences, they are also violating the anticommandeering doctrine.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

### 1. Defendants' efforts to dictate how Washington reviews and tabulates ballots violate vertical separation of powers.

In addition to the "horizontal separation of powers among the branches of the National Government," the Constitution also establishes "a vertical separation of powers between the National Government and the States." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 564 (6th Cir. 2011) (Sutton, J., concurring in part). This separation is reflected in the Tenth Amendment's reservation "to the States" of all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. "[C]onsiderations of federalism and the vertical separation of powers" are especially salient when executive action intrudes upon States' traditional authority to administer elections. *LULAC III*, 818 F.Supp.3d at 100. As explained above, "the Constitution vests authority first in the States" to both determine "who is qualified to vote" and to "regulate federal election procedures." *Id.* at 59.

Defendants' campaign to superintend Washington's election administration tramples upon this division of authority, which was motivated by "the Framers' aversion to concentrated power." *ITCA*, 570 U.S. at 17. That reservation of authority to the States prohibits the Executive Branch from second-guessing the States' choices about voter eligibility, voter registration lists, and the issuance, collection, and tabulation of ballots. This Court possesses the equitable jurisdiction to enjoin this ongoing violation of the separation of powers. *See, e.g.*, *Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge."); *Bond v. United States*, 564 U.S. 211, 223-24 (2011) (holding that an individual may "challenge a law as enacted in contravention of constitutional principles of federalism").

**2. Threatening Washington election officials with civil and criminal liability to coerce compliance with federal policy violates the anticommandeering doctrine.**

Similarly, the Tenth Amendment's anticommandeering doctrine embodies the "fundamental structural decision incorporated into the Constitution" to "withhold from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). The doctrine "prohibits the federal government from commandeering state and local officials to help enforce federal law." *City & County of San Francisco v. Trump*, 816 F.Supp.3d 1017, 1040 (N.D. Cal. 2026) (citing *Printz v. United States,* 521 U.S. 898, 935 (1997)). And while typically framed as a restriction on Congress's authority, it naturally extends to the Executive Branch, which enjoys no greater constitutional authority to issue edicts to the States. *See Galarza v. Szalczyk*, 745 F.3d 634, 644 (3d Cir. 2014). That is particularly so in the election context, where the Executive's only authority comes from Congress.

The anticommandeering doctrine applies when the federal government "directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012); *see also City & County of San Francisco v. Trump*, 783 F.Supp.3d 1148, 1184 (N.D. Cal. 2025) (explaining the doctrine applies "regardless of whether that compulsion is direct (through command) or indirect (through coercion)"), *appeal docketed*, No. 25-3998 (9th Cir. June 23, 2025). At heart, under the Constitution's division of powers, States "ha[ve] the right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts." *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019).

Defendants' campaign to federalize Washington's election administration seeks to deprive the State of that choice, using the threat of federal investigation, retaliation, and lawsuits as a cudgel to make election officials bend the knee to the current administration's policy preferences. Indeed, Defendants do not even attempt to mask their "commandeering" of state election administration. The President has called for his own party in Congress to "nationalize" elections and to "take over the voting." Ex. E. Defendants' demands to Washington can only reasonably be understood as coercive ultimatums. As Defendants escalate their efforts, "States and local municipalities may feel compelled to adhere" to Defendants' demands. *San Francisco v. Trump*, 816 F.Supp.3d at 1041. Such "weaponiz[ation]" of the federal government's resources and investigative authority—to displace state choices over state matters—violates the Tenth Amendment. *Id.*

### C. Defendants' actions violate Plaintiffs' right to vote and right to fundamentally fair elections.

Defendants' actions violate the fundamental right to vote as secured by the First and Fifth Amendments and the right to fundamentally fair elections secured by the Due Process Clause of the Fifth Amendment. The Constitution protects the right of qualified citizens to vote and to have their votes counted. *United States v. Classic*, 313 U.S. 299, 315 (1941); *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964). And the Fifth Amendment's Due Process Clause protects that right against federal action and protects voters against government conduct that renders an election fundamentally unfair. *See Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998).

Defendants' demand that Washington officials segregate ballots based on unreliable methodology, without notice or opportunity to be heard by affected voters, severely burdens

the right to vote of eligible Washington voters, including Plaintiffs' members and constituents. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also infra* Argument II (detailing harms to Plaintiffs' members). Defendants have admitted that their list of purported noncitizens may include naturalized citizens, *see* Ex. D-5, which means the segregation of ballots could result in disenfranchisement of lawful voters. And even those individuals not on the list may be deterred from exercising their right to vote because of Defendants' threats. *See infra* Argument II.A. Defendants have no legitimate justification for demanding, on pain of criminal prosecution, that Washington officials segregate ballots based on a faulty list. Any supposed interest in preventing voting by noncitizens could be achieved by means far less burdensome on the right to vote—including pursuing criminal prosecutions under Section 611. *See Nader v. Brewer*, 531 F.3d 1028, 1037 (9th Cir. 2008) (holding State's fraud-prevention justification did not justify ban on nonresident petition circulators because less burdensome methods existed that "would achieve the same end").

Defendants also threaten to render the upcoming election fundamentally unfair in violation of the Due Process Clause of the Fifth Amendment by compelling Washington officials to depart, in the middle of an election, from the procedures on which voters relied in casting their ballots. *See Bennett*, 140 F.3d at 1226-27. A change in rules that invalidates ballots already cast in reliance on established election procedures renders "the election itself ... a flawed process." *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978). Far from promoting election integrity, Defendants' demand that Washington alter its election procedures mid-election would undermine "the very integrity of the electoral process." *Griffin v. N.C. State Bd. of Elections*, 781 F.Supp.3d 411, 435 (E.D.N.C. 2025) (citation omitted).



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

## II. Plaintiffs have standing and face imminent irreparable harm.

### A. Plaintiffs satisfy Article III standing on multiple grounds.

Plaintiffs are likely to show they have an "injury-in-fact" that is "traceable to the actions of the" Defendants and "likely to be redressed" by an injunction against Defendants. *Cedar Park Assembly of God v. Kreidler*, 402 F.Supp.3d 978, 985 (W.D. Wash. 2019) (citing *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 950 (9th Cir. 2013)). Each has a strong interest in ensuring its members and constituents can exercise their right to vote. Further, each has a distinct interest in preserving its own voter engagement efforts, which will be hampered by DOJ's attempts to prevent lawfully registered voters—and naturalized citizens in particular—from voting.

***Harm to the right to vote.*** Plaintiffs have associational standing because Defendants' election interference directly harms the right of Plaintiffs' members and supporters to vote. *Mi Familia Vota v. Fontes*, 719 F.Supp.3d 929, 983-88 (D. Ariz. 2024) (finding organizations had standing to protect members' voting rights), *aff'd in part, vacated in part*, 129 F.4th 691 (9th Cir. 2025), *cert. granted sub nom. Republican Nat'l Comm. v. Mi Familia Vota*, 146 S.Ct. 2799 (2026). Plaintiffs collectively represent tens of thousands of Washingtonians—including many naturalized citizen voters—across the state. *See* Norouzi ¶4; Ballesteros ¶5; Oyefeso ¶3. Plaintiffs' members who are naturalized citizens face the greatest risk of being wrongly flagged as noncitizens—and thereby disenfranchised by Defendants' actions—because federal records often fail to reflect naturalization. *See* Norouzi ¶10; Ballesteros ¶¶4, 12; Oyefeso ¶¶7, 11; *supra* Background § III. Indeed, DOJ's October 26 letter admitted that the names provided to Washington likely include naturalized citizens. Ex. D-5. DOJ's attempt to force Washington to set aside voters' ballots—or otherwise burden voters' participation—





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

threatens injury to Plaintiffs' members. *See DSCC v. Trump*, No. 26-cv-1114, 2026 WL 2681471, at *6 (D.D.C. Sep. 13, 2026) (holding that "an increased risk of disenfranchisement in an upcoming election can make that injury sufficiently imminent for standing purposes" (citation modified)).

Plaintiffs have standing on behalf of their members and constituents even if they are able to ultimately collect and submit proof of their citizenship in order to establish their eligibility to vote. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009) (holding voters with acceptable photo ID "would still have standing to challenge" photo ID requirement); *Fish v. Schwab*, 957 F.3d 1105, 1119-20 (10th Cir. 2020) (same, for proof-of-citizenship requirement). As the Supreme Court recently held, "such a 'need to take … affirmative steps to avoid risk of harm … constitutes a cognizable injury' supporting standing." *DHS v. League of Women Voters*, No. 26A308, 2026 WL 2879700, at *2 (U.S. Sep. 25, 2026) (per curiam) (alterations in original) (citation omitted).

Defendants' actions also injure Plaintiffs' members because they are likely to deter those members from participating in the political process. Naturalized citizens already vote at lower rates than other voters and are likely to be deterred if DOJ prevails—either because they are concerned that voting will subject them and their families to false accusations and undue scrutiny, or because they conclude their votes may not count. Ex. S; Norouzi ¶12; Ballesteros ¶¶7-8, 14; Oyefeso ¶¶7, 11-12. Many already fear registering to vote will invite intrusive government scrutiny, and enforcement of a secret federal list of "likely noncitizens" whose ballots must be investigated and set aside would only confirm those fears. Norouzi ¶¶6, 10, 12; Ballesteros ¶8; Oyefeso ¶12.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

***Harm to core activities.*** Plaintiffs also have organizational standing because Defendants' conduct will "directly interfere with their core activities." *LULAC I*, 780 F.Supp.3d at 180. When a government action "'directly affect[s] and interfere[s] with [an organization's] core business activities,'" such that an organization has "diverted resources in response," then "an organization has suffered an injury in fact." *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 633 (9th Cir. 2026) (first and second alteration in original) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)). Plaintiffs' core activities include encouraging their members and constituencies, among them naturalized citizens, to register and vote. Norouzi ¶¶5, 7, 12-13; Ballesteros ¶¶7-8; Oyefeso ¶¶4-5. Each Plaintiff expends significant resources promoting voter registration and turnout among its members and constituents. Norouzi ¶7; Ballesteros ¶¶3-7, 9; Oyefeso ¶5. OneAmerica Votes, for example, conducts person-to-person outreach and messaging campaigns aimed at ensuring its constituents' votes and voices are counted. Norouzi ¶7. The Latino Community Fund of Washington State ("LCF") has engaged with more than 15,000 voters in Washington already and plans to reach thousands more before election day. Ballesteros ¶9. The United Food and Commercial Workers International Union ("UFCW") also conducts voter education and get-out-the-vote campaigns. Oyefeso ¶5. Defendants' actions would force Plaintiffs to divert resources to aiding voters swept into DOJ's eleventh-hour demand and reassuring new voters, including naturalized citizens, who are deterred by DOJ's threats. *See* Norouzi ¶11; Ballesteros ¶12; Oyefeso ¶¶8-9. This injury is sufficient to establish Article III standing. *See Mi Familia Vota*, 719 F.Supp.3d at 985.

***Traceability/Redressability.*** Each of Plaintiffs' injuries is directly traceable to Defendants. As discussed *supra*, the mere existence of Defendants' ongoing threats can deter



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

Plaintiffs' members from voting. Plaintiffs may also "establish a causal link between a challenged government action and harm resulting from the independent conduct of third parties by showing that third parties will likely react in predictable ways to the challenged government action." *Ctr. for Biological Diversity v. EPA*, 168 F.4th 1164, 1176 (9th Cir. 2026) (citation modified). The increasing pressure on Washington election officials increases the likelihood that they will acquiesce to Defendants' demands to burden and disenfranchise registered voters. Equitable relief would redress Plaintiffs' injuries by stopping that coercion. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

**B. The harm Plaintiffs are suffering is irreparable.**

Voting is already underway in Washington, and election day is tomorrow. As Justice Kavanaugh has stressed, "[w]hen an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S.Ct. 879, 880-81 (2022) (Kavanaugh, J., concurring). Simply put, it is inherently disruptive for federal actors to "swoop in and re-do a State's election laws in the period close to an election." *Id.* Yet that is precisely what Defendants are doing, imposing half-cocked, chaos-inducing demands on Washington election officials. *See* Holmes ¶¶4-40; *supra* Background § IV.C. Without injunctive relief, Plaintiffs will suffer quintessential irreparable harm: once the election occurs—and the time to vote passes—"there can be no do over and no redress." *Newby*, 838 F.3d at 9 (citation omitted). And preliminary relief "requires only a likelihood of irreparable injury." *Id.* at 8-9. "Damocles's sword does not have to actually fall ... before the court will issue an injunction." *Id.* at 9. Plaintiffs face irreparable harm in two ways.

*First*, Plaintiffs' members and supporters are likely to suffer irreparable harm to their voting rights when federal threats deter voting or cause their ballots to be withheld or rejected.





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

*See, e.g.*, *DSCC*, 2026 WL 2681471, at *9 ("The harm of untransmitted ballots—both to voters and candidates—is irreversible … ."). "[T]here are no do-overs for voters entitled to participate in elections," *Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, 2026 WL 2635380, at *13 (D.C. Cir. Sep. 8, 2026), so courts "routinely deem" such threats of injury to "voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Newby*, 838 F.3d at 8-9 (finding irreparable harm likely even where "unclear whether Alabama and Georgia are currently enforcing their proof-of-citizenship laws").

*Second*, Defendants are disrupting Plaintiffs' civic engagement programs at the 2026 election's final, most crucial moment. To protect voters from having their ballots discarded, Plaintiffs must revamp their voter education and anti-suppression programs at the expense of their mobilization efforts, making it more difficult to accomplish their purpose of helping their members and constituencies vote and ensure those ballots are counted. Norouzi ¶¶11, 13; Ballesteros ¶¶13, 15; Oyefeso ¶¶8-9. An organization faces irreparable harm where "new obstacles … unquestionably make it more difficult" to accomplish its time-sensitive mission. *Ctr. for Taxpayer Rts.*, 2026 WL 2635380, at *13 (quoting *Newby*, 838 F.3d at 9). Plaintiffs are scrambling to prevent disenfranchisement from Defendants' interference, and the Court "can neither postpone an election nor turn back the clock to give Plaintiffs additional time to pursue" these objectives. *LULAC I*, 780 F.Supp.3d at 201.

## III. The equities and public interest favor relief.

The public interest and the equities further favor the issuance of a restraining order and preliminary injunction. Because here "the Government is the opposing party," the assessment of the equities and the public interest "merge." *Nken*, 556 U.S. at 435. "Thus, the

Court asks whether any significant 'public consequences' would result from issuing the preliminary injunction." *Isho v. Marin*, 830 F.Supp.3d 1002, 1012 (C.D. Cal. 2026) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008)).

Defendants face no harm at all from an order enjoining unlawful election interference. *See, e.g.*, *Newby*, 838 F.3d at 12 (explaining "[t]here is generally no public interest in the perpetuation of unlawful" government conduct). The requested relief would leave intact every lawful tool that Congress has given Defendants, including investigating and prosecuting election-related crimes through the criminal process, subject to the appropriate procedural and evidentiary requirements. *See Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983) (holding the government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations"). And although there is a public interest in "preserving the integrity of [the] election process," *Newby*, 838 F.3d at 13 (alteration in original) (citation omitted), there is no evidence that noncitizen voting is a widespread problem, nor any evidence that Defendants have anything helpful to offer state and local election officials. Given the well-documented inaccuracies in Defendants' lists, Defendants are at best sending election officials on a wild goose chase that distracts from the mission of keeping elections safe and secure. The reality, of course, is much worse. *Supra* Background § III; *see also* Holmes ¶¶25-39.

Without relief, by contrast, Defendants have free rein to carry out a smash-and-grab election interference crusade in Washington. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12. Left unchecked, Defendants will threaten Washingtonians' "strong interest in exercising the fundamental political right to vote,"





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (internal quotation marks and citation omitted), and corresponding interest in "permitting as many qualified voters to vote as possible," *LULAC I*, 780 F.Supp.3d at 203 (quoting *Newby*, 838 F.3d at 12). Because Plaintiffs support the same goal in encouraging and assisting their supporters, the "programmatic harm" to Plaintiffs "dovetails with the public interest." *Newby*, 838 F.3d at 13.

The balance of equities and public interest overwhelmingly support Plaintiffs' requested relief.

## **CONCLUSION**

The Court should grant Plaintiffs' motion and enter a temporary restraining order and preliminary injunction.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

Dated: November 2, 2026

Respectfully submitted,

/s/ *Abha Khanna*
**ABHA KHANNA**
WA Bar No. 42612
**TYLER L. BISHOP**
WA Bar No. 63821
**WALKER McKUSICK**
WA Bar No. 63205
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
(206) 656-0177
akhanna@elias.law
tbishop@elias.law
wmckusick@elias.law

**LUCAS W. LALLINGER***
DC Bar No. 1046778
**HARLEEN K. GAMBHIR***
DC Bar No. 1781869
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
(202) 935-1148
llallinger@elias.law
hgambhir@elias.law

*Attorneys for Plaintiffs*

**Admitted Pro Hac Vice*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs OneAmerica Votes, Latino Community Fund of Washington State, and the United Food and Commercial Workers International Union, certifies that this memorandum contains 8,400 words, in compliance with the Local Civil Rules.

Dated: November 2, 2026

*/s/ Abha Khanna*
**ABHA KHANNA**
WA Bar No. 42612
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
(206) 656-0177
akhanna@elias.law

*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System.

I also certify that I have conveyed Plaintiffs' Complaint for Declaratory and Injunctive Relief and all supporting exhibits, as well as the foregoing Motion and all supporting documents, by email to counsel of record for Defendants Donald J. Trump, in his official capacity as President of the United States, the U.S. Department of Justice (DOJ), Todd Blanche, in his official capacity as U.S. Attorney General, the U.S. Department of Homeland Security (DHS), and Markwayne Mullin, in his official capacity as Secretary of Homeland Security—all of whom are Defendants here—in *DSCC v. Trump*, No. 1:26-cv-03674-JEB, using the following contact information:

Catherine J. Malycke
DOJ-Civ
U.S. Attorney's Office, Civil Division
601 D Street NW
Washington, DC 20530
202-252-2500
Email: Catherine.Malycke@usdoj.gov

Kathryn Barragan
DOJ-Civ
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
202-598-7696
Email: kathryn.e.barragan@usdoj.gov

Abigail Nusbaum
DOJ-CIV
1100 L Street NW
Washington, DC 20005
202-451-7304
Email: abigail.s.nusbaum@usdoj.gov

Christian Dibblee
DOJ
FEDERAL PROGRAMS BRANCH - Civil Division
1100 L Street, N.W.
Washington, DC 20005
202-353-5980
Email: christian.r.dibblee@usdoj.gov

I have also conveyed Plaintiffs' Complaint for Declaratory and Injunctive Relief and all supporting exhibits, as well as the foregoing Motion and all supporting documents, by email to directly to Defendant Charles Neil Floyd at neil.floyd@usdoj.gov and Defendant Simon Peter Serrano at pete.serrano@usdoj.gov.

Dated: November 2, 2026

*/s/ Abha Khanna*
**ABHA KHANNA**
WA Bar No. 42612
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
(206) 656-0177
akhanna@elias.law

*Attorney for Plaintiffs*