# Exhibit D

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

OneAmerica Votes, et al.,

Plaintiffs,

v.

Donald J. Trump, in his official capacity as the President of the United States, et al.,

Defendants.

No. 2:26-cv-4223

DECLARATION OF STUART HOLMES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Stuart Holmes, declare as follows:

1. I am a United States citizen and resident of the State of Washington. I am over the age of 18. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Office of the Secretary of State ("OSOS") staff, or from my review of relevant documents and information. If called as a witness, I could and would testify competently to the matters set forth below. I recently submitted a materially identical declaration in an action filed in the Northern District of California, *Services Employees Internal Union, et al. v. U.S. Department of Justice*, No. 3:26-cv-12800-TLT.

2. I am the Director of Elections in Washington. I work for the Secretary of State, Steve Hobbs, and support him in his official capacity as the Chief Election Officer for the State of Washington. In my role, I assist him in the execution and enforcement of all state and federal laws relating to elections. I have served as the Director of Elections since November 2021. I've worked in the Elections Division of the OSOS since September 2014, and, prior to that, worked in the Benton County Auditor's Office Election Department between May 2005 and September 2014.

3. The Secretary of State is the state's Chief Election Officer, responsible for executing and enforcing all state and federal laws relating to elections within the state. *See* Wash. Rev. Code § 29A.04.230. The Elections Division is responsible for implementing the Secretary of State's responsibilities with regard to elections. Washington law charges my office with preventing disenfranchisement and ensuring that all eligible voters who want to vote are able to do so. *See* Wash. Rev. Code §§ 29A.04.206, 29A.92.005.

4. In my current role, my duties include, among other things, overseeing the elections systems in the state of Washington. I am responsible for making sure that, on a



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

statewide basis, elections in Washington are conducted fairly, that voters have access to the means of exercising their right to vote, and that Washington's elections are conducted with a high degree of integrity and security. I also lead the Secretary of State's supervision of election administration by counties. Some of my duties include ensuring that the State's and counties' administration of elections comply with state and federal election laws. As part of these duties, I keep abreast of legal requirements and participate in national conferences on election administration. I also generally keep abreast of other states' election administration practices and developments, particularly as it relates to vote by mail. In my role as election director, I also oversee all aspects of the Secretary of State's role as Chief Election Officer, including working with counties on election administration, creating and implementing standards and trainings governing elections, and interacting with the public to addresses voters' questions and concerns and promote voter confidence.

5. Washington and its subdivisions are collectively responsible for administering state and federal elections in Washington. These responsibilities encompass all manner of election administration, including maintaining and updating voter rolls, issuing ballots to registered voters, tabulating votes, and certifying results in all elections for state and federal office, among numerous other tasks.

6. As part of my responsibilities in administering elections, I am in constant communications with county auditors and election administrators about all aspects of election administration. Based on my work with county election administrators and my own experience, as well as the experience of my staff, I can say that this election cycle has been the most stressful and anxiety-filled cycle I have ever experienced in my more than twenty years working in elections. This extraordinary stress has been due to the relentless interference state and local

election officials have experienced from the Trump Administration and the Department of Justice and the continuous and escalating threats of criminal prosecution simply for doing our jobs in accordance with state and federal law. These threats and interference from this Administration have diverted untold attention and resources away from our core duties of administering a fair, accurate, and accessible election, and has created an environment of fear and intimidation among elections administrators.

7. These threats and overreach started soon after President Trump was inaugurated. In March 2025, President Trump issued Executive Order 14,248. Among other things, this order purported to impose new restrictions on registering to vote, set aside longstanding and widespread state laws setting ballot-return deadlines, and dictate which voting machines can be federally certified. Because these requirements conflicted with state election laws and processes, Washington led a successful lawsuit to enjoin implementation of the executive order, requiring diversion of staff time to support that effort. A federal district court enjoined key aspects of that Executive Order as violating constitutional separation of powers. *Washington v. Trump*, No. 2:25-cv-00602-JHC (W.D. Wash. Jan. 9, 2026).

8. The overreach did not stop there. In September 2025, the Department of Justice demanded a copy of Washington's voter registration list, including confidential information for all Washington voters such as their social security numbers, drivers' license numbers, and other confidential information. A true and correct copy of the Department of Justice letter is attached as **Exhibit D-1**. Secretary Hobbs responded explaining how to request a copy of the publicly available voter registration list and explaining that federal and state law prevented him from disclosing the private confidential information for more than five million Washington voters. But he also invited the Department of Justice to provide additional information about its authority to

access the confidential information. A true and correct copy of Secretary Hobbs's September 23, 2025 response is attached as **Exhibit D-2**.

9. The Department of Justice did not provide any additional authority that would authorize disclosure. Instead, the Department sued Secretary Hobbs, seeking the full state voter registration list. Because the request contravened Washinton law, Washington opposed that lawsuit, again requiring diversion of staff resources to support that effort. A Washington district court later dismissed DOJ's lawsuit against Secretary Hobbs. *United States v. Hobbs*, No. C25-6078-KKE, 2026 WL 2833713 (W.D. Wash. Sept. 22, 2026). I understand that DOJ has sued 29 states and the District of Columbia to try and get their confidential voter roll lists, and every court to have decided the case has ruled against DOJ.

10. DOJ thereafter continued to send threatening letters directly to Secretary Hobbs, despite the fact that DOJ was in active litigation against Secretary of Hobbs, in which he was represented by attorneys in the Washington Attorney General's Office. In July 2026, Assistant Attorney General Harmeet Dhillon sent another letter to Secretary Hobbs, making numerous threats of criminal prosecution. A true and correct copy of this letter is attached as **Exhibit D-3**. In that letter, Ms. Dhillon threatened that "state election officers, including the chief election officer of the state, could be criminally prosecuted for aiding and abetting the violation" of statutes prohibiting noncitizens from claiming to be a citizen to register to vote or voting in an election. Ms. Dhillon repeated that "any election officer, including the chief election officer of the state, who knowingly retains noncitizens on the state's voter registration list or facilitates noncitizens in receiving and casting ballots could be subject to criminal liability." A third time, she threatened that an "intentional act that is aimed at diluting the votes of citizens could also constitute a violation of 18 U.S.C. § 241, which makes it unlawful for two or more persons to



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

conspire to injure any person in the exercise of that person's constitutional rights." She continued her threats by asserting that "several provisions of federal law make it unlawful for noncitizens to vote in federal elections, and an election officer could be criminally liable for aiding and abetting under 18 U.S.C. § 2 for the violation of any of these provisions or knowingly including noncitizens on the state's voter registration list." She concluded the letter by demanding that the Secretary to respond the letter "within five days informing us how the state of Washington intends to ensure it is complying with these federal laws both at the state and local level."

11. I have never seen or heard of a similar type of threat coming from DOJ in all my years working in elections. I found this letter intimidating because of the complete imbalance of power between DOJ and state and local election workers and DOJ's demonstrated willingness to pursue legal actions that dozens of judges had explicitly and repeatedly held was unlawful. By repeating the threat of criminal prosecution six times in a single letter, I clearly understood that the purpose of this letter was to intimidate. And the threats were completely unfounded. As an election official, I know that we must act in accordance with the law and only register individuals when all state and federal registration requirements have been met. All election officials know this and, in my experience, all election officials abide by this. I have never once heard of an election worker registering someone they knew to a non-citizen. By repeating these threats of criminal prosecution over and over again, DOJ strongly insinuated that election officials could be held criminally liable simply for carrying out our legal duties. For years, I have been aware of threats from third party actors, including of potential prosecutions. Now, those same baseless threats are coming from the DOJ, making them particularly intimidating.

12. The threats did not end there. In September 2026, Secretary Hobbs received a letter from Acting Chief of the Department of Justice's Civil Rights Division Eric Neff about the

subject of ongoing litigation in which Secretary Hobbs continued to be represented by attorneys at the Washington Attorney General's Office. That letter stated that Secretary Hobbs was "currently under investigation" as to the extent to which he had failed to comply with his duties under the Civil Rights Act, the National Voter Registration Act (NVRA), and the Help America Vote Act. A true and correct copy of this letter is attached as **Exhibit D-4**. It further demanded Secretary Hobbs preserve records beyond the preservation periods set forth in federal law and that, if he failed to do so, he could be subject to "civil and criminal sanctions." Because of the threat, I again found this letter to be threatening and intimidating.

13. These threats were not the only interference we experienced. While all these threats were ongoing, the Administration continued to interfere with election administration at a larger scale. On March 31, 2026, the President issued Executive Order No. 14,399, entitled *Ensuring Citizenship Verification and Integrity in Federal Elections* ("EO"). I understood the EO to direct the Department of Homeland Security and the U.S. Postal Service to create voter eligibility lists that are different from state voter registration lists. I also understood it to threaten investigation and prosecution state election officials if they sent ballots to voters missing from those lists. I further understood the EO to directly interfere with mail voting by mandating that the United States Postal Service ("USPS") issue a rule requiring creation of a ballot portal for delivery of election mail and a list of voters authorized to receive election mail and directing USPS not to deliver voted ballots unless the voters were registered into the Ballot Portal and appeared on the lists.

14. USPS later published a final rule on August 26, 2026, Ballot Mail for Federal through a central Ballot Portal, less than two months before Washington State was due to mail all active registered voters in the State their mail-in ballots. The Rule imposed numerous new





ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

requirements, including design requirements for outbound and return ballot envelopes, a requirement to use trackable Intelligent Mail barcodes on such envelopments, and a requirement to obtain USPS's pre-approval of States' ballot envelope designs. The Rule also provided that USPS would not deliver mail ballots that did not comply with the Rule's requirements, including if election officials sent election mail to voters who were not enrolled in the ballot portal, or any information missing for a particular voter in the ballot portal, or if States used envelopes that did not comply with USPS new design standards.

15. Issuing the Rule so close to the election caused chaos. Not only was staff time diverted to support the legal action to enjoin enforcement of the rule, but election administrators and public officials in Washington spent significant time and resources preparing contingency plans in case the Rule went into effect. Washington runs its election almost exclusively by mail and no longer as the infrastructure available to accommodate in-person voting at a large scale. The inability to use USPS to deliver ballots created a substantial risk that millions of Washington voters would not be able to obtain a ballot at all. And because USPS published the Rule so close to the election, counties had already purchased all their envelopes for delivery of mail ballots. Because those ballots would not comply with the requirements of the Rule, several counties rushed to order substitute ballot envelopes that could accommodate the use of intelligent mail barcodes, at a cost of tens of thousands of dollars. For most counties, however, it was too late to order new ballot envelopes. Facing the dire possibility that Washington would not be able to get ballots to its over 5 million registered voters, the Secretary of State's Office spent countless hours preparing contingency plans on how the State would send millions of ballots to voters without USPS. Thankfully, courts enjoined enforcement of the Rule, and the U.S. Supreme Court denied a stay of that injunction. But a significant amount of time and resources were expended both in

fighting the illegal acts by the Administration and for preparing contingency plans in case the Administration succeeded in its illegal efforts.

16. Yet again, the interference did not stop there. On the morning of October 26, 2026, I learned about that our office had received an inquiry from a member of the news media stating that the Department of Justice had announced it would be holding a press conference at 2:00pm that day "to discuss the issue of non-citizens being registered to vote in the State of Washington." This was the first time I learned about the press conference.

17. At 11:46am on October 26, 2026, our office received an email from First Assistant United States Attorney Pete Serrano and Acting U.S. Attorney Charles Neil Floyd, who lead the two Offices of the U.S. Attorneys in Washington that included a letter saying that they would be "addressing the United States' concerns of non-citizen voting in federal election." The letter attached a PDF list of 405 names that, according to the letter, consisted of people who "are or *were* noncitizens" and that the federal government believed "was sent a vote-by-mail ballot from the State of Washington to participate in the November 2026 federal election." A true and correct copy of the letter (without the list of voters) is attached as **Exhibit D-5**.

18. This was the first communication that we received from the Department of Justice on this subject. In the months leading up to the election, state election officials had been meeting regularly with federal officials, including representatives from the Federal Bureau of Investigation and the U.S. Attorneys' Offices for both the Eastern and Western Districts of Washington, to discuss election related concerns and threats. At no time before receiving the October 26 letter did any representative of the United States Attorneys' Office contact the Office of the Secretary of State with a list of people who may be ineligible to vote, whether due to citizenship status or otherwise.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

19. Neither the letter nor the attachment included any individualized evidence to substantiate its claims, only assertions. In addition, neither the letter nor the attachment explained the sources of information consulted or otherwise explained the methodology underlying the list. It provided no information for OSOS to be able assess the credibility or reliability of the Department's assertions. I understand that the Department of Justice has indicated that it relied on Lexis Nexis for some part of its search.

20. The letter made two requests. First, it requested that our office review the list of names it provided "within 24 hours of receipt of this letter to determine whether United States citizens are listed." Second, it requested that, "[i]f a ballot for any individual on the list has been or subsequently is return, instruct the appropriate elections official to not verify the signature and/or tabulate the ballot until citizenship can be determined."

21. It also made threats for noncompliance. It stated that "while our offices do not enforce State law," "we do make criminal referral to our state counterparts; nonetheless, we do expect a prompt response from your office by enacting the approach above and with any further actions you deem appropriate to comply with the State or Federal laws.

22. But the letter did not even state that the individuals on the list are currently noncitizens. Having once been a noncitizen who might have naturalized, as the Department of Justice asserted, does not disqualify a person from voting. In the absence of corroborating evidence that the individuals on the list are currently noncitizens, I believe it would be illegal to remove these voters from the State's voter rolls or refuse to process their ballots.

23. To register to vote in Washington State, each registrant must swear under penalty of perjury that they are a United States citizen or present proof of citizenship as part of a transaction with another state agency. This is the proof of citizenship required by federal and

state law to register to vote. As a result, every registered voter has confirmed United States citizenship, and, by law, our office must give effect to that confirmation absent proof to the contrary.

24. And based on the limited information available, our office had significant reasons to doubt the reliability and credibility of DOJ's assertions about the individuals. For example, the letter asserted the United States' "belief that each of these individuals was a sent a mail ballot from the State of Washington" for the upcoming election. This is incorrect. Based on the best information available to me, I preliminarily determined that, of the 403 unique individuals on the list, at least 62 individuals had not received ballots: 24 had a canceled voter registration, 27 had an inactive voter registration, and there were 11 names I could not find, which means that these individuals did not receive a ballot. These numbers may actually be higher or lower, depending on additional information that the federal government has not provided.

25. To further "determine whether any United States citizens are listed," as requested by DOJ's letter, I coordinated with the Department of Licensing. From the information provided by the Department of Licensing, I understand that, as part of transactions with that agency, multiple people on this list presented proof of citizenship, including United States birth certificates, United States passports, and certificates of naturalization. I further understand that the Department of Licensing does not necessarily collect or retain citizenship documentation from people who apply for non-enhanced driver licenses and identity cards. That means that the absence of citizenship documents from the information available to the Department of Licensing is not evidence that the person is a noncitizen.

26. A few hours after sending the letter, the authors of the letters held a press conference. Contrary to its statements in the letter that the individuals "are or were noncitizens,"

acting U.S. Attorney Floyd asserted that all individuals are currently noncitizens. In that press conference, Mr. Franz made several veiled threats. He said: "We will continue to investigate and we will criminally prosecute those who vote illegally, and those who assist others in voting illegally." In response to a question about whether the DOJ will potentially charge state officials he said: "What I can tell you is what the law says. It is illegal under section 611 for noncitizens to vote. Anyone that assists someone in voting illegally will be also guilty of that crime, like murder or just like any other. So if you conspire, aid and abet, someone else in committing a crime, then you can be guilty of the crime too."

27. After our office conducted a preliminary review of the list, Secretary Hobbs responded to DOJ's letter. A true and correct copy of that letter is attached as **Exhibit D-6**. The letter explained that our preliminary investigation "confirms what your letter acknowledges: This list includes United States citizens and is not reliable." It also explained that, without individualized proof of ineligibility, "it would be both irresponsible and illegal for election officials to decline to process a registered voter's ballot." It further invited the DOJ to provide individualized proof if available "so election officials can take appropriate steps that are consistent with federal and state law."

28. While the letter threatened that if the State did not agree to DOJ's demands, that DOJ would be forced to seek emergency relief, DOJ has not filed a lawsuit against Secretary Hobbs. I understand, however, that the Department of Justice has announced that it is initiating a criminal probe of election administrators in California that have not abided by DOJ's demands to segregate and not count ballots from individuals who DOJ has claimed may be noncitizens. I fear that myself, staff members of the Secretary of State's Office, Secretary Hobbs, and election administrators around the state could become targets of a similar criminal probe.



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

29. This fear was heightened when I learned about additional threats made more recently. In a radio interview on October 29, First Assistant United States Attorney Serrano made comments that I understand to be targeted at election officials, including, "We will continue to investigate and criminally prosecute . . . those who assist others in voting illegally"; "When it comes to these issues, our job is to prosecute. And when there are prosecutable issues that are brought to my office in the Eastern District of Washington, I can assure you that my people, my team and I, will utilize our full force and efforts"; "Knowingly assisting those [noncitizens] who are voting is a crime"; "what I'm trying to find out are the organizations, the people, the systems that set up illegal voting in the State of Washington." While I know that neither I nor any of my staff have violated any criminal law, these threats are intimidating.

30. The threats keep coming. This morning—October 30—I received a letter sent by Acting Deputy Attorney R. Trent McCotter. The letter began with a reminder about federal laws requiring preservation of records. I am aware of federal and state law records preservation requirements and did not need a reminder. I am not aware of the DOJ ever previously sending a similar reminder on the eve of an election. The top of the second page of the letter contains what I understand to be an additional threat to state and local election officials:

> It is a crime to willfully fail to comply with Section 20701. Such a failure is punishable by up to a year in prison and a $1,000 fine. It is also unlawful to willfully steal, destroy, conceal, mutilate, or alter these records under Section 20702. I understand the purpose of this letter to be to intimidate state and local election officials like me with the threat of criminal prosecution.

31. Threats of criminal actions put election administrators in an untenable position. They are forced to choose between executing their duties faithfully in accordance with state or federal law or preserving their own financial interests and freedom from a baseless criminal probe. We are public servants. Many of us have made sacrifices so that we could devote



ELIAS LAW GROUP LLP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
(206) 656-0177

ourselves to public service. Even a baseless criminal probe can threaten potential bankruptcy.

32. These threats come in the context of a frantic and ever-escalating effort by the Trump Administration to interfere with elections. I am still shocked that the greatest threat that election administrators and voters face today is interference and lawlessness by their own President and their own government. Our office has spent countless hours and many thousands of dollars on legal fees fighting against election interference from the President, the Department of Justice, and other federal agencies. We have had whole-of-government tabletop exercises to prepare for the threat of interference from the federal government. We have had to hold emergency meetings with other state agencies and county auditors to prepare for the possibility that federal agents will unlawfully seize ballots, intimidate voters, invade polling locations, or arrest election workers. Our attorneys have been forced to prepare for similar possibilities. On attorneys' fees alone, our Office has spent over hundreds of thousands of dollars fighting against federal interference with election administration.

33. The threats from the federal government also trigger escalating threats from private citizens. Since 2020, many election officials have faced threats and intimidation from third parties. For example, in December 2020, my predecessor, the then-Elections Director for the Washington Office of the Secretary of State, received a death threat online and had her home address and photograph posted online. This was part of a campaign of threats against dozens of election officials. I am also aware that local election officials have been threatened. Washington State has experienced multiple white powder incidents, including during this election cycle, and election administrators have been doxxed online.

34. This whole environment has created a recruiting crisis. Many election administrators in the State have quit amidst the increasing personal risks and harassment from

private parties and from the federal government. It has become harder and harder to recruit election workers, who perform a vital function in ensuring that elections are fair, free and accessible. These are not high-paying jobs and our democracy will not function if we cannot ensure that election administrators can do their jobs without fear or favor.

35. All across the country, large numbers of election officials have resigned or decided to not seek re-election. This creates serious challenges for successfully running elections. The threats of criminal prosecution from the Department of Justice are a new and very troubling continuation of this history of threats and intimidation.

36. The most difficult part of all this interference is that election administrators have such an important job to do, and continually decreasing funds and resources with which to do that job. Preparing for an election is a complicated and time-consuming process filled with tasks that are critical to holding a successful election.

37. Right before an election is the busiest and most critical time of the year. Time we are spending fighting off federal interference could and should be spent on the continuous process of updating voter registrations, ensuring that voting centers are working properly, addressing resource limitations, assisting voters seeking to register or cancel their registrations, answering voters' questions and conducting get-out-the-vote efforts, ensuring access to the ballot, and the monumental task of processing ballots, verifying signatures, tabulating election results, welcoming election monitors, conducting recounts, and assisting voters.

38. Washington continues to process and count ballots that are postmarked by Election Day until it certifies the election approximately three weeks after election day. This entire period is extremely busy for election administrators.

39. Diversion of our attention and resources during this critical time period harms

voters and harms elections. Election administrators should not be forced to perform their critical work through a fog of fear and intimidation.

40. Washington has been suffering a fiscal crisis for years. The budget of the Secretary of State has continually been whittled down so that it now only covers core functions. Without relief from this Court, the Secretary of State's Office will likely be forced to expend additional funds to engage a criminal defense attorney to prepare for the possibility of baseless criminal actions. That is state taxpayer money that should be devoted to improving elections and helping voters, not fighting against baseless threats from the federal government.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

Executed on November 1, 2026 at Olympia Washington.

Executed on: 11/1/2026

Stuart Holmes
Director of Elections
Office of the Secretary of State