UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ONEAMERICA VOTES; LATINO COMMUNITY FUND OF WASHINGTON STATE; and UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as U.S. Attorney General; CHARLES NEIL FLOYD, in his official capacity as Acting U.S. Attorney for the Western District of Washington; and SIMON PETER SERRANO, in his official capacity as First Assistant U.S. Attorney for the Eastern District of Washington; U.S. DEPARTMENT OF HOMELAND SECURITY; and MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,

Defendants.

CASE NO. 2:26-cv-04223-JNW

**ORDER GRANTING TEMPORARY RESTRAINING ORDER IN PART**

## 1. INTRODUCTION

This matter comes before the Court on Plaintiffs' motion for a temporary restraining order. Dkt. No. 12.

On October 26, 2026—eight days before Election Day—Acting U.S. Attorney for the Eastern District of Washington Pete Serrano and First Assistant United States Attorney for the Western District of Washington Neil Floyd sent Washington Secretary of State Steve Hobbs a list of roughly 400 registered voters and demanded that he instruct county election officials not to verify the signatures on, or tabulate, those voters' ballots until their "citizenship can be determined." At a press conference the same day, Serrano and Floyd announced that the State was "on notice" and that anyone who assists an ineligible voter "would be also guilty of that crime under the aiding abetting theory." Washington reviewed the list and found that it includes United States citizens—people who had already shown the State proof of their citizenship. Nothing in the record suggests that anyone on the list has been charged with a crime. The federal government has kept up the pressure anyway and has promised more lists and more letters.

Three Washington organizations whose members include naturalized citizens ask the Court to stop that pressure while this case proceeds. The Ninth Circuit has drawn the line that decides this motion. In *United States v. California*, it held that 18 U.S.C. § 611, the statute DOJ invokes, contains no provision authorizing DOJ to "take charge of or intervene in a state's administration of an ongoing election," and that DOJ could not use it to compel California to set aside ballots it alleged were cast by noncitizens. No. 26-7231, 2026 WL 3268272, at *4 (9th Cir. Oct. 30, 2026).

The Supreme Court declined to disturb that ruling. *United States v. California*, No. 26A624 (U.S. Nov. 2, 2026). Days later, in *Service Employees International Union v. U.S. Department of Justice*, a three-judge Ninth Circuit panel stayed a nationwide order restraining similar demands; after briefly vacating that stay, the en banc court reinstated it. The panel concluded that the Government was likely to succeed on the merits because its letters to state officials were requests, not commands, that didn't "actually disturb the states' regulation of their own elections." No. 26-7303, slip op. at 6 (9th Cir. Nov. 2, 2026), *reinstated* (9th Cir. Nov. 3, 2026) (panel order). *SEIU* and *California* thus mark the two ends of a line: the Government may ask a State to set ballots aside, but it may not compel one to do so. The question is which side Defendants fall on here.

On this record, Defendants did not ask. They directed Washington to set aside specific voters' ballots, set a deadline, told election officials they would be prosecuted if they counted those ballots as state law requires, and, when the Secretary of State refused, announced that they would go around him to the county auditors and "continually demand" the same thing. That is the compulsion *California* holds DOJ has no authority to exercise, and the fact that Defendants pursue it through threats rather than a court order does not change its character. Plaintiffs are likely to succeed on their claim that Defendants have exceeded their authority, and the harm to Washington voters whose ballots are set aside on the strength of an unreliable federal list cannot be undone after the fact.

Having considered the matter, and finding oral argument unnecessary, the Court GRANTS the motion in part. The Court's order is narrow. Nothing in it stops

the Government from investigating or prosecuting anyone who votes unlawfully, from sharing information with election officials, from stating its view of what federal law requires, or from asking for Washington's cooperation, and nothing in it changes a single rule of Washington's election. The order reaches only Washington, and it expires in fourteen days unless the Court extends it further. For the next two weeks, while Washington's counties count and certify the ballots already cast, DOJ may not demand that election officials set aside a registered voter's ballot because the voter's name appears on a federal list and may not threaten those officials with prosecution for counting votes as state law requires. Voters who followed the rules should not lose their votes to a list that even its authors admit may include citizens.

## 2. FINDINGS OF FACT

Considering Plaintiffs' motion and supplemental brief, Defendants' response, the Parties' supporting exhibits, and the record, the Court finds the following:[1]

Washington conducts its elections by mail. County officials mailed ballots to registered voters by October 16, 2026, and have been processing returned ballots since. Counties must certify their results by November 24, 2026, and the State by December 3, 2026. RCW 29A.60.190, .250. State law prescribes the exclusive procedure for challenging a registered voter's eligibility, which requires a sworn

---

[1] Findings of fact and conclusions of law made in connection with a preliminary injunction are not binding adjudications. *Horphag Rsch. Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). The court may come to different, perhaps even opposite, conclusions as the case advances.

challenge, made on personal knowledge, with notice to the voter. RCW 29A.08.810–.850.

On July 7, 2026, Assistant Attorney General Harmeet Dhillon of the Civil Rights Division sent Secretary Hobbs a letter to provide "notice of the federal laws applicable to state and local election officials" and to outline "the potential criminal penalties for those who fail to carry out their duties." Dkt. No. 12-8 at 2. The letter contains threats of criminal prosecution, warning among other things that "any election officer, including the chief election officer of the state, who knowingly retains noncitizens on the state's SVRL or facilitates noncitizens in receiving and casting ballots could be subject to criminal liability." *Id.* at 3. Dhillon concluded the letter by demanding that Hobbs "respond to this letter within five days informing [DOJ] how the state of Washington intends to ensure it is complying with these federal laws both at the state and local level[.]" *Id.* at 4. In more than twenty years of elections administration, Washington's Director of Elections had never seen a "notice" of this kind from DOJ. Dkt. No. 12-5 ¶¶ 6, 11.

Secretary Hobbs responded on July 16, 2026, calling DOJ's letter "another instance in a troubling pattern of efforts to intimidate election officials and interfere with states' constitutionally protected election administration." Dkt. No1-10 at 2. He added that Washington "welcome[s] meaningful assistance, including timely information sharing regarding potential election crimes" and is "committed to working cooperatively" with federal partners. *Id.* at 3. The federal government did not provide Washington with timely or reliable information.

Several months later, with little more than a week before the 2026 midterm election, Serrano and Floyd sent Secretary Hobbs a letter demanding that Washington election officials set aside and not count around 400 ballots cast by individuals whom DOJ believes are or were noncitizens, acknowledging that these individuals could have naturalized. Dkt. No. 12-10 at 2–3. The letter, dated October 26, 2026, cites 18 U.S.C. § 611, which makes it a crime for a noncitizen to vote in a federal election, and no other federal authority. *Id.* at 2. It states DOJ's "request and expectations": that the Secretary review the list "within 24 hours" and, "[i]f a ballot for any individual on the list has been or subsequently is returned, instruct the appropriate elections official to not verify the signature and/or tabulate the ballot until citizenship can be determined." *Id.* at 3. It continues: "[w]hile our offices do not enforce State law, we do make criminal referrals to our state counterparts; nonetheless, we do expect a prompt response from your office by enacting the approach above[.]" *Id.* It sets a deadline of noon on October 28, after which "the United States will have no choice but to seek emergency relief," and promises that a second list will follow. *Id.* The letter includes no individualized evidence and does not explain the sources or methodology behind the list. Dkt. No. 12-5 ¶ 19.

At a press conference that same day, Floyd and Serrano announced the demand that Washington set aside around 400 ballots. Dkt. Nos. 12-5 ¶ 26; 12-23 at 2. They also warned that because "the state is on notice, it is incumbent upon state officials to make sure they are counting only legal votes" and DOJ "will criminally prosecute . . . those who assist others in voting illegally." Dkt. No. 12-23 at 2–3. When asked whether county election officials could be charged for processing the

ballots of voters on DOJ's list, Floyd responded that "anyone that assists someone in voting illegally would be also guilty of that crime under the aiding abetting theory, just like any other crime." *Id.* at 9. When asked what happens if the Secretary of State's office doesn't comply, Floyd answered that DOJ "will continue to provide them notice of those individuals that are noncitizens and ultimately . . . may have to take additional action[.]" *Id.* at 6.

Washington's preliminary review of DOJ's list revealed substantial inaccuracies. At least 62 of the individuals had not been sent a ballot because their registrations were cancelled, inactive, or could not be found at all. Dkt. No. 12-5 ¶ 24. Multiple people on the list had presented proof of U.S. citizenship to the Department of Licensing. *Id.* ¶ 25. On October 28, 2026, Hobbs responded to DOJ that Washington's review confirmed the list is unreliable and includes United States citizens, and that "it would likely be unlawful to decline to count ballots simply because a person's name appears on the unverified list." Dkt. No. 12-11 at 3.

The refusal did not end the matter. On October 29, 2026, the day after Hobbs declined, Serrano said on the radio that DOJ would not "let it go by the wayside" and would instead "start working with county auditors, which now places the county auditors in a position do I potentially violate this law because Steve Hobbs will not do his job." Dkt. No. 12-24 at 7:3–8. He said that DOJ would "continually demand that these [ballots] are segregated," that "if ultimately we have to send 39 letters to 39 auditors over the next couple days we can do that," and that the auditors would find themselves "in a pickle" between a federal demand and state law. *Id.* at 8:7–13, 8:19–9:2. He described the goal as making "sure these ballots

aren't counted," *id.* at 8:21–22, and added that "if we've got to take legal action to cure them, we will do just that. If we want to cure the issue, we may just have to cut the state out." *Id.* at 9:18–22. Defendants tell the Court that "no further action has been taken" since the October 26 letter. Dkt. No. 19 at 3. Their own statements say otherwise.

Washington election officials "clearly understood that the purpose" of Defendants' threats was "to intimidate." Dkt. No. 12-5 ¶¶ 11, 30. Washington's Director of Elections testified in a declaration that he fears that he, his staff, Secretary Hobbs, "and election administrators around the state could become targets of a . . . criminal probe." *Id.* ¶ 28. Election officials state Defendants are forcing them "to choose between executing their duties faithfully in accordance with state or federal law or preserving their own financial interests and freedom from a baseless criminal probe." *Id.* ¶ 31. That is the choice Serrano described. The Court finds that Defendants' demand was not a request Washington could decline and be done with. It was a directive to set aside specific ballots, backed by threats of prosecution, that Defendants repeated after the State refused and have said they will keep making.

On October 30, 2026, Plaintiffs—two Washington civic organizations and a labor union—filed a complaint for declaratory and injunctive relief. Dkt. No. 1. Plaintiffs ask the Court to enjoin Defendants from demanding that any Washington state or local election official: (1) remove specific registered voters from their statewide voter registration lists; (2) refuse to issue ballots to specific voters; or (3) segregate, or otherwise not count and tabulate, any ballots returned by specific

registered voters for the November 3, 2026 General Election, or from threatening election officials with criminal penalty or investigation for failure to comply with such demands. Dkt. No. 12-27.

## 3. LEGAL STANDARD

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

These four factors—the *Winter* factors—apply whenever a preliminary injunction is sought. *Winter*, 555 U.S. at 20; *see All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("a showing on all four prongs" is required). The Ninth Circuit takes a "sliding scale" approach to preliminary relief, under which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiffs can support issuance of a preliminary injunction, so long as the plaintiffs also show that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16

F.4th 613, 635 (9th Cir. 2021) (citation modified). This approach allows a stronger showing of one *Winter* factor to offset a weaker showing of another. *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 843–44 (9th Cir. 2024).

"[W]hen the Government is the opposing party," the final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## 4. CONCLUSIONS OF LAW

### 4.1 The motion is ripe for decision.

Plaintiffs moved for ex parte relief, but briefing on the motion is now complete. Plaintiffs served the motion on Defendants the day they filed it. Dkt. No. 12 at 42–43. Defendants appeared and filed their opposition within the time the Local Civil Rules allow, Dkt. Nos. 15, 19, and Plaintiffs filed the supplemental brief the Court requested, Dkt. No. 18. The motion is thus before the Court on notice, and the requirements for relief without notice under Rule 65(b)(1) are not at issue.

### 4.2 Plaintiffs have standing.

Before reaching the merits, the Court must be satisfied that at least one Plaintiff has standing.[2] *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547

[2] Standing is determined by the facts as they existed when the complaint was filed, *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001), and Plaintiffs filed on October 30 and moved on November 2, while ballots were still being cast. Whether the passage of Election Day has since mooted the dispute is a separate question, *id.*, which turns on whether the Court can still grant effective relief, *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). It can. An injunction today cannot restore a missed opportunity to vote, but it can prevent further demands to set aside ballots, and further threats against the officials processing them, while that processing

U.S. 47, 52 n.2 (2006) (the court need "not determine whether the other plaintiffs have standing because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). For a TRO, plaintiffs "must make a clear showing that [they are] likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation modified).

Plaintiff United Food and Commercial Workers International Union ("UFCW") sues on behalf of its members. UFCW has more than 60,000 members in Washington, many of them naturalized citizens. Dkt. No. 12-4 ¶ 3. An organization has associational standing when "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *California Nurses Ass'n v. Mullin*, No. 26-7139, 2026 WL 3268397, at *3 (9th Cir. Oct. 30, 2026) (quoting *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977)). Defendants do not contest the second and third elements, and rightly

---

continues. Mail ballots are still arriving and being counted, county certification does not occur until November 24, and state certification follows by December 3. Dkt. No. 18 at 14. Defendants' demand that listed ballots be set aside stands, they have said they will press it on the county auditors, and they have promised further lists.

so: voter-registration and get-out-the-vote work is "critical to [UFCW's] mission," Dkt. No. 1 ¶ 23, and claims for declaratory and injunctive relief are "particularly suited for group representation," *California Nurses Ass'n*, 2026 WL 3268397, at *5. The contested question is whether a UFCW member would have standing in her own right.

Defendants have publicly described the people on their list as "known to be non-U.S. citizens, full stop," Dkt. No. 12-24 at 3:6–9; have warned that they "will criminally prosecute those who vote illegally," Dkt. No. 12-23 at 3; have told voters "we will find you," *id.*; and have announced a post-election review of the voting logs, Dkt. No. 18 at 11–12 & n.4. These threats are aimed at a population Defendants concede "may have subsequently naturalized," Dkt. No. 12-10 at 2, drawn from a list that Washington's review confirmed includes citizens, Dkt. No. 12-11 at 3, with another list promised, Dkt. No. 12-10 at 3. UFCW's International Vice President attests that the demands will "intimidate and deter some of our members from engaging in the political process." Dkt. No. 12-4 ¶ 12.

Defendants characterize this as "subjective apprehension," which cannot support an injunction "absent a real and immediate threat of future injury." Dkt. No. 19 at 10 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983)). But the Ninth Circuit held last week, in a decision Defendants do not cite, that this injury is cognizable and, on a record much like this one, immediate. In *California Nurses Association*, union members who had never been interrogated or listed challenged a DHS initiative that targeted naturalized citizens based on inaccurate data. 2026 WL 3268397, at *1–5. Their injury was the fear the program caused and

the election activity they gave up because of it. *Id.* The court held the members had "clearly shown that the Federal Defendants' conduct chills citizens' election-related activities and presents a real and immediate threat of future injury to their legally protected interest in participating in the election." *Id.* at *4 (citation modified) (citing *Ariz. All. for Retired Ams v. Mayes*, 186 F.4th 622, 635–36 (9th Cir. 2026) (en banc), and *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708–09 (9th Cir. 2025)).

Three features made the threat immediate: the Government had already acted under the initiative; the members were "precisely the types of people" it had already targeted; and the scope of the initiative, measured against the unions' membership, made future injury likely. *Id.* Each is present here. Defendants have already acted: they sent the list, made the demand, and repeated the threat publicly. Naturalized citizens may, by Defendants' own account, be targeted on the list, and Washington's review confirmed that citizens are already on it. And Defendants have promised more lists.

Defendants' remaining arguments on this injury fail for the same reason. They say the October 26 letter "has no independent legal effect," Dkt. No. 19 at 8, but standing requires injury traceable to the challenged conduct, not conduct with legal force. A demand backed by a public threat of prosecution can cause injury whether or not it binds its recipient. Defendants also argue that any injury depends on a "highly attenuated chain of possibilities"—a future letter must misidentify a member, Washington must comply, and a court must order relief. *Id.* at 3, 9 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).

The Ninth Circuit rejected this same argument in *California Nurses Association* because the members there, unlike the *Clapper* plaintiffs, feared "something that has already begun happening to people like them," which the Government had gone out of its way to publicize. 2026 WL 3268397, at *4–5. So too here. As in *California Nurses Association*, Defendants have made sure the people they target know about it. The deterrence injury thus depends on no further contingency. The sequence Defendants describe (a future letter, state compliance, a court order) goes to a different injury, the risk of ballot segregation.

The injury is traceable to Defendants' statements and redressable by the order Plaintiffs seek. Defendants say a sent letter is a "rung bell" that an injunction cannot unring, and that past injury supports forward-looking relief only for its "predictive value." Dkt. No. 19 at 9–10. The predictive value here is considerable. As found above, Defendants' assertion that "no further action has been taken," *id.* at 3, is contradicted by Serrano's announced plan to press the demand on all thirty-nine county auditors. The threat that deters UFCW's members is not a past event but an ongoing campaign, and enjoining the campaign removes its basis going forward. *See Lujan*, 504 U.S. at 560–61; *see supra* n.2.

UFCW members also face the risk that their ballots will be set aside. Defendants have demanded that listed ballots not be tabulated "until citizenship can be determined," Dkt. No. 12-10 at 3, which would require a misidentified citizen to take affirmative steps to prove her eligibility before her vote counts, *see* Dkt. No. 12-4 ¶ 7. But the "need to take affirmative steps to avoid risk of harm constitutes a cognizable injury supporting standing." *Dep't of Homeland Sec. v. League of Women*

*Voters*, No. 26A308, 2026 WL 2879700, at *2 (U.S. Sept. 25, 2026) (citation modified).

Defendants answer that the Secretary of State has refused to comply, so any injury depends on independent choices of state officials and is too speculative to support standing. Dkt. No. 19 at 9. But causation may run through third parties who "will likely react in predictable ways to the challenged government action," *Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 168 F.4th 1164, 1176 (9th Cir. 2026) (citation modified), and a county auditor facing a demand backed by a threat of prosecution is such a party. The Director of Elections attests that the threat forces administrators to choose between their duties and "freedom from a baseless criminal probe," Dkt. No. 12-5 ¶ 31. Segregation is the reaction Defendants intend to produce, and Defendants have announced they will go around the Secretary to the auditors to produce it. This injury independently supports standing.

Defendants also note that UFCW has not identified a particular member who faces these injuries. Dkt. No. 19 at 10. UFCW's showing comes from an officer's declaration that the union's Washington membership includes "many naturalized U.S. citizens" who will be deterred by Defendants' threats. Dkt. No. 12-4 ¶¶ 3, 12. The *California Nurses Association* plaintiffs offered declarations from named members, 2026 WL 3268397, at *3–4, as associational plaintiffs often do, *see Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). On this emergency motion, however, the Court is satisfied that the officer's sworn declaration establishes the existence of members who face the deterrence injury described above, which does

not depend on any member's individual circumstances. Plaintiffs will have the opportunity to supplement the record on this point before the preliminary-injunction hearing.

UFCW thus has standing, which is enough to proceed. The Court need not decide at this stage whether OneAmerica Votes and LCF have standing as well. *See Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026) ("Because only one plaintiff needs standing for a suit to proceed, we do not address whether" the other plaintiffs have standing).

**4.3 Plaintiffs are likely to succeed on the merits.**

"Likelihood of success . . . 'is a threshold inquiry and is the most important factor' in any motion for a preliminary injunction." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)).

Plaintiffs allege that Defendants' conduct goes beyond their lawfully delegated authority over federal elections. Dkt. No. 1 ¶ 97. The Elections Clause "invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citation modified). It assigns no role to the Executive. Whatever authority DOJ has over the counting of ballots in a state-administered election must therefore come from Congress, and Congress's exercise of its Elections Clause power displaces state law "so far as it is exercised, and no farther." *Id.*

The Ninth Circuit has addressed the statute DOJ invokes. In *United States v. California*, No. 26-7231, 2026 WL 3268272, at *4 (9th Cir. Oct. 30, 2026), it denied the United States' request for an injunction that would have ordered California to segregate the ballots of alleged noncitizens, holding that "[n]othing in § 611, a statute that criminalizes voting by a noncitizen, preempts California's comprehensive statutory scheme that has been duly enacted under the Elections Clause," and that the statute contains no "provision authorizing the Department of Justice to take charge of or intervene in a state's administration of an ongoing election." 2026 WL 3268272, at *4. The court also held that the demand likely conflicts with the National Voter Registration Act's bar on systematic removal programs within 90 days of a federal election. *Id.* at *6. The Supreme Court denied the United States' application for an injunction pending appeal. *United States v. California*, No. 26A624 (U.S. Nov. 2, 2026). Judge Carter, denying DOJ's motion below, put the point directly: "Congress knows how to displace state election procedures with federal law," and it "did not do so in Section 611." *United States v. California*, No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428, at *9 (C.D. Cal. Oct. 28, 2026).

Defendants' demand on Washington is the same demand, resting on the same statute. The October 26 letter cites § 611 and nothing else. Dkt. No. 12-10 at 2. Washington, like California, prohibits noncitizens from voting and has enacted its own procedure for challenging a voter's eligibility. RCW 29A.08.810–.850. Congress has not displaced that procedure, and DOJ cannot do so on its own.

Defendants answer that they have compelled nothing: the October 26 letter was a request, Washington declined it, and under *SEIU* the Government is likely entitled to make such requests. Dkt. No. 19 at 3, 8. The Court takes *SEIU* as it finds it. The panel there considered "only whether the Government *can* make such a request in the first place," on a record in which "the Government requested that the targeted states sequester certain ballots," the state "refused, and that refusal was ratified by this Court." Slip op. at 6. On that record, the panel held, "[t]he states' constitutional authority to regulate their elections is therefore unaffected." *Id.* Defendants themselves read the panel's holding as resting on the absence of any "further action to force the states to adopt the ballot-sequestration requested by the Government." Dkt. No. 19 at 6. The panel grounded the distinction in *Printz v. United States*, 521 U.S. 898, 935 (1997), which holds that the federal government may request, but may not compel, a state to enact or enforce a federal program. *SEIU,* slip op. at 6.

That is the line, and the findings above place Defendants' conduct on the other side of it. Defendants did not ask Washington to consider a list. They directed the Secretary to instruct county officials not to verify or count specific ballots, set a 24-hour deadline, and told him they "expect[ed] a prompt response from your office by enacting the approach above[.]" Dkt. No. 12-10 at 3. When he refused, they did not treat the refusal as the end of the matter; they announced that they would "continually demand" segregation, would send letters to all thirty-nine county auditors, and would "cut the state out" if necessary. Dkt. No. 12-24 at 7:3–8, 8:19–9:2, 9:18–22. And they told the auditors, through a press conference and the radio,

that an official who processed a listed ballot "would be also guilty of that crime under the aiding abetting theory." Dkt. No. 12-23 at 9; *see* Dkt. No. 12-5 ¶¶ 28, 31. A demand of that kind is not a request the State is free to refuse. It is an effort to obtain by threat what *California* holds DOJ may not obtain by court order, and "what cannot be done directly cannot be done indirectly." *Cummings v. Missouri*, 71 U.S. 277, 325 (1866); *see SEIU*, slip op. at 6–7 (Murguia, C.J., dissenting).

The Court does not question that the Executive decides which crimes to investigate and whom to prosecute or that DOJ may tell state officials what it believes federal law requires. *See SEIU*, slip op. at 1 (Miller, J., concurring). Defendants did more than that here. By Serrano's own account, the point of taking the demand to the auditors was to put them "in a pickle" between the federal demand and state law, and the goal was to "make sure these ballots aren't counted." Dkt. No. 12-24 at 8:7–13, 8:21–22. A threat of prosecution made for that purpose is not legal advice. It is the pressure that makes the demand work, and the order restrains the two together.

Accordingly, the Court concludes that Plaintiffs are likely to succeed on their claim that Defendants have exceeded their authority under the Elections Clause. At a minimum, Plaintiffs have raised serious questions going to the merits, and, for the reasons stated below, the balance of hardships tips sharply in their favor, which independently supports relief. *All. for the Wild Rockies*, 632 F.3d at 1135. Because that conclusion suffices to support the relief ordered below, the Court does not reach Plaintiffs' remaining claims at this stage.

**4.4 Plaintiffs will face irreparable harm without immediate injunctive relief.**

A "showing of a mere possibility of irreparable harm is not sufficient under *Winter*." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010). Plaintiffs have easily met their burden here.

Defendants' ultra vires conduct will likely lead to United States citizen voters being stripped of their right to vote and fully participate in elections. Because Defendants chose to send their list to Washington on October 26, just days before the election, this harm is especially pronounced. Defendants' threats to Washington election workers and voters also chill participation, especially by naturalized citizens who are at risk of being misidentified by DHS. Judge Carter found that the same demand would "create a chilling effect on election workers and voters alike" and that "those most at risk of being disenfranchised are naturalized citizens." *United States v. California*, 2026 WL 3252428, at *14–15. The ballots at issue have been cast; they await signature verification, tabulation, and county certification on November 24. A ballot set aside on the strength of the federal list and not counted by then is lost. The *SEIU* panel observed that an election worker's fear of a future prosecution can be addressed in the prosecution itself. Slip op. at 7. The injury Plaintiffs assert is different. It is the loss of their members' votes before certification, for which no later proceeding offers a remedy.

**4.5 The balance of equities and public interest favor a TRO.**

In weighing the equities, courts "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested

relief." *Winter*, 555 U.S. at 24. The public interest inquiry "primarily addresses impact on non-parties rather than parties." *CTIA - The Wireless Ass'n v. City of Berkeley, Cal.*, 928 F.3d 832, 852 (9th Cir. 2019) (citation modified). Because the Government is a party, the two factors merge. *Padilla v. Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

The record shows concrete and severe harm flowing directly from Defendants' conduct, most of it irreversible. *See Am. Encore v. Fontes*, 152 F.4th 1097, 1120 (9th Cir. 2025) ("Vindication of constitutional rights is always in the public interest."); *United States v. California*, No. 2:26-cv-12025-DOC-ADS, 2026 WL 3252428, at *15 (C.D. Cal. Oct. 28, 2026) ("Constitutional rights and our democracy [for voting rights] are at stake."). On the other side of the ledger, the Government "'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *California Nurses Ass'n*, 2026 WL 3268397, at *6 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). The *SEIU* panel declined to apply that principle because the conduct the district court had restrained in *SEIU*—requests to the states—was likely lawful. Slip op. at 7 n.§. That distinction does not apply here. The conduct this order restrains is the compulsion *California* held to be unauthorized; the order leaves Defendants free to make the requests *SEIU* protects and takes nothing from them that Congress gave. *See* Dkt. No. 12 at 29.

Nor does *Purcell v. Gonzalez*, 549 U.S. 1 (2006), counsel against relief. *Purcell* warns federal courts against altering election rules on the eve of an election, and the Ninth Circuit applied it last week against DOJ, because a court-ordered regime for segregating and verifying listed ballots would alter the rules of an election

already underway. *United States v. California*, 2026 WL 3268272, at *7. This order preserves the procedures Washington's legislature enacted and that Washington's voters relied on when they returned their ballots, and it restrains the party whose demand would upend them.

Thus, the balance of equities and the public interest tip sharply in Plaintiffs' favor.

**4.6 Scope of relief.**

Plaintiffs ask the Court to issue a TRO even though other district courts have entered injunctions barring similar coercion. But the Ninth Circuit stayed the *SEIU* TRO and denied a full rehearing en banc on November 3, 2026. The U.S. District Court for the District of Columbia issued a TRO barring DHS, Mullin, and Blanche from demanding that California election officials segregate the ballots of voters on the lists of suspected noncitizens, or otherwise deviate from existing state election procedures on the basis of those lists. *Coal. for Humane Immigrant Rts. v. DHS* ("CHIRLA"), No. 1:26-cv-3072-JEB (D.D.C. Nov. 2, 2026), Dkt. No. 48.

A Washington TRO is appropriate in these urgent circumstances. "[N]o court has adopted the view that an injunction imposed by one district court against a defendant deprives every other federal court of subject matter jurisdiction over a dispute in which a plaintiff seeks similar equitable relief against the same defendant." *California v. U.S. Dep't of Health & Hum. Servs.*, 941 F.3d 410, 421–22 (9th Cir. 2019), *cert. granted, judgment vacated on other grounds sub nom. Dep't of Health & Hum. Servs. v. California*, 591 U.S. 1027 (2020). The *SEIU* and *CHIRLA*

orders afford Plaintiffs no protection—*SEIU* is stayed and *CHIRLA* does not apply to Washington election officials or Defendants Floyd or Serrano. Plaintiffs' members in Washington should not have to depend on the continued vitality of an order entered in another district, in a case to which they are not parties, to protect their right to have their ballots counted.

The Court does not enjoin the President. The demand and threats at issue were made by the agency and officer Defendants, and an order directed to them affords Plaintiffs complete relief. The order restrains only the demand that Washington set aside registered voters' ballots and the threats made to enforce that demand. It requires no affirmative act of Defendants, and it expires in fourteen days. *Cf. SEIU*, slip op. at 4.

Defendants ask that any relief be stayed pending appeal or, at a minimum, administratively stayed for seven days. Dkt. No. 19 at 28. The request is denied. The order preserves Washington's existing procedures rather than altering them, so for the reasons stated in § 4.5, *Purcell* cuts against a stay rather than for one, and the conduct the order restrains is what the Ninth Circuit has already held DOJ has no authority to compel.

Finally, Rule 65(c) "invests the district court with discretion as to the amount of security required, *if any*," and the Court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation modified). Defendants face no monetary harm from being restrained

from conduct the Ninth Circuit has already held to be unauthorized. No security is required.

### 5. CONCLUSION

Accordingly, it is hereby ORDERED that Plaintiffs' TRO motion is GRANTED in part as follows:

1. Defendants U.S. Department of Justice (DOJ), Attorney General Todd Blanche, U.S. Department of Homeland Security (DHS), Secretary of Homeland Security Markwayne Mullin, Acting United States Attorney for the Eastern District of Washington Pete Serrano, and First Assistant United States Attorney for the Western District of Washington Charles Neil Floyd, together with all their agents, employees, and persons in active concert or participation with them who receive actual notice of this order, are RESTRAINED from directing or demanding that any Washington state, county, or local election official (i) remove specific registered voters from their statewide voter registration lists; (ii) refuse to issue ballots to specific registered voters; or (iii) segregate, or otherwise not count and tabulate, any ballots returned by specific registered voters for the November 3, 2026 General Election, or from threatening any such official with criminal prosecution or investigation for failure to comply with such demands.
2. Nothing in this order restrains Defendants from providing information to Washington election officials, from stating their views of what federal law

requires, from requesting the cooperation of state or local officials, or from investigating or prosecuting any person who registers or votes unlawfully.

3. Defendants are FURTHER ORDERED to show cause why a preliminary injunction to the same effect should not issue. Defendants must file any opposition to Plaintiffs' motion for a preliminary injunction, Dkt. No. 12, by November 12, 2026. Plaintiffs may file a reply, if any, by November 16, 2026. The Court will hear the motion on November 18, 2026, at 1:30 p.m. (PT), in Courtroom 16A.
4. No security is required under Fed. R. Civ. P. 65(c).
5. This order takes effect immediately and will remain in effect for FOURTEEN (14) days from the date of entry, unless and until extended by further order of this Court.

Dated this 5th day of November, 2026, at 4:21 p.m.

Jamal N. Whitehead
United States District Judge