The Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ONEAMERICA VOTES; LATINO COMMUNITY FUND OF WASHINGTON STATE; AND UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as U.S. Attorney General; CHARLES NEIL FLOYD, in his official capacity as Acting U.S. Attorney for the Western District of Washington; SIMON PETER SERRANO, in his official capacity as First Assistant U.S. Attorney for the Eastern District of Washington; U.S. DEPARTMENT OF HOMELAND SECURITY; and MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,

Defendants.

Case No. 2:26-cv-04223-JNW

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

## TABLE OF CONTENTS


**INTRODUCTION** ........ **3**

**BACKGROUND** ........ **4**

**I. Factual Background** ........ **4**

- A. Secretary Hobbs' refusals ........ 4
- B. Defendants' inaction ........ 6

**LEGAL STANDARD** ........ **7**

**ARGUMENT** ........ **7**

**I. Plaintiffs Have Not Shown a Fair Chance of Establishing Standing** ........ **7**

- A. Plaintiffs lack an injury-in-fact. ........ 8
- B. Plaintiffs cannot establish associational standing. ........ 10
- C. Plaintiffs cannot establish organizational standing. ........ 11

**II. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits** ........ **13**

- A. Defendants' challenged actions are not ultra vires. ........ 13
- B. Defendants' challenged actions do not violate the Elections Clause or the NVRA. ........ 15
  1. Elections Clause. ........ 15
  2. State's Election Powers. ........ 18
  3. NVRA. ........ 19
- C. Defendants' challenged action does not violate the separation of powers. ........ 20
- D. Defendants' challenged action does not violate the Tenth Amendment. ........ 22

**III. Plaintiffs Cannot Establish a Risk of Irreparable Harm** ........ **25**

**IV. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief** ........ **25**

**V. Any TRO Should be Limited, Accompanied by Security, and be Stayed** ........ **27**

**CONCLUSION** ........ **28**




**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

## INTRODUCTION

While the Court granted Plaintiffs' motion for a temporary restraining order, it did so on limited facts surrounding Defendants' efforts to inform the State of likely noncitizens on Washington's voting rolls. The Court found that the matter did not end when Secretary Hobbs issued a letter refusing to act on Defendants' list. But what the Court did not consider was Secretary Hobbs' additional, adamant refusals to act on Defendants' list. In fact, he has publicly declared, "I'm not going to do anything with this list." Further, the Court found that the matter had not ended based on statements Defendants made to the press about potential next steps, Defendants have not taken the potential future actions the Court was concerned about. And in fact, on November 2, 2026, Defendants were enjoined from taking further action in Washington in *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 26-CV-3602 (TSC) (Dkt. 30), 2026 WL 3316699 (D.D.C. Nov. 2, 2026) (enjoining Defendants, including DOJ, "from further disclosing, transmitting, or releasing data purporting to constitute lists of individual potential or actual non-citizen voters or registered voters, to any State, county, municipal, or other local official, employee, or officer responsible for administering voter registration, issuing or processing ballots, verifying signatures, or tabulating or certifying votes."). Thus, the matter has ended.

On this record, Plaintiffs lack standing because there is no injury in fact. Plaintiffs' alleged injury was speculative at best when they filed their action four days before the election. Now, nine days after election day, it has become abundantly clear that Plaintiffs' fears – that a naturalized citizen will be misidentified as a noncitizen by Defendants and that Secretary Hobbs will remove their ballot and it will not be counted – did not and will not occur. Secretary Hobbs has said in no uncertain terms that he will not act on Defendants' list and Defendants have not and cannot provide further lists to the State of Washington or any local election official. Thus, the Court should deny the motion for preliminary injunction.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

On the merits, Plaintiffs have not demonstrated the requisite likelihood of success.[1] To start, Plaintiffs' ultra vires claim for those challenged actions does not rise above the Supreme Court's strict scope of review for ultra vires claims, which requires a successful "Hail Mary" pass in a case where error is virtually jurisdictional. A non-binding letter identifying potential ongoing violations of federal law is not that. And despite states' traditional authority in managing elections, Congress has made noncitizen voting in federal elections unlawful. 18 U.S.C. § 611. The Executive Branch may investigate and prosecute alleged violations of that federal prohibition within the limits of its lawful authority. That statute is not challenged here. Thus, Defendants' challenged actions are supported by the double font of constitutional and statutory authority, making *Defendants'* likelihood of success on the merits strong.

Finally, the balance of equities and public interest tips decisively in favor of the government. The government's compelling interest in combating voter fraud significantly outweighs Plaintiffs' speculative and non-existent injuries.

## BACKGROUND

### I. Factual Background

The facts known to the Court at the time of its ruling are set forth in this Court's Order Granting Temporary Restraining Order in Part. Dkt. 21, pgs. 4-9. Defendants provide additional facts surrounding Secretary Hobbs' continued refusals to act on Defendants' list and Defendants' continued inaction.

#### A. Secretary Hobbs' refusals

On October 28, 2026, Secretary Hobbs sent a letter to Defendants refusing to take any action based on the information DOJ provided. *See* Dkt. 12-11 at 3. Secretary Hobbs stated,

[1] Defendants' merits arguments were set forth in their opposition to the motion for temporary restraining order and preliminary injunction and set forth again in this opposition.



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

"Without individualized proof of ineligibility, it would be both irresponsible and illegal for election officials to decline to process a registered voter's ballot." *Id.* He conducted a preliminary analysis of the list and found it unreliable. *Id.* He stated, "it would likely be unlawful to decline to count ballots simply because a person's name appears on the unverified list." *Id.* That was not the end of Secretary Hobbs' refusal to act on Defendants' list.

On October 29, 2026, Secretary Hobbs and King County Elections Director Julie Wise appeared at a joint press conference urging voters to return their ballots to county elections drop boxes. They admitted that Washington does not check voter rolls for people who are noncitizens and instead they rely on self-disclosure stating, "we don't have a system that can identify whether someone is [an] actual non-citizen." With respect to Defendants' list, Secretary Hobbs stated, "they're sending this dumpster fire disguised as a legal document, rife with mistakes, they can't even get the election date right.… So, I'm not going to do anything with this list because it's garbage." Secretary Hobbs referred to a process through the country prosecutor as the proper way challenge someone's eligibility. *See* Ex. A.[2]

The same day, October 29, 2026, Secretary Hobbs gave an interview to KOMO News. With regard to Defendants' list, he stated that the state cannot simply declare someone a noncitizen and remove them from the voter rolls and instead must follow a process through the county prosecutor as the proper way challenge someone's eligibility. *See* Ex. B.[3]

Then, on election day, November 3, 2026, Secretary Hobbs gave another interview to KOMO News. When Secretary Hobbs was asked why the state does not check citizen status before

[2] Accessible at: https://tvw.org/video/wa-secretary-of-state-king-county-elections-press-conference-2026101174/

[3] Accessible at: https://komonews.com/news/local/sec-of-state-department-of-justice-noncitizen-voter-claim-is-dumpster-fire-disguised-as-legal-document-midterms-november



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

registering to vote, he stated that it is rare to find individuals that vote that are noncitizens, but also stated that Washington State complies with federal and state laws. With respect to Defendants' list, Secretary Hobbs stated it was "rife with problems and mistakes in it" and stated, "[w]e'll be taking them to court and they'll be taking us to court afterwards." *See* Ex. C.[4]

Thus, it has become abundantly clear that Secretary Hobbs has no intention of acting on Defendants' list and instead is threatening legal action against Defendants.

### B. Defendants' inaction

The Court cited Defendants' statements in a press conference the day Defendants issued their letter to Secretary Hobbs on October 26, 2026, and during a radio interview given by First Assistant United States Attorney Serrano on October 29, 2026, responding to Secretary Hobbs' refusal where Defendants discussed potential future steps, to find that the matter had not ended with Secretary Hobbs' refusal.[5] Dkt. 21, pgs. 6-8. The potential future actions Defendants discussed have not materialized. Indeed, on November 2, 2026, the District Court for the District of Columbia issued a preliminary injunction enjoining Defendants from taking the potential actions discussed with regard to Secretary Hobbs or any election official in Washington. *See League of Women Voters*, No. 26-CV-3602 (TSC) (Dkt. 30).

Thus, it is now clear that Defendants did not, and now cannot, take further action. On this record, Plaintiffs' injuries have gone from being speculative at best when they filed their complaint to not possible. Thus, they lack standing and the motion for preliminary injunction should be denied.

---

[4] Accessible at: https://komonews.com/news/politics/washington-secretary-of-state-steve-hobbs-voter-roll-eligibility-dispute-general-election-security-illegal-voting-justice-department-mail-delivery-delays-ballot-drop-boxes

[5] Acting United States Attorney Floyd also issued a press release on October 29, 2026, following Secretary Hobbs' refusal letter. *See* Exhibit D.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs Have Not Shown a Fair Chance of Establishing Standing

Article III's "case or controversy" requirement obligates federal courts to determine, as a preliminary matter, whether plaintiffs have standing to bring suit. *Lance v. Coffman*, 549 U.S. 437, 439 (2007). A plaintiff establishes standing by showing: (1) that it suffered an injury in fact, meaning a concrete and particularized harm that is actual or imminent, rather than hypothetical; (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions; and (3) a non-speculative likelihood that the injury will be redressed by a decision in the plaintiff's favor. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380-81 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

The burden of "substantial likelihood of standing" at this stage is meaningfully heavier than the burden on a motion to dismiss. When a plaintiff moves for preliminary relief, "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). Plaintiffs "cannot rest on 'mere allegations,' but must instead point to factual evidence." *Id.* (quoting *Lujan*, 504 U.S. at 561).

Here, Plaintiffs cannot establish standing because their alleged injuries are not imminent and the possibility that they will ever suffer any qualifying harm is too attenuated and speculative.

**A. Plaintiffs lack an injury-in-fact.**

Plaintiffs lack a concrete and particularized injury-in-fact, and thus, this Court lacks jurisdiction. When they filed their action 4 days before the election, Plaintiffs speculated that it was possible that one of their members, who is a naturalized citizen, would be misidentified by Defendants as a noncitizen on a list provided to Secretary Hobbs, that Secretary Hobbs would take action on that list and remove that member, and their vote would not be counted. This did not occur and now cannot occur between now and the state certification on December 3, 2026.

To begin, the October 26, 2026 letter and list has no independent legal effect. The state of Washington can decide whether to comply. On October 28, 2026, Secretary Hobbs notified DOJ that the state will not comply with the request based on the information provided. *See* Dkt. 12-11 at 3. Since then, Secretary Hobbs has doubled down and has adamantly rejected the list. In fact, he said, "I'm not going to do anything with this list." Defendants have not and cannot provide another list following the injunction entered in *League of Women Voters*. In sum, the injury Plaintiffs feared was speculative when they filed this action – but now it is not possible.

Plaintiffs have not shown that the October 26, 2026 letter itself inflicts the concrete, particularized injury necessary to support the sweeping prospective relief they seek. The letter does not itself change any voter's registration status, withhold a ballot, or alter ballot tabulation. *See*



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

*Trump v. California*, 609 U.S. 1032, 1037-38 (2026) (holding that the plaintiffs lacked standing to challenge President Trump's Executive Order directing the Attorney General to "prioritize" investigating and prosecuting violators of existing federal voting laws because the Executive Order "d[id] nothing to them"); *Virginia v. Ferriero*, 525 F.Supp.3d 36, 46 (D.D.C. 2021) (holding that the plaintiffs lacked standing to challenge the Archivist's refusal to publish a ratified amendment as part of the Constitution because the publication of the amendment is a formality with "no legal effect"), *aff'd on other grounds,* 60 F.4th 704 (D.C. Cir. 2023); *Boone v. Illinois Dep't of Corr.*, 2024 WL 4750494, at *2 (7th Cir. Nov. 12, 2024) ("Because, as a matter of Illinois state law, [the statute at issue] has no independent legal effect, the statute could not have caused the plaintiffs an injury in fact that is capable of redress."), *cert. denied*, 145 S. Ct. 2819 (2025).

Plaintiffs also have not shown that the letter threatens to cause them actual harm. At most, they allege a fear of what might happen. Plaintiffs hypothesize about harms that may befall their members if they are misidentified as non-citizens in the letter or any future letter. Plaintiffs rely on predictions of what "may" or is "likely" to happen to their members, but they cite no proof that these alleged harms will materialize. Alleging that this might happen evinces little more than an apprehension about the future.

This is precisely the sort of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409-10 (2013) (A threatened injury must be certainly impending to constitute injury in fact; allegations of possible future injury are not sufficient); *see also Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (rejecting standing based on a speculative chain of possibilities); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990) (same); *United States v. Texas*, 599 U.S. 670, 674, 680 n.3 (2023) (remote and speculative harms are not cognizable injuries-in-fact).



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

In sum, the unfounded fear that a misidentification may occur based on a chain of discretionary events, to particularize the proffered harm is far too attenuated to constitute an injury-in-fact. *See Murthy*, 603 U.S. at 70 (detailing the chain of discretionary events that must occur for the plaintiff to suffer a likely future injury).

Moreover, any injunction must be forward-looking, as an injunction cannot remedy past harm. *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 527 F.Supp.2d 101, 105 (D.D.C. 2007) ("That [the plaintiff] has adequately alleged a past injury-in-fact, however, does not in of itself give [the plaintiff] standing to seek prospective relief." (citation omitted)); *see also Murthy*, 603 U.S. at 59 ("[B]ecause the plaintiffs are seeking only forward-looking relief, the past injuries are relevant only for their predictive value." (citation omitted)). A previously sent letter is a rung bell, which "[t]he grant of an injunction … cannot 'unring.'" *Leatt Corp. v. Innovative Safety Tech., LLC*, 2010 WL 1526382, at *10 (S.D. Cal. Apr. 15, 2010).

**B. Plaintiffs cannot establish associational standing.**

Plaintiffs contend that they have associational standing because "Defendants' election interference directly harms the right of Plaintiffs' members and supporters to vote." Dkt. 12, pg. 24. "An organization can assert associational standing on behalf of its members if: '(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.'" *Elec. Priv. Info. Ctr. v. United States Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019) (quoting *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005)).

Plaintiffs assert standing based on their voting members, but they do not identify a violation nor explain how their votes will likely be disregarded. At most, they allege that "Plaintiffs' members who are naturalized citizens are at risk of being wrongly flagged as noncitizens" and that



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

they will be thereby disenfranchised and deterred from participating in the political process because of Defendants' actions." Dkt. 12, pgs. 24-25.

This fear of unidentified members is entirely speculative. What matters "is the *reality* of the threat of [future] injury," not a plaintiff's "subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). Thus, the "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.* When a plaintiff "claims associational standing, it is not enough to aver that unidentified members have been injured." *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 803 (D.C. Cir. 2021) (citation omitted).

Even if Plaintiffs could identify a member who holds these fears, the harm is too speculative to confer standing. There is no evidence that even if a naturalized citizen was misidentified as a noncitizen would be at risk of injury; the citizen could submit proof of their citizenship and establish their eligibility to vote. There is no evidence these unidentified, hypothetical individuals will be denied a ballot, or told that their ballots will not be counted during any ballot-sequestering process that the state of Washington may employ based on the government's request. Indeed, it is highly speculative that the State will take any action on the non-binding letter as the State has already declined to take the requested action based on the information DOJ provided citing a lack of individualized proof of ineligibility.

**C. Plaintiffs cannot establish organizational standing.**

Plaintiffs contend that they have organizational standing because Defendants' conduct "will directly interfere with their core activities." Dkt. 12, pg. 26 (quotation omitted). Organizations may "sue on their own behalf for injuries they have sustained[,]" but, like all litigants, they must "satisfy the usual standards for injury in fact, causation, and redressability." *Hippocratic Med.*, 602 U.S. at 393-94.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Specifically, Plaintiffs assert that their "core business activities" include encouraging their voters to register and vote. Dkt. 12, pg. 26. They allege that, as a result of Defendants' conduct, they will be "forced" to "divert resources to aiding voters swept into DOJ's eleventh-hour demand and reassuring new voters, including naturalized citizens, who are deterred by DOJ's threats." *Id.* This allegation, even if true, is insufficient to establish organizational standing.

*First*, Plaintiffs' suit is a challenge to prevent Defendants from "requesting or demanding" that any state or local election official (i) remove specific registered voters from their statewide voter registration lists; (ii) refuse to issue ballots to specific registered voters; or (iii) segregate, or otherwise not count and tabulate, any ballots returned by specific registered voters for the November 3, 2026 General Election, or from threatening election officials with criminal penalty or investigation for failure to comply with such demands. Dkt. 12, pg. 27.

As explained above, no action to effectuate this request has occurred; nor can it reasonably be anticipated to occur absent judicial intervention or, at a minimum, the independent choices of the state of Washington. And Washington has already indicated its unwillingness to comply with the request. Thus, any expenditures premised on that possibility are unjustified, self-inflicted, and not fairly traceable to the challenged conduct of Defendants. *See Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 634 (9th Cir. 2026) (en banc) (holding that potential expenditures to mitigate the hypothetical impact of a challenged action "cannot support standing" when the alleged impact "lacks record support and is highly speculative" (quoting *Hippocratic Med.*, 602 U.S. at 390)). It is no less fatal to Plaintiffs' alleged organizational standing than to individual or associational standing that there is no imminent threat that Washington will take the actions requested in Defendants' challenged letter.

*Second*, Plaintiffs' asserted expenditure/diversion of resources theory has been squarely rejected by the Supreme Court. In *Alliance for Hippocratic Medicine*, the Supreme Court



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

unanimously held that associations "cannot spend [their] way into standing[.]" 602 U.S. at 390. The generic setback to associations' missions without any actual "impediment to [their] advocacy businesses" does not support Article III standing. *Id.* at 395. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental policy it wishes to challenge. *Id.* at 394-95. So too here.

Defendants' challenged action may make Plaintiffs' core mission objectives, such as voter mobilization, less likely to succeed (though that is deeply speculative and itself inadequate), but even so, Plaintiffs have not alleged or proved—nor could they allege or prove—that Defendants' challenged action actually interferes with Plaintiffs' ability to pursue activities like voter mobilization. "[A]n organization may not establish standing simply by spending money 'opposing those policies' that it 'dislike[s].'" *Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1001-02 (D.C. Cir. Sept. 8, 2026) (quoting *Hippocratic Med.*, 602 U.S. at 395). It is only when "a government action 'directly affect[s] and interfere[s] with' an organization's 'core business activities,' and the organization 'diverted its resources' *to continue pursuing those activities*, [that] such concrete harm to the organization's activities supports standing to sue." *Id.* (emphasis added).

## II. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

### A. Defendants' challenged actions are not ultra vires.

Plaintiffs cannot establish that Defendants' action - sending a letter to the state with the results of their investigation and requesting the state to take action under its own laws - is ultra vires. The Supreme Court has "strictly limited" the scope of ultra vires review, otherwise "ultra vires review could become an easy end-run around the limitations of … judicial-review statutes." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (noting than an ultra vires claim "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds" (citation omitted)). Thus, ultra vires claims must fit within "painstakingly delineated procedural



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

boundaries"; and such review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition'" in a statute. *Id.* (first quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964), then quoting *Bhd of Ry. & S.S. Clerks v. Assoc. for Benefit of Noncontract Emps.*, 380 U.S. 650, 660 (1965)).

Ultra vires review is also unavailable here for at least two reasons. First, ultra vires review is unavailable if "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors of the FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Plaintiffs specifically argue that Defendants' challenged actions are ultra vires because they violate a provision of the NVRA. Dkt. 12, pgs. 17-18. Although Plaintiffs fail to meet the requirements to bring such a cause of action here, it is undisputed that challenges to final agency action allegedly in violation of the NVRA can be brought under the APA. *See, e.g., League of Women Voters of the U.S. v. Harrington*, 560 F.Supp.3d 177, 180-81 (D.D.C. 2021); *Almaklani v. Trump*, 444 F.Supp.3d 425, 432-34 (E.D.N.Y. 2020). Plaintiffs cannot simply ignore the basic requirements that Congress has established through the final agency action requirement. *See* 5 U.S.C. § 704. Given that "alternative path to judicial review," an ultra vires claim is not available. *Nuclear Regul. Comm'n*, 605 U.S. at 682. And as here, "if [] plaintiff's claims [fail] under the APA, then those same claims necessarily could not succeed under ultra vires review, which has an even narrower scope.'" *Fed. Express Corp. v. U.S. Dep't of Com.,* 39 F.4th 756, 765 (D.C. Cir. 2022) (citation modified).

Even if there were no alterative path to review, an ultra vires claim fails unless the agency "plainly act[ed] in excess of its delegated powers" and "its error must be 'jurisdictional or nearly so.'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022) (citing *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). As discussed further



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

below, sending a non-binding letter is not an ultra vires act in violation of federal law, rather, it is an appropriate act designed to *further* federal law.

**B. Defendants' challenged actions do not violate the Elections Clause or the NVRA.**

1. Elections Clause. Plaintiffs contend that Defendants' actions are ultra vires executive actions in violation of the Elections Clause. Dkt. 12, pgs. 16-17. Plaintiffs mistakenly contend that Congress has not provided statutory authority for the challenged actions consistent with its constitutional authorities. Again, the challenge here is not to any *actions* taken by the Federal Government. It is to a non-binding letter identifying potential ongoing violations of federal law. Thus, Plaintiffs' challenge is doubly difficult: not only does it have to show that the actions they contend this letter *seeks* the state to take is ultra vires, but that sending the non-binding letter itself is ultra vires. They cannot run the table on that exceptional request.

It is not ultra vires for the Federal Government to inform states of probable ongoing violations of federal law. The Elections Clause of the Constitution grants states the authority to set the rules for the "Times, Places and Manner" of elections. U.S. Const. art. VI, cl. 2. It also lets Congress make or alter those rules. And acting under its authority over immigration law, Congress passed 18 U.S.C. § 611(a)—the law undergirding Defendants' actions to issue the October 26, 2026 letter to Secretary Hobbs. *See Arizona v. United States*, 567 U.S. 387, 394 (2012) (stating that the Federal Government "has broad, undoubted power over the subject of immigration and the status of aliens" (citation omitted)); *see also Chavez-Perez v. Ashcroft*, 386 F.3d 1284, 1292 (9th Cir. 2004) ("Federal authority in the areas of immigration and naturalization is plenary[.]") (citation modified).

Since at least 1996, Congress has made it "unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

President, Presidential elector, Member of the Senate, Member of the House of Representatives, Delegate from the District of Columbia, or Resident Commissioner[.]" 18 U.S.C. § 611(a). A noncitizen who violates the voting ban may be fined or imprisoned. *See id.*; *United States v. Knight*, 490 F.3d 1268, 1271 (11th Cir. 2007) (finding 18 U.S.C. § 611 to be a general intent crime where the government needs only to "prove that the defendant knowingly engaged in the conduct prohibited" (citation omitted)). And Congress has vested the Attorney General with broad authority "to detect and prosecute crimes against the United States." 28 U.S.C. § 533.

Section 611 falls within those broad grants of authority as it regulates the conduct of noncitizens within the sphere of federal elections and allows for the "maintenance of a republican form of government" by ensuring only citizens can vote in federal elections. *See Smiley v. Holm*, 285 U.S. 355, 366-67 (1932); *Burroughs v. United States*, 290 U.S. 534, 547 (1934); *Bluman v. FEC*, 800 F.Supp.2d 281, 283 (D.D.C. 2011) (Kavanaugh, J.), *aff'd*, 565 U.S. 1104 (2012) (upholding federal statute banning certain aliens from engaging in election-related expenditures, on the ground that "[t]he Supreme Court has long held that the government (federal, state, and local) may exclude foreign citizens from activities that are part of democratic self-government in the United States").

Indeed, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952); *accord Arizona*, 567 U.S. at 395 (recognizing that it is "fundamental that foreign countries" confer with "one national sovereign" on immigration issues). That naturally includes authority over the statuses of noncitizens and "regulation of the conduct of an alien before naturalization." *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Thus, "the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

acts, and where the state also acts on the same subject, 'the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.'" *Id*. That is all true even if there are some unconstitutional applications of the law. *See United States v. Raines*, 362 U.S. 17 (1960). In this case, however, Section 611(a) constitutionally applies to situations where noncitizens are voting in a federal election. 18 U.S.C. § 611(a). In sum, the challenged action here is supported by both the Constitution and statute.

Plaintiffs contend that because Section 611 is a criminal statute, Defendants are precluded from issuing letters or bringing a lawsuit seeking to enforce the law prohibiting noncitizen voting. Dkt. 12, pgs. 18-19. That is misplaced. "Courts have long accepted that the United States may invoke equitable jurisdiction to vindicate the supremacy of federal law." *United States v. California*, 2026 WL 3212945, at *26 (9th Cir. Oct. 26, 2026) (Bumatay, J., dissenting) (citing *Arizona*, 567 U.S. at 393-94 and *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024) (collecting cases)). Such an equitable cause of action "follows from the general principle that 'the United States may sue to protect its interests.'" *Id.* (citations omitted). Indeed, such equitable jurisdiction is "longstanding" and based on "[t]he sovereign's special treatment in equity." *Id.* (citing Mila Sohoni, *Equity and the Sovereign*, 97 Notre Dame L. Rev. 2019, 2027 (2022)).

Furthermore, since 18 U.S.C. § 611 represents Congress' constitutional prerogative to regulate federal elections, "a state may [therefore] not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (citation omitted). State action—such as Washington's refusal to take the requested action to verify whether the identified voters are U.S. citizens—must "give way" when it conflicts with "a considered judgment" embodied in federal law. *Arizona*, 567 U.S. at 399, 405. When a State "authorizes [persons] to engage in conduct that the federal [law] forbids, it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Congress." *Mich. Canners & Freezers Ass'n v. Agric. Marketing & Bargaining Bd.*, 467 U.S. 461, 478 (1984) (citation modified).

Further, while a State is not required to help the Federal Government investigate and prosecute crimes, facilitating the commission of such crimes unlawfully hampers such efforts. It is not practicable or feasible for the Federal Government to prosecute thousands, let alone tens of thousands, of individuals that two federal investigative offices have identified as likely noncitizens. That necessarily, and unlawfully, frustrates federal objectives in enforcing the law. *See id.*; *California*, 2026 WL 3212945, at *28 (Bumatay, J., dissenting) (explaining how California's interpretation of both "federal and state election law to preclude separating illegal voters' ballots from legal ones" "frustrates § 611(a)").

Ultimately, while Plaintiffs inaccurately labels Defendants' request to Washington as an unlawful "last-minute purging of Washington's voter rolls," Dkt. 12, pg. 18; the Government's request is simply to set aside ballots momentarily to allow for confirmation of citizenship and compliance with federal (and even state) law.

2. <u>State's Election Powers.</u> Moreover, the challenged actions do not impinge on the state's Article I authority to prescribe the "Times, Places and Manner" of holding federal elections. The federal government seeks only to temporarily segregate unsolicited vote-by-mail ballots where there is credible evidence showing that the ballots may be tied to noncitizens; and such segregation is only to ensure an accurate vote count pending citizenship verification. The non-binding letter does not require Washington to systematically remove anyone from voter rolls. Instead, Defendants' narrowly requested relief seeks only to root out the fundamental unfairness of a vote cast by a noncitizen canceling a vote by a citizen. *See Anderson v. United States*, 417 U.S. 211, 227 (1974) ("Every voter in a federal primary election … has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes."). And again, the



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

letter itself—the thing actually challenged here—does not impinge on anything. It simply requests that the state take action to comply with federal law. That does not infringe on the state's rights, just as a federal law enforcement agency would not violate state election powers if it notified a jurisdiction of an imminent terrorist attack targeting an election facility.

3. NVRA. Finally, the challenged action does not violate federal law prohibiting the effectuation of a "program" with a purpose "to systematically remove the names of ineligible voters from the official lists of eligible voters'" within 90 days of an election, as Plaintiffs allege. 52 U.S.C. § 20507(c)(2)(A) ("NVRA"). Dkt. 12, pg. 18. The Federal Government is not seeking systematic or programmatic changes to any registration list, nor does it allege that Washington violated the law by initially registering voters. *See California*, 2026 WL 3212945, at *33 (Bumatay, J., dissenting) ("[T]he government is not asking the State to carry out a voter roll program."). The Federal Government seeks only standard (and temporary) ballot-handling procedures to ensure an accurate vote count pending citizenship verification. The October 26, 2026 letter did not require Washington to remove anyone from voter rolls, cancel qualified voters, or take any similar action. *See id.* ("[N]o one would be removed from the voter rolls, and no one would be prevented from casting their ballot.").

And "while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, *it does not preclude States from deny[ing] registration based on information in their possession establishing the applicant's ineligibility*." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) (emphasis added & citation omitted)); *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1348 (11th Cir. 2014) (The NVRA "does not in any way handcuff a state from using its resources to ensure that noncitizens are not listed in the voter rolls." "As a result, the 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information[.]").



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

In fact, the Supreme Court has expressly—and recently—held that "*individualized* inquiries" into citizenship "are permitted under federal law during [the 90-day] period." *Dep't of Homeland Sec. v. League of Women Voters*, No. 26A308, --- 609 U.S. ---, 2026 WL 2879700, at *3 (U.S. Sept. 25, 2026). To prevent the Federal Government from conducting such individualized inquiries would "inhibit[its] efforts to assist state and local agencies in the proper administration of the midterm elections." *Id.*

Put differently, the Defendants actions do not seek to enjoin "election rules on the eve of an election." *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (citation omitted). Far from it. Defendants only requested that Washington investigate and *conform* to federal and state election rules concerning noncitizen voting. *See* 18 U.S.C. § 611. Such relief would not cause confusion among voters or otherwise because it concerns how to handle certain ballots once cast. And Washington has laws and systems in place to accommodate the requested relief. *See*, *e.g.*, Wash. Admin. Code §§ 132V-112-036, 045.

But, again, all of this is premature. Nothing has happened yet, and the letter itself – in contrast to any potential lawsuits – does not force anyone to do anything. It certainly does not remove any voter from the rolls. Consequently, Plaintiffs' claims that the Federal Government has exceeded its authority in the challenged actions fall flat and are likely to fail.

**C. Defendants' challenged action does not violate the separation of powers.**

Plaintiffs' separation of powers argument ignores the vital, constitutionally mandated role the Executive Branch plays in carrying out the will of the people through enforcing the laws enacted by Congress. This includes laws related to elections. "Congress may at any time by Law make or alter such Regulations" set by the States in prescribing the "Times, Places and Manner of holding [congressional] Elections." U.S. Const. art. I, § 4, cl. 1. The Elections Clause functions as "a default provision; it invests the States with responsibility for the mechanics of congressional



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

elections, but only so far as Congress declines to pre-empt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "The power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith.'" *Inter Tribal Council*, 570 U.S. at 9.

Congress has exercised that power by passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, which, as codified in 18 U.S.C. § 611, prohibited noncitizens from voting in federal elections. The Executive is charged with enforcing IIRIRA and related laws pertaining to noncitizen voting. Enforcement is not just punishment, it includes investigation into whether a crime has been committed and includes actions designed to prevent criminal activity.

Moreover, the separation of powers is not just top-down. The Elections Clause does not give the States the power to preempt Congress or the Executive's law enforcement role. "Congress's Elections Clause power to establish federal election rules is supreme over, but coextensive with, the States' own regulatory power." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F.Supp.3d 34, 60 (D.D.C. 2026) (citation omitted). It follows then that while States are authorized to determine who is qualified to vote, *see* U.S. Const. art. I, § 2, cl. 1, where Congress has spoken on those qualifications through statutes or constitutional amendments, State qualifications cannot conflict with those set forth by Congress or the Constitution. States, for example, cannot decide that noncitizens are qualified to vote in federal elections, because Congress has expressly prohibited it. States similarly cannot unilaterally decide not to comply with federal law regarding noncitizen voting. If there has been any separation of powers violation here, it comes from Washington's refusal to cooperate with the Executive's law enforcement authority.



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

But this is all a dispute over potential future enforcement actions. Those are not at issue here. Rather, the action Plaintiffs complain of do not constitute interference with the state's duties to administer the upcoming election. Defendants sent one letter and provided elections officials with lists of individuals Defendants have reason to believe are noncitizens who are statutorily ineligible to vote in federal elections. The letter is designed to ensure that the law is followed, and votes of eligible citizens are not diluted—a far cry from interfering with the role and function of the states under the Elections Clause. The Executive's actions do not violate the vertical separation of powers.

**D. Defendants' challenged action does not violate the Tenth Amendment.**

Plaintiffs argue that Defendants have violated the Tenth Amendment through a violation of the anticommandeering doctrine by allegedly threatening state election officials with "federal investigation, retaliation, and lawsuits" to "make elections officials bend the knee to the current administration's policy preferences." Dkt. 12, pg. 22. Plaintiffs are incorrect. Even if Plaintiffs' allegations were true, no violation of the anticommandeering doctrine can exist for alleged mere threats to coerce compliance with a federal policy; instead, a plaintiff must demonstrate, at a minimum, that the federal government is requiring a State "to enact … laws or regulations" or that the federal government is requiring a State "to assist in the enforcement of federal statutes regulating private individuals." *See Reno v. Condon*, 528 U.S. 141, 151 (2000).

The Tenth Amendment "is essentially a tautology" that "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 156-57 (1992). And the anticommandeering doctrine is narrow and "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). A violation of the



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

anticommandeering doctrine must be a proverbial "gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). The Supreme Court has endorsed it in a few instances, but the facts from those cases only magnify that Plaintiffs cannot demonstrate an anticommandeering claim here.

As the Supreme Court stated in *Murphy*, the "pioneering case," 584 U.S. at 471, for the anti-commandeering doctrine is *New York v. United States*, where the Supreme Court held that Congress may not commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program. 505 U.S. at 161. Likewise, in *Printz v. United States*, the Supreme Court considered the constitutionality of a federal statute that imposed on state law enforcement officers the temporary obligation "to perform background checks on prospective handgun purchasers." 521 U.S. 898, 904, 933 (1997). In *Sebelius*, the Court held that requiring States to accept the Affordable Care Act's expansion in health care coverage or else lose all Medicaid funding similarly violated this principle by "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." 567 U.S. at 581-82. And in *Murphy*, the Supreme Court ruled that a provision of the Professional and Amateur Sports Protection Act—which prohibited a State from "authoriz[ing]" sports gambling—ran afoul of the anticommandeering doctrine because it "dictate[d] what a state legislature may and may not do." 584 U.S. at 474.

Here, the facts alleged are nothing like those precedents. Plaintiffs argue that Defendants violate the anticommandeering doctrine through a nondescript campaign to attempt to federalize election administration by threatening federal investigation, retaliation, and lawsuits as a cudgel to make election officials to bend the knee to the current administration's policy preferences" with their evidence primarily being public statements taken out of context. Dkt. 12, pg. 22. Those allegations go far afield of the bounds of the doctrine. Plaintiffs do not allege that Defendants



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

"require[d] [a State] to enact any laws or regulations," or that Defendants have "require[d] state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno*, 528 U.S. at 151.

Instead, all that Plaintiffs have presented is a letter reminding state officials that "federal law prohibits noncitizens from voting in federal elections" and providing evidence of noncitizens who "with a high level of confidence" have voted in Washington elections. Dkt. 12-10.. Judge Bumatay, writing in dissent, recognized the federal government's authority not only to send such letters, but to bring a lawsuit to enforce its interests, if it so chose. *See California*, 2026 WL 3212945, at *24-30 (Bumatay, J., dissenting). In doing so, Judge Bumatay dispelled the notion that the anti-commandeering doctrine prohibits the federal government's authority to do so, let alone to send mere letters. *See id.* at *31-32.

Plaintiffs characterize Defendants' letter as a "coercive ultimatum." Dkt. 12, pg. 22. But so-called ultimatums do not suffice to demonstrate that Plaintiffs must make an unconstitutional choice to enact the federal governments' preferred laws or regulations or that Plaintiffs must assist the federal government in regulating private third parties. *See Reno*, 528 U.S. at 151. Again, the letter itself is not self-executing—it does not compel anyone to do anything.

Ultimately, Plaintiffs also do not argue that 18 U.S.C. § 611 or enforcement of it is somehow unconstitutional, and so long as the federal action is authorized by the Constitution, "the Tenth Amendment gives way." *United States v. Hatch*, 722 F.3d 1193, 1202 (10th Cir. 2013); *see also United States v. Comstock*, 560 U.S. 126, 144 (2010). And a statement that a state action is violating *federal* law and a request that that violation be remedied is not a Tenth Amendment violation. It is a basic feature of a federal system where federal law is ultimately supreme over state actions.

In short, Plaintiffs have not and cannot state a claim for relief under the anticommandeering



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

doctrine.

### III. Plaintiffs Cannot Establish a Risk of Irreparable Harm

Plaintiffs' motion for preliminary relief must also be denied because they do not meet their burden to establish substantial likelihood of irreparable harm. A plaintiff must demonstrate they are likely to suffer irreparable harm in the absence of a preliminary injunction. *See Winter*, 555 U.S. at 20. The Ninth Circuit has cautioned that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

First, Plaintiffs' alleged injuries for anticipated harms are not sufficiently concrete or imminent to establish standing, let alone irreparable harm.

Second, even if standing were not at issue, Plaintiffs' allegations do not establish the necessary threat of irreparable harm. Plaintiffs allege that they face irreparable harm because Defendants' challenged requests "deter voting or cause their ballots to be withheld or rejected and frustrate the organization Plaintiffs' core mission, and impair members' voting rights, which cannot be remedied once an election has passed. Dkt. 12, pgs. 27-28. However, as explained in detail *supra*, there is no present possibility that Washington state officials will act to interfere with Plaintiffs' voting rights based on Defendants' request.

The indisputable fact that Washington state officials are not acting on DOJ's request also breaks the necessary causal chain for the less specific harms alleged by Plaintiffs, including voter disenfranchisement. In the absence of any immediate threat of the allegedly irreparable harm, Plaintiffs fail to satisfy this prong of the preliminary injunction analysis.

### IV. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief

The balance of the equities and the public interest "merge when the Government is the



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

opposing party." *Nken*, 556 U.S. at 435. The government has a compelling interest in combating voter fraud. *See Anderson*, 417 U.S. at 227 ("Every voter in a federal primary election … has a right under the Constiution to have his vote fairly counted, without its being distorted by fraudulently cast votes."). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Id.* "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.*

As the Supreme Court has explained, "[t]he deposit of [fraudulent] ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is immaterial." *Anderson*, 417 U.S. at 227. Accordingly, the government is permitted to "take action to prevent election fraud" before it has occurred. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).

Congress's enactment of 18 U.S.C. § 611 reflects an express mandate to protect those interests by authorizing the Executive Branch to enforce the prohibition on noncitizens voting in federal elections. A court deciding whether to issue an injunction is not free to disregard that legislative "order of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

Here, where Plaintiffs seek an injunction prohibiting the government from carrying out its responsibilities under a "statute[ ] enacted by representatives of [the] people," "it suffers a form of irreparable injury." *Trump* v. *CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation omitted). The Supreme Court emphasized that point recently in staying two lower court injunctions that interfered with the federal government's ability to enhance election integrity. *See California*, 2026 WL 2473573, at *4; *League of Women Voters*, 2026 WL 2879700, at *2-3. Because Plaintiffs' requested injunction would similarly prohibit Defendants from taking appropriate action



UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

to ensure voter integrity in the elections, it is the harm to the United States that is irreparable. *California*, 2026 WL 2473573, at *4; *see Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv.*, 2026 WL 2168004, at *1 (D.C. Cir. July 17, 2026) (finding the federal government demonstrated irreparable harm because "'there can be no do over' once the election occurs") (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).

Americans benefit from an electoral process that prevents tabulation of illegal votes. Plaintiffs' requested injunction would undermine that important goal and frustrate the purpose of 18 U.S.C. § 611 to prevent noncitizen voting. The public interest and equities strongly tip in Defendants' favor and outweigh Plaintiffs' speculative and presently non-existent injuries.

## V. Any TRO Should be Limited, Accompanied by Security, and be Stayed

If the Court concludes that Plaintiffs are entitled to an injunction, the relief granted "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Any preliminary injunction should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff that the Court finds to have established such harm.

Plaintiffs' proposed injunction violates the Supreme Court's decision in *CASA* by seeking universal relief not tailored to any particular Plaintiff. *See CASA, Inc.*, 606 U.S. at 847, 851 (stating that injunctive relief must be no "broader than necessary to provide complete relief to each plaintiff with standing to sue."). Plaintiffs cannot secure broad injunctive relief for all their unknown members, particularly those members who lack Article III standing in their own right. *Summers*, 555 U.S. at 497-500 ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm."). Because "standing is not dispensed in gross," a preliminary injunction must be tailored only to those specific plaintiffs who have established standing "for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (citation



**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

omitted).

Any preliminary injunction should also require Plaintiffs to post security. The Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction issued. The bond amount should consider that the relief Plaintiffs request will prohibit Defendants from taking appropriate action to ensure voter integrity and to investigate and pursue violations of federal election laws. If Plaintiffs fail to comply with Rule 65(c), the Court should deny or dissolve the requested injunctive relief.

Finally, to the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending any appeal, or at a minimum that such relief be administratively stayed for a period of seven days to allow Defendants to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' motion for temporary restraining order and preliminary injunction.

DATED this 12th day of November, 2026.

Respectfully submitted,

*s/ Kristin B. Johnson*
KRISTIN B. JOHNSON, WSBA #28189
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone No. (206) 553-7970
Email: kristin.b.johnson@usdoj.gov

Attorney for Defendants

I certify that this memorandum contains 8,395 words, in compliance with the Local Civil Rules.